**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

BETTER MARKETS, INC.,
*Plaintiff,*
v.
BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM; and
MICHELLE W. BOWMAN, in her official capacity as Vice Chair for Supervision of the Board of Governors of the Federal Reserve System,
*Defendants.*

---

Civil Action No. 1:26-cv-3163

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. This case involves the most important financial stability rulemakings in the United States that directly relate to the risk of another 2008-type financial crisis, which put more than 25 million Americans out of work, caused 16 million foreclosure filings, and, among many other things, resulted in trillions of dollars in bailouts for the financial industry ("2008 Financial Crisis"). Those rulemakings have reportedly been intentionally and fatally rigged by Vice Chair for Supervision Michelle Bowman ("Bowman") and others at the Board of Governors of the Federal Reserve System (the "Fed"), who corrupted the process for unbiased, uninfluenced, and meaningful public input into those rulemakings by, among other things, secretly colluding with, coaching, and directing Wall Street's biggest, most dangerous banks. Bowman and other Fed Officials[1] staged this reported charade to create a misleading record that presented greater support for and less opposition

[1] "Fed Officials" includes any officer, employee, agent, representative, consultant, or contractor of the Fed, including without limitation any member of the Board of Governors, any Reserve Bank personnel, and Fed staff at any level, whether or not identified by name herein.

to Bowman's proposed and preferred rules. The rulemaking process was designed to enable informed and uninhibited public input for agencies to consider in adopting rules that have the force of law—not be a mere formality to give cover for secret collusion or manipulated, pre-determined outcomes.

2. "The ***process of notice and comment rulemaking is not to be an empty charade***" but "a process of reasoned decision-making" that depends on "the opportunity for interested parties to participate in a meaningful way in the discussion and final formulation of rules." *Conn. Light & Power Co. v. NRC*, 673 F.2d 525, 528 (D.C. Cir. 1982) (emphasis added). The Administrative Procedure Act ("APA") requires meaningful and genuine public participation in agency rulemaking that directly impacts the lives and livelihoods of Americans. Disclosure, transparency, adequate public notice, a meaningful opportunity to comment, informed public involvement, unbiased and open-minded consideration of facts and data, unconflicted decisionmakers, and reasoned decision-making are mandated features of the process. As designed, those features imbue the rulemaking process and any resulting rules—as well as the agency and its decisionmakers—with integrity and democratic legitimacy.

3. This process depends on an agency decisionmaker having an open mind to consider and weigh public comments that the agency receives. An agency decisionmaker who demonstrates "an unalterably closed mind on matters critical to the disposition of [a] rulemaking" cannot continue to preside over the rulemaking. *Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1154 (D.C. Cir. 1979).

4. The process likewise depends on the agency's good faith application of these principles, among them, the fundamental duty to "offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 756 (2019). A contrived or pretextual rationale cannot possibly justify agency action and renders judicial review "an empty ritual[.]" *Id.* at 785.

5. In this case, the most powerful banking regulator in America, Vice Chair Bowman, together with other Fed Officials, not only ignored these bedrock principles, but improperly orchestrated a secret scheme to manipulate the rulemakings, thereby intentionally corrupting the public comments on which the rulemaking process depends and fatally infecting the entire process. This has resulted in an incomplete and misleading public rulemaking record—one that has prevented, and will continue to prevent, meaningful public participation in these critical rulemakings, including Better Markets' own participation. If not remedied, this secret scheme will culminate in the finalization of rules based on a corrupted rulemaking process and record, which courts will then have to rely on in subsequent litigation.

6. Bowman and others at the Fed took these bad-faith actions to create a false, misleading, and incomplete public record that minimized opposition and maximized support for Bowman's proposed rules from key Regulated Entities.[2] This scheme sought to justify a pre-determined outcome, regardless of the public input received through the mandated process. That this conduct involved the Fed's most important financial stability rules—those setting how much loss-absorbing capital the largest and most dangerous banks must have—only highlights the seriousness of this corruption.

7. On March 19, 2026, the Fed, together with the Office of the Comptroller of the Currency ("OCC") and the Federal Deposit Insurance Corporation ("FDIC"), issued two joint Notices of Proposed Rulemaking, and the Fed separately issued a third Notice of Proposed Rulemaking ("NPRM").[3] Collectively these three NPRMs (the "2026 Capital

[2] "Regulated Entities" includes any banking organization subject to the 2026 Capital Proposals described herein, together with any affiliate thereof and any officer, director, employee, agent, representative, counsel, consultant, or trade association acting on its behalf.

[3] *See Regulatory Capital Rule: Category I and II Banking Organizations, Banking Organizations With Significant Trading Activity, and Optional Adoption for Other Banking Organizations*, 91 Fed. Reg. 14,952 (Mar. 27, 2026), Docket No. OCC-2026-0265, Fed. Docket No. 1887, FDIC RIN 3064-AF29 (the "ERBA Proposal" or "2026 Basel III Proposal"); *Regulatory Capital Rule (Regulation Q): Risk-Based Capital Surcharges for Global Systemically Important Bank Holding Companies; Systemic Risk Report (FR Y-*

Proposals") constitute a single, coordinated rulemaking initiative purportedly to modernize the regulatory capital framework, which determines how much capital a bank must have to absorb its own losses without failing, going bankrupt, causing a financial and economic crisis, or requiring taxpayer-funded bailouts. The comment period for all three NPRMs closed June 18, 2026.

8. According to reporting, during the open comment period, Bowman held secret, *ex parte* meetings with the chief executive officers ("CEOs") of JPMorgan Chase & Co., Goldman Sachs Group Inc., and other major Regulated Entities, urging, directing, and coaching those executives to maximize their public support for the proposed rule and minimize their opposition.[4] Bowman also reportedly communicated separately through private channels that industry comments should be "limited and specific" and warned against commenters adopting an "aggressive" tone.[5]

9. Apart from the impropriety of these meetings—and likely evidence of Bowman's and the Fed's knowledge of that impropriety—the Fed did not disclose any April 2026 meetings or contacts between Bowman and the CEOs of the biggest banks, as the Fed's own rules and well-established principles of good governance require.[6] The Fed's

---

*15)*, 91 Fed. Reg. 14,908 (Mar. 27, 2026), Fed. Docket No. 1889 and RIN 7100-AH22 (the "G-SIB Surcharge Proposal"); and (c) *Regulatory Capital Rules: Regulatory Capital and Standardized Approach for Risk-Weighted Assets*, 91 Fed. Reg. 15,332 (Mar. 27, 2026), Docket No. OCC-2026-0034 and RIN 1557-AF49, Fed. Docket No. R-1888 and RIN 7100-AH21, FDIC RIN 3064-AG23 (the "Standardized Approach Proposal").

[4] Katanga Johnson, *Fed's Bowman Cautions Wall Street CEOs Against Capital Gripes*, Bloomberg (Apr. 23, 2026), https://www.bloomberg.com/news/articles/2026-04-23/fed-s-bowman-cautions-wall-street-ceos-against-capital-gripes, attached hereto as Exhibit A.

[5] Pete Schroeder & Michelle Price, *Exclusive-US Fed Has Told Big Banks Not to Push Back Aggressively on New Capital Rules*, Reuters (Apr. 17, 2026), https://www.reuters.com/world/us-fed-has-told-big-banks-not-push-back-aggressively-new-capital-rules-2026-04-17/, attached hereto as Exhibit B.

[6] *See, e.g.*, *Home Box Off., Inc. v. FCC*, 567 F.2d 9, 57 (D.C. Cir. 1977) (*per curiam*) ("Once a notice of proposed rulemaking has been issued … any agency official or employee who is or may reasonably be expected to be involved in the decisional process … should refuse to discuss matters relating to the disposition of [the] rulemaking proceeding with any interested private party… . If *ex parte* contacts nonetheless occur, we think that any written document or a summary of any oral communication must be placed in the public

"Transparency Policy," adopted in 2010,[7] requires public disclosure of "written summar[ies] of communications with the public on any matter subject to proposed rulemaking" to "help ensure the process is conducted in a fair, open, and transparent manner[.]"[8]

10. While the Fed did not disclose Bowman's reported meetings, it *did* disclose other, contemporaneously held meetings with some of those same banks that did *not* include Bowman or the bank CEOs.[9]

11. As a result, none of the other interested parties in the rulemaking process, including Better Markets, were provided with notice of Bowman's secret meetings, what was communicated in those meetings, or access to the details of those Communications.[10] Nor can anyone know—not Better Markets or any other interested parties, not the other Fed governors who did not attend the backroom meetings, not even this Court—what type of suggestions, comments, materials, studies, competing positions, or alternative proposals would have been submitted during the comment period but for Bowman's corrupting influence.

12. The 2026 Capital Proposals' importance cannot be overstated. They represent a dramatic and sweeping reversal of the capital-strengthening measures adopted after the 2008 Financial Crisis to prevent another catastrophic financial crash and economic

---

file established for each rulemaking docket immediately after the communication is received so that interested parties may comment thereon.") (cleaned up).

[7] https://www.federalreserve.gov/regreform/reform-milestones2010.htm.

[8] Communications with the Public, BD. OF GOVERNORS OF THE FED. RSRV. SYS., https://www.federalreserve.gov/regreform/communications-with-public.htm.

[9] *See, e.g.,* Meeting Between Staff of the Federal Reserve System and Representative of SIFMA, Citigroup, and Goldman Sachs (Apr. 9, 2026), https://www.federalreserve.gov/regreform/rr-commpublic/sifma-meeting-20260409.pdf.; Meeting Between Federal Reserve Board Staff & Representatives of J.P. Morgan Chase & Co. (Apr. 14, 2026), https://www.federalreserve.gov/regreform/rr-commpublic/jp-morgan-chase-meeting-20260414.pdf.

[10] "Communications" includes any communication of any kind between or among Fed Officials and Regulated Entities, whether written, electronic, oral, or otherwise, including meetings, telephone calls, text messages, and electronic messages, together with any and all documents, notes, memoranda, calendars, drafts, and records relating thereto.

calamity like the so-called Great Recession. The proposed capital reduction would decrease the capital that the largest banks would be required to have to adequately absorb losses in a crisis—and correspondingly would increase the burden on taxpayers and the country when the next crisis arrives. As a result, if the 2026 Capital Proposals are finalized as proposed, the largest and most dangerous banks will have roughly the same capital levels that they had in the years before the 2008 Financial Crisis, when they were at their lowest levels since the Great Crash of 1929.

13. Whether those policy choices are appropriate is a question for democratic deliberation through good-faith application of the process that Congress created: notice, public comment, full and fair consideration of all views on a complete record, reasoned agency deliberation and decision-making, and a final rule based on that public record explaining the outcome and addressing comments. However much Better Markets disagrees with the Fed's 2026 Capital Proposals, this Complaint does not challenge the Fed's authority to finalize those Proposals if done lawfully. What this Complaint challenges is the Fed's bad faith and corrupt subversion of that process, engineered to support a predetermined outcome to reduce capital requirements to pre-2008 levels. The rulemaking was thus conducted not as a genuine deliberation open to all, but as a coordinated charade in which the key Fed decisionmaker colluded with the regulated industry in secret during the legally required public proceeding from which the public was—and remains—excluded and in the dark.

14. By conducting a bad faith and corrupted rulemaking, Defendants' actions "clearly violate[] an important constitutional or statutory right" and thus present the "exceptional circumstances" that would justify enjoining an ongoing unconstitutional proceeding. *Peter Kiewit Sons' Co. v. Corps of Eng'rs*, 714 F.2d 163, 169 (D.C. Cir. 1983). While virtually all rulemaking challenges involve a final rule, the premise of those cases is that the rule resulted from a good-faith application of the APA-mandated rulemaking process—including a rulemaking record that is complete and accurate, upon which courts

can rely when rules are challenged. The features of such a compliant rulemaking process were designed to ensure that rules that would have the force of law were the product of careful and fulsome input, deliberation, and reasoned decision-making. This process reflected the belief that sunlight would be the best disinfectant for incompetent, baseless, or corrupt decision-making by government officials. If the process was corrupted—by a bribe, by fraud, or by denying the public a meaningful opportunity to comment—it would be deficient regardless of the final action taken. Here, Bowman and others at the Fed corrupted the 2026 Capital Proposals' rulemaking process through their active, bad-faith manipulation of the public's ability to meaningfully participate in this critical undertaking and thus denied participants in the rulemaking process, such as Better Markets, due process.

15. Bowman's reported charade makes a mockery of public participation in the rulemaking and of the APA itself—and this "here-and-now injury" is continuing. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023). Under the APA-prescribed process, once the comment period closes, the public and interested parties review and analyze the comment file, consider the arguments made in those comments, plan actions to advance their respective positions before the agency and the public, meet with agency staff and principals like Bowman, and generally engage in advocacy regarding the proposal—all prior to the rule being finalized based on the public rulemaking record assembled and maintained by the agency. In this case, that process has been fatally impaired by Bowman's reported concealed manipulation of the process, leaving the public in the dark and crippling informed public input and advocacy, all in violation of Constitutional guarantees.

16. The consequences are thus concrete and are presently subjecting Better Markets to continuing harm. Since 2012, at substantial expense, Better Markets has participated at every stage of the Basel III rulemaking, submitting comment letters, meeting with Fed officials, conducting research, and advocating for the public interest in a strong capital framework that protects depositors, taxpayers, the banking and financial systems,

and the broader economy. As opposed to that open and transparent public process, Bowman's reported scheme for the 2026 Capital Proposals has taken place in secret backroom meetings in which Bowman manipulated the rulemaking process by ensuring that the public record had adequate and appropriate support for her predetermined outcome, thus denying participants like Better Markets due process.

17. To ensure that the process complies with the Constitution free from bad faith, corruption, bias, manipulation, and prejudgment, and to redress its continuing harm, Better Markets seeks: (1) a declaration that the rulemaking process surrounding the 2026 Capital Proposals was fatally compromised by unconstitutional decisionmaker bias, undisclosed secret *ex parte* contacts, collusion, prejudgment, and bad faith and pretextual administrative record and process manipulation; (2) an injunction requiring withdrawal of the tainted 2026 Capital Proposals developed under Bowman's supervision and direction; and (3) an order requiring the recusal of Bowman and any Fed Officials who participated in these bad-faith and corrupt acts from participating in any rulemaking arising from or related to the 2026 Capital Proposals or any related re-proposals.

## PARTIES

### A. Plaintiff

18. Plaintiff Better Markets, Inc. is a nonprofit, nonpartisan, independent organization, with its principal place of business in Washington, D.C.

19. Better Markets was founded in 2010 in the immediate aftermath of the 2008 Financial Crisis. Better Markets' core mission is to represent the public interest in the federal economic and financial policymaking process with a primary focus on the rulemaking process that implements the laws passed by Congress. Better Markets does this rule-by-rule and agency-by-agency, advocating for a financial system that serves society and supports the productive economy, creating economic opportunity, prosperity, and security for every American while rebuilding the middle class, reducing social and economic injustice, and preventing the financial crashes and taxpayer bailouts that devastate

Main Street families. With a senior, deeply experienced staff, Better Markets represents the American public in the financial rulemaking and policymaking processes, bringing the people's voice into the power centers of Washington.

20. Better Markets is the leading nonprofit public interest organization active in federal financial regulation and rulemaking. Its staff includes experienced banking experts, economists, securities lawyers, and policy specialists who engage substantively in the rulemaking process, including: pre-proposal advocacy and research; commenting and comment file analysis; meeting with agency staff and principals; working with allies and other interested parties; litigation; and post-finalization implementation, oversight, and enforcement.

21. To date, Better Markets has participated in almost 600 rulemakings at financial regulatory agencies, executive departments, and self-regulatory organizations. Better Markets has influenced hundreds of rules, and its analyses has been cited hundreds of times. Its banking policy team focuses specifically on the three agencies responsible for the 2026 Capital Proposals: the Fed, FDIC, and OCC.

22. Since its inception, bank capital requirements have been among Better Markets' highest-priority issues because adequate bank capital is the most important protection against financial crises that devastate America's families, businesses, banking and financial systems, economy, and fiscal condition. Adequate capital is also the most important factor in banks' ability to continue lending through economic downturns, which reduces such downturns' length and severity. Better Markets has consistently advocated for strong, well-calibrated capital requirements as the foundation of a safe and sound banking system that supports broad-based growth in the real economy and actually serves the public rather than merely extracting wealth from it.

23. Since 2012, Better Markets has filed dozens of comment letters to banking regulators that were directly related to proposed adjustments to the bank capital framework. Additionally, Better Markets has engaged in innumerable other advocacy activities

regarding bank capital. For example, Better Markets has researched, drafted, and issued more than 15 fact sheets and reports, participated in more than 15 meetings with banking agency principals, issued dozens of press releases, and conducted more than 50 media interviews related to the banking agencies' capital proposals over the years.

24. Better Markets has participated in every stage of the Basel III rulemaking. Better Markets submitted comment letters on Basel III implementation rules in October 2012. In January 2024 and January 2025, Better Markets submitted comment letters supporting the Fed's 2023 Basel III Proposals, and also met with Fed staff, the then-Vice Chair for Supervision, other Fed governors, and other banking regulators to advocate for implementation of strong capital requirements.

25. Better Markets submitted comments on the 2026 Capital Proposals on June 18, 2026.

26. Better Markets' right to informed, meaningful participation in this rulemaking process was nullified by Defendants' secret and undisclosed misconduct. Defendants' corrupt actions took place during the open comment period, while Better Markets and other public participants were preparing their submissions under the belief that the record was lawfully being assembled pursuant to the APA-required process and not subverted through secret backroom meetings.

27. Better Markets has expended more than 1,000 hours of its staff's time analyzing the 2026 Capital Proposals, drafting over 200 pages of substantive comments, and numerous advocacy pieces, as well as meeting with Fed members and other banking regulators.

28. But because Defendants' reported charade rigged the process to support their pre-determined outcome with the country's largest and most dangerous banks, Better Markets' efforts and resources were expended in a corrupt process and based in part on a fraudulently incomplete record: Defendants omitted the substance of what Vice

Chair Bowman told the bank CEOs in their secret backroom meetings, what representations she made about the rulemaking or the expected path to and content of a finalized rule, or what she or other Fed Officials told the CEOs about the substance and tone of their comments. Contrary to the Fed's own policy and despite disclosing meetings between other Fed staff and big bank officials on the same proposals that occurred during this same period, the Fed has not disclosed those meetings.

29. Moreover, the comment file was itself a curated product of Bowman's coaching and directives: it omitted the positions, data, alternatives, and arguments the banks were told, encouraged, or coached to omit, soften, or abandon because those submissions were never made. Better Markets cannot now reconstruct an uncorrupted comment file, and neither can this Court. Due Process has thus been denied.

30. Consequently, Better Markets has been subjected to continuing harm that extends beyond the closing of the comment period and continues to date. Defendants' reported bad-faith corruption of the public rulemaking process to create the misleading appearance of greater support so they could adopt a predetermined outcome prevents Better Markets from exercising its right to meaningfully advocate against the 2026 Capital Proposals. Better Markets' practice is to review comments and meeting summaries and to respond, directly or indirectly, to their content or otherwise incorporate it into Better Markets' advocacy. Better Markets reviews the comment file, and its subsequent advocacy is informed by what that file contains. For example, during the post-comment period in which Better Markets is engaging with agency decisionmakers and the public, Better Markets may respond to or rebut arguments made in comments with which it disagrees, and it may amplify arguments that are consistent with its position. Defendants' corrupt scheme has deprived Better Markets of its Constitutional right to meaningfully engage in these forms of public advocacy.

**B. Defendants**

31. Defendant Board of Governors of the Federal Reserve System is an independent federal agency established pursuant to the Federal Reserve Act, 12 U.S.C. § 221, headquartered in Washington, D.C. The Fed is the lead federal agency for the 2026 Capital Proposals, and the sole issuing agency for the G-SIB Surcharge Proposal.

32. Defendant Michelle W. Bowman is the Vice Chair for Supervision of the Board of Governors of the Federal Reserve System, the Fed's most senior and lead official for bank supervision and regulatory policy, and the principal architect of the 2026 Capital Proposals. She is sued in her official capacity. While not named as defendants, it is believed that Bowman's actions were materially supported by numerous other Fed Officials, some of whom reportedly accompanied her to the secret meetings she had with the banks discussed herein.

33. As the Vice Chair for Supervision, Bowman wields power and influence over individual banks and the banking industry that is broad, deep, and pervasive. By statute and practice, the Vice Chair for Supervision is the most powerful banking regulator in the United States. Section 10 of the Federal Reserve Act expressly assigns the Vice Chair for Supervision responsibility for leading the Fed's supervisory and regulatory work: "[t]he Vice Chairman for Supervision shall develop policy recommendations for the Board regarding supervision and regulation of depository institution holding companies and other financial firms supervised by the Board, and shall oversee the supervision and regulation of such firms." 12 U.S.C. § 242; *see also* Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 § 1108(a)(1), Pub. L. No. 111-203, 124 Stat. 1376, 2126 (2010) ("Dodd-Frank Act").

34. Bowman thus sets the supervisory agenda for every bank holding company subject to Fed oversight, directs the work of hundreds of Fed examiners stationed on a continuous, day-to-day basis inside the largest banking institutions, and exercises broad

discretion over examination ratings, enforcement referrals, capital and liquidity expectations, merger and acquisition approvals, and resolution planning. Many of those decisions are made informally, are largely insulated from public or judicial view and review, and directly determine whether life for a regulated bank is easy or difficult. As Vice Chair for Supervision, Bowman is figuratively a Damocles Sword hanging over every major bank in the United States, including those that reportedly attended the secret meetings at which she coached and directed them as to the 2026 Capital Proposals' comment process.

35. Bowman's actions have a profound impact on banks' bottom lines. Her supervisory authority, powers, and statements operate alongside the Vice Chair's rulemaking role: a bank executive who hears the Vice Chair speak about a pending rule understands that she also commands a supervisory army and apparatus that will scrutinize that executive's institution every day for years to come. For that reason, private communications between the Vice Chair for Supervision and the chief executives of regulated banks carry an unmistakable—even if unstated—expectation of compliance and the ever-present risk of informal retribution or punishment for failure to follow the Vice Chair's "suggestions."

36. In this case, the Vice Chair reportedly convened one or more secret meetings with the CEOs of the biggest Wall Street banks subject to her supervision at which she directed, coached, and coordinated the banks' comments on the 2026 Capital Rules Proposals. Given her powerful position, the message Bowman sent was undoubtedly clear: the banks were expected to get in line and do as they were told.

## JURISDICTION AND VENUE

37. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under federal law, including the Constitution and the APA.

38. Venue is proper in this District under 28 U.S.C. § 1391(e) as the Fed's principal offices are in the District of Columbia.

39. This action is ripe. The comment period for all three NPRMs closed on June 18, 2026, and the "clear[] violat[ion of] an important constitutional or statutory right" alleged here—bad faith and pretextual agency action, including decisionmaker bias, collusion, and prejudgment of the final rules regardless of public input and the APA mandated process—are complete and fit for judicial resolution. *Peter Kiewit Sons' Co.*, 714 F.2d at 169. Such constitutional claims may be brought "prior to final agency action." *Ass'n of Nat. Advertisers*, 627 F.2d at 1156. The result is that Better Markets has been—and continues to be—deprived of a meaningful opportunity to participate in the APA-mandated rulemaking process by being informed of—and being able to comment on—a complete and uncorrupted public record in a process overseen by an impartial, unbiased decisionmaker. Better Markets does not seek review of a final rule but rather an order reversing the unconstitutional corruption of an ongoing proceeding to redress Better Markets' "here-and-now injury." *Axon Enter.*, 598 U.S. at 191.

**STANDING**

40. Better Markets has Article III standing under direct organizational and informational injury principles and as a direct participant in this rulemaking process.

41. Better Markets has suffered direct organizational injury. A core institutional mission is to ensure that financial regulation and specifically the rulemaking process at the Fed, FDIC, and OCC is conducted in a transparent, accountable, and lawful manner, with genuine consideration of all public input. Defendants' misconduct has directly impaired that core mission by converting the 2026 Capital Proposals, a proceeding in which Better Markets has invested more than 10 years of sustained effort and organizational resources, into a process infected with secret collusive behavior and rigged in favor of the Regulated Entities—in short, a charade. Better Markets has also been forced to expend resources, apart from litigation expense, to combat the biased narrative surrounding the proposals. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

42. Better Markets has additionally suffered concrete informational injury. Its right to participate in the rulemaking through the comment process has been materially impaired by Defendants' reported misconduct corrupting that process. First, their reported failure to publicly disclose and docket the secret *ex parte* Communications with Regulated Entities resulted in a misleading and incomplete public record on which Better Markets relied and continues to rely. Second, and independently, Defendants' directives manipulated the content of the comment record itself. Better Markets was deprived not only of information Defendants concealed, but of the very submissions that a lawful comment period would have generated—the competing positions, data, studies, information, alternative proposals, and industry views that the banks were privately coached, suggested, or instructed not to make. That deprivation cannot be undone by disclosure, because there is no way to know what the record would have contained absent Bowman's directives and unstated threats. Only by removing the unconstitutional taint and restarting the process can the Court remedy this harm.

43. These injuries are concrete and particularized. Better Markets has devoted substantial organizational resources to bank capital rulemakings over more than a decade and has a demonstrable institutional interest in the outcome of the 2026 Capital proceedings. But Better Markets is participating in a corrupted process in which the decisionmakers have reportedly coordinated with Regulated Entities to support a predetermined outcome. As a result, Better Markets submitted its comments on a manipulated record, has engaged (and is currently engaging) in multiple forms of advocacy based on the incomplete and misleading record, and faces the imminent prospect that the Fed will finalize the 2026 Capital Proposals on that same corrupt record absent judicial intervention.

44. These injuries are traceable to Defendants' specific conduct: Bowman's reported secret meetings with JPMorgan, Goldman Sachs and other bank executives in

early April 2026; her private directives limiting comment scope and content while directing what the Regulated Entities should say; and the Fed's failure to docket, disclose, and take corrective action regarding these Communications.

45. These injuries are redressable. An order requiring withdrawal of the tainted 2026 Capital Proposals and recusal of Bowman and other tainted staff from presiding over or participating in any re-proposed rulemakings would restore the procedural integrity that the Constitution and APA requires and to which Better Markets is entitled, and enable it to participate in a rulemaking where all participants receive the genuine consideration the law requires.

## FACTUAL ALLEGATIONS

### A. The Fed

46. The Fed is the nation's central bank. It was established in 1913 to serve as a "bank to banks" that supports the smooth functioning of our banking system and more stable economic growth. The Fed functions through twelve quasi-private Reserve Banks, each of which covers a separate area of the country, known as Federal Reserve districts. This unique quasi-private, district-based structure was designed to ensure that the Fed's operations and its Board of Governors' decisions remain grounded in the economy the Fed supports by incorporating district-specific features and information.

47. Fed decisions are made by its seven-member Board. The Chair and the Vice Chairs have specific statutory responsibilities, and the remaining four are voting governors. The current Board members are Kevin Warsh (Chair), Philip Jefferson (Vice Chair), Michelle Bowman (Vice Chair for Supervision), Lisa Cook, Michael Barr, Christopher Waller, and Jerome Powell.

48. The Federal Reserve Act authorizes the Board to "make all rules and regulations necessary" for the Fed to perform its assigned functions. 12 U.S.C. § 248(i). To be adopted, a rule must be approved by an affirmative vote of a majority of the Board's members. 12 C.F.R. § 261b.2(d). The Board records and publicly reports its votes on proposed

and final rules, identifying the members voting for and against each action.[11] Subject to limited exceptions inapplicable here, when the Board convenes to conduct that business, "every portion of every meeting of the agency shall be open to public observation," 12 C.F.R. §§ 261b.4(a), 261b.5, and Board members are prohibited from "jointly conduct[ing] or dispos[ing] of official agency business other than in accordance with" those rules, *id*. § 261b.3.

49. Congress placed the Vice Chair for Supervision in charge of Board rulemaking: "[t]he Vice Chairman for Supervision shall develop policy recommendations for the Board regarding supervision and regulation of depository institution holding companies and other financial firms supervised by the Board." 12 U.S.C. § 242. The Vice Chair for Supervision serves as chair of the Board's Committee on Supervision and Regulation and as the oversight governor for the Division of Supervision and Regulation. Under the Committee's governing charter, its chair sets the Committee's strategic direction and priorities, and participates in determining its agenda. The Fed's organizational structure places the Vice Chair directly above the Division of Supervision and Regulation, which contains a dedicated Regulation and Policy Group responsible for such matters as prudential regulation, capital, liquidity, and supervisory policy. The Vice Chair for Supervision therefore leads and exercises substantial influence over the specialized staff responsible for performing the core analytical, policy development, and drafting that precedes a Board vote on a regulatory matter.

50. The Vice Chair for Supervision thus controls virtually all aspects of the Board's rulemaking process: whether a rule is developed and proposed, the staff assigned to it, the evidence and assumptions employed, the alternatives considered, the substantive content of the proposed and final rules, the explanations and evidence used to justify the policy decisions, and the information made available to the other governors.

[11] *See* Bd. of Governors of the Fed. Rsrv. Sys., Board Votes, https://www.federalreserve.gov/aboutthefed/boardvotes.htm.

51. Bowman reportedly used her unique position to predetermine the substance of the 2026 Capital Proposals and to engage in secret outside coordination and coaching to shape the public comment process, including the contents of the public comment file. Her conduct thereby deprived the other governors of accurate and complete information necessary to evaluate the proposals independently and to exercise their rulemaking authority through a fully informed deliberative process.

52. Indeed, Defendants' reported actions violate the Fed's "Transparency Policy" that was adopted in 2010 to protect the Fed from the very risks inherent in *ex parte* industry contacts.[12] The Fed suffered from a legitimacy crisis following the 2008 Financial Crisis—particularly public and congressional criticism regarding the Fed's secret use of its emergency lending programs. This lack of transparency contributed to concerns that the regulated industry would utilize informal access to dilute Fed rules implementing Dodd-Frank reforms.

53. In turn, the Fed's "Communications With The Public" webpage provides: "During the Federal Reserve Board's rulemaking process, meetings will take place between the Board and the public—including, for example, representatives of bank organizations, consumer groups, trade associations, researchers, and academics—that allow the Board to gather information and help educate the public on matters subject to agency rulemaking. These meetings contribute to an informed rulemaking process. To help ensure the process is conducted in a fair, open, and transparent manner, Federal Reserve staff will develop a written summary of communications with the public on any matter subject to proposed rulemaking—either a rulemaking proposed by the Board in a notice

[12] The "Transparency Policy" provides: "The Board established a transparency policy with regard to the Dodd-Frank Act implementation on August 12, 2010. This policy requires Federal Reserve representatives who communicate with the public on any matter subject to potential or proposed rulemaking under the DFA to submit a written summary of the meeting or other contact. These summaries will be made available on" the Fed's website. *See* https://www.federalreserve.gov/regreform/reform-milestones2010.htm.

of proposed rulemaking or that the Board is required by law to conduct. The summaries will be posted below."[13]

**B. The Basel III Rulemaking**

54. The Basel Committee on Banking Supervision ("Basel Committee") is headquartered at the Bank for International Settlements in Basel, Switzerland. The Basel Committee is the international standard-setting body for bank regulation, comprising central banks and supervisory authorities from 28 jurisdictions.

55. Following the 2008 Financial Crisis, in which undercapitalized megabanks required trillions of dollars in government support while tens of millions of Americans lost their jobs, homes, and retirement savings, the Basel Committee developed comprehensive capital reforms designed to ensure that major financial institutions have sufficient loss-absorbing capital to minimize the probability of their failure and related taxpayer bailouts.

56. While the initial Basel III framework was agreed upon in 2010 in the immediate aftermath of the 2008 Financial Crisis, the Basel Committee spent the better part of the following decade wrestling with how to address banks' widespread use of internal risk models to calculate appropriate capital levels. Because banks have strong incentives to use those models in ways that minimize their apparent risk—and therefore their capital requirements—regulators found it difficult to compare capital adequacy across institutions or jurisdictions, which severely undermined the credibility of the Basel capital framework.

57. After years of complex and hard-fought multilateral negotiations, the Basel Committee reached a landmark agreement in December 2017 that constrained the use of internal models and introduced an output floor requiring that internally modeled capital

[13] https://www.federalreserve.gov/regreform/communications-with-public.htm.

requirements be no less than 72.5 percent of what standardized approaches would require. This represented a compromise that set the international baseline that U.S. regulators were obligated by their membership in the Basel Committee to implement domestically.

58. Implementation of the final phase of these reforms has been the central contested rulemaking in U.S. banking regulation for several years.

59. In July 2023, the Fed, OCC, and FDIC jointly published a proposed rule under then-Vice Chair for Supervision Michael Barr that would have increased risk-based common equity tier 1 capital requirements ("CET1 requirements") in aggregate across the eight U.S. global systemically important banks ("G-SIBs") by an estimated 19%, with a broader estimated impact of approximately 9% across covered institutions. The proposal followed the March 2023 failures and bailouts of Silicon Valley Bank, Signature Bank, and First Republic, three of the four largest bank failures in U.S. history, each of which demonstrated the catastrophic public costs of inadequate bank capital.[14]

60. In detailed comment letters submitted in January 2024 and January 2025, Better Markets strongly supported the 2023 Basel III NPRM as essential to protecting Main Street American families and highlighting research demonstrating that the largest U.S. banks remain undercapitalized. It also published supporting research, engaged extensively with the media, and met formally with Fed staff, the then-Vice Chair for Supervision, other Fed governors, and others to advocate for its positions.

[14] The March 2023 failures of Silicon Valley Bank, Signature Bank, and First Republic Bank cost the FDIC's Deposit Insurance Fund approximately $35 billion in direct losses (roughly $20 billion for Silicon Valley Bank alone, with Signature Bank and First Republic Bank accounting for the remainder). To replenish the Fund, the FDIC levied a $16 billion special assessment. However, the indirect costs were substantially higher: the Fed's emergency Bank Term Funding Program extended more than $160 billion in loans to prevent further bank runs, and broader credit tightening across the regional banking sector compounded the economic impact.

61. The banking industry engaged in an aggressive advertising and lobbying campaign that was largely credited with preventing finalization of the 2023 Basel III NPRM.[15]

62. Vice Chair Barr resigned from his supervisory role in early 2025, but remains as a governor. Bowman was confirmed as Vice Chair for Supervision in mid-2025.

63. On March 19, 2026, the Fed, together with the OCC and the FDIC, issued the 2026 Capital Proposals.[16] These proposals represent a material deviation from the minimum standards agreed internationally through the Basel Committee's years-long process. Whereas the 2023 proposal would have increased CET1 requirements in aggregate across the G-SIBs by approximately 19% as a buffer against catastrophic loss and financial crashes, the Fed estimates that the 2026 Capital Proposals would reduce aggregate CET1 requirements at the G-SIBs by approximately 4.8%. Better Markets' analysis details how that reduction will be closer to 15%.[17]

64. The comment period for the 2026 Capital Proposals opened March 27, 2026, and closed June 18, 2026.

### C. Bowman's reported coaching and directives to manipulate public comments and ensure swift adoption of the 2026 Capital Proposals

65. During the comment period, while Better Markets and other public participants were preparing comments, Vice Chair Bowman reportedly held secret, *ex parte*, undisclosed meetings with the CEOs and other representatives of the largest regulated banking institutions in the country.

[15] *See, e.g.*, Courtenay Brown, *Behind Wall Street's big win with regulators*, Axios (Sept. 11, 2024), https://www.axios.com/2024/09/11/wall-street-federal-reserve-banking-regulations.

[16] *See supra* n.3.

[17] Christopher Appel & Phillip Basil, Better Markets, *The Federal Reserve's Capital Rule Impact Analysis Is Detached from Reality* (July 23, 2026), https://bettermarkets.substack.com/p/the-federal-reserves-capital-rule.

66. On April 17, 2026, Reuters reported that, although the 2026 Capital Proposals represented a "victory for the industry," "not everyone is happy," specifically pointing to an April 6, 2026 statement from JPMorgan's Jamie Dimon to bank shareholders criticizing the proposals as "'very flawed'" with "aspects [that] were 'un-American.'"[18] Reuters also reported that "[o]ther big bank executives" were forecasting "that the industry would likely seek some changes" and "feedback ... during" the "comment period."[19]

67. Based on accounts from three people with direct knowledge of the Communications, Reuters reported that Bowman and other Fed Officials had privately told big bank executives that they did not expect the industry to stage another "aggressive" push back in pursuit of further capital relief.[20] Rather, "industry comments" were directed to "be limited and specific."[21] Reuters also pointed out that these Communications "underscore[] Bowman's eagerness to finalize the rules" that she had publicly signaled she "hoped to finalize ... this year."[22]

68. The Reuters' report was followed by an April 23, 2026, Bloomberg News article further detailing Bowman's corruption of the rulemaking process.[23] In early April 2026, Bowman met in Washington with the CEOs of major banking institutions "from the likes of JPMorgan Chase & Co. and Goldman Sachs Group Inc."[24] The reporting, attributed to people with knowledge of the meetings, stated that Bowman urged those CEOs to publicly support the capital proposals and to stop seeking further concessions and

[18] Pete Schroeder & Michelle Price, *supra* n.5; Saeed Azhar, *JPMorgan's Dimon warns Iran war may drive inflation and interest rates higher* (Apr. 6, 2026), https://www.reuters.com/business/finance/jpmorgans-dimon-warns-iran-war-may-drive-inflation-interest-rates-higher-2026-04-06/; *see also* https://www.jpmorganchase.com/ir/annual-report/2025/ar-ceo-letters.

[19] Pete Schroeder & Michelle Price, *supra* n.5.

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] Katanga Johnson, *supra* n.4.

[24] *Id.*

carve-outs. She emphasized the overall favorable effect of the proposals on the industry as a whole, encouraging the executives to view the package as a satisfactory resolution even for institutions that, like JPMorgan, felt they had received fewer benefits than competitors. And despite indicating that she was "open to all comments," Bowman instructed the banks to "avoid submitting letters related to the big-bank surcharge and Basel III plans that resemble the industry's demanding tone on stress tests."[25] Previously, some in the industry, in December 2025, provided comments on aspects of a Fed proposal to adjust the "stress tests" the Fed utilizes to gauge banks' ability to weather recessionary conditions, describing them as "overly severe and implausible."[26]

69. According to Bloomberg, after the April meetings, "[s]ome bankers walked away from the exchange with the view that they should limit their public comments" to "constructive feedback that helps to advance the plans, since the capital proposals are unlikely to undergo major changes."[27]

70. Indeed, JPMorgan appears to have gotten the message. Echoing Bowman's directive, the bank's CFO stated on April 14, 2026, that "[e]veryone wants to move on, so our comments will be very focused."[28]

71. As have other bank officials. According to one report, five anonymous executives told Reuters that banks "pared back their asks" after Bowman's meetings and Communications, and that the industry is "keen to move on from a policy fight that has sucked up years of time and energy." One trade group reportedly whittled nearly 100 identified

---

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] Tatiana Bautzer, *JPMorgan sees capital hike in latest Basel fight twist*, Reuters (Apr. 14, 2026), https://www.reuters.com/legal/legalindustry/banks-press-more-capital-relief-make-plans-use-excess-capital-2026-04-14/, attached hereto as Exhibit C.

issues down to "only a few dozen."[29] The principal industry trade group's joint comment letter ran a mere 40 pages—a dramatic reduction from the 314-page joint letter those associations had submitted in opposition to the 2023 Basel III proposals.

72. No summary of these reported secret meetings with JPMorgan, Goldman Sachs, and other banks was placed in the Fed's rulemaking record. And the Fed made no attempt to correct or cure the reported corruption of the rulemaking process.

73. By reportedly coaching, directing, and coordinating the regulated industry's public response to the pending rulemaking, Bowman rigged the process. Leveraging her uniquely powerful position, she told the largest participants, in secret backroom meetings, how she expected them to engage with a proceeding she was simultaneously overseeing—all to produce a record supporting her predetermined outcome. That conduct violates due process: the APA guarantees interested parties a meaningful opportunity to submit whatever written data, views, information, and arguments they choose, 5 U.S.C. § 553(c), and no agency official may secretly instruct the very Regulated Entities subject to the rulemaking on what to say and not say. Thus, the resulting comment file is incomplete and misleading, yet it will serve as the basis for a final rule that appears predetermined regardless of the untainted input received during the comment period. That is a corrupted process, stage-managed in secret by senior Fed Officials, to support a predetermined outcome.

74. Independent observers have characterized the Fed's conduct in similar terms. Jeremy Kress, a former Fed bank policy attorney, was quoted by Bloomberg News as saying that "[t]he Fed is trying to get ahead of any potential in-fighting among the banks and keep them in line so they don't do anything to jeopardize swift finalization."[30]

---

[29] Pete Schroeder & Nupur Anand, *U.S. banks to make final push on capital rule changes as Fed wraps up consultation*, Reuters (June 18, 2026), https://www.reuters.com/legal/transactional/us-banks-make-final-push-capital-rule-changes-fed-wraps-up-consultation-2026-06-18/, attached hereto as Exhibit D.

[30] Katanga Johnson, *supra* n.4.

75. The Fed has not denied the contents of the reports of secret meetings and other Communications to bank CEOs regarding the scope and tone of comments on the proposals despite being contacted for comment by the reporters for each article before publication. Both articles reported: "A spokesperson for the Fed declined to comment."[31]

76. Additionally, Vice Chair Bowman, in response to questioning at a hearing before the House Financial Services Committee on June 4, 2026, did not deny that these secret meetings occurred and testified that she met with bank CEOs in her capacity as Vice Chair for Supervision. She also referred to the Fed's disclosure process for such meetings—an apparent reference to the Transparency Policy.

77. Despite being on notice through the two newspaper reports and Bowman's reference to the disclosure requirement in response to the House Committee's questioning, the Fed has made no public comment on the reports, has posted no public record of these meetings on its website (or elsewhere), and has taken no corrective action publicly in response to the reported misconduct. At the same time, the Fed has disclosed meetings with Fed staff and big bank officials discussing the same proposals (and others) that also occurred in April 2026.[32] The disclosure of these other meetings—apparently involving the Fed staff but *not* the Vice Chair of Supervision, and apparently *not* coaching, directing, or coordinating the industry's response to the proposals—strongly suggests that the Fed is involved in an ongoing coverup of the reported secret meetings.

### D. The Manipulated Administrative Record

78. As a result of this reported misconduct, the administrative record for the 2026 Capital Proposals is tainted and materially incomplete. It does not include: (a) the fact or substance of Bowman's reported early April 2026 secret meetings with the CEOs of JPMorgan Chase and Goldman Sachs and other banking executives; (b) whatever

---

[31] Katanga Johnson, *supra* n.4; Pete Schroeder & Michelle Price, *supra* n.5.

[32] *See, e.g.*, April 9 and 14 Meetings with Representatives of SIFMA, Citigroup, Goldman Sachs and J.P. Morgan Chase & Co., *supra* n.9.

coaching, statements, suggestions, directives, or representations Bowman (and other Fed Officials) made in those meetings about the rulemaking, including its direction, content, disposition, and finalization; (c) the secret instructions to the industry about the tone and substance of their submitted comments; or (d) any other secret substantive, *ex parte*, or off-the-record Communications between Fed Officials and Regulated Entities during the comment-period phase of this rulemaking.

79. The absence of these materials from the record reflects a coordinated and intentional effort to supplant the APA-mandated deliberative process with secret backroom meetings, private assurances, and private directives, while maintaining a public comment record for appearances. A record rigged in this manner has denied Better Markets its right to meaningfully participate in the rulemaking. The APA's fundamental purposes, including ensuring that the public has a meaningful opportunity to participate in the rulemaking process and that any resulting rules are based on the public record, public deliberations, and reasoned decision-making, have been subverted.

80. The observable effect of Defendants' reported manipulation of the public record is reflected in the comments ultimately submitted, which support the conclusion that the banks heard, understood, and acted on Bowman's secret coaching and directives regarding what they should and should not say and do in the comment process.

81. The injury to the public therefore encompasses more than the absence of materials Defendants withheld from it. Because Bowman's reported coaching and directives operated on the comments themselves, influencing what Regulated Entities should and should not say, the affirmative content of the record was manipulated at its source. It is impossible to know what the public record for the 2026 Capital Proposals would have contained had Bowman not secretly instructed bank executives what to say and what not to say: which parties would have commented, which issues they would have raised, what data, studies, alternatives, and analyses they would have submitted. The comments filed

are themselves the product of Defendants' secret directives, and the positions and evidence never filed—or filed only in muted form—appear in the record not at all. Defendants' reported misconduct has thus made the lawful record unknowable: no amount of after-the-fact supplementation can reconstruct what an untainted comment period would have produced. The violation is complete and irremediable by disclosure alone. Only re-proposal and initiation of a new rulemaking overseen by an untainted official can remedy the harm caused by the misconduct alleged herein.

## CLAIMS FOR RELIEF

### COUNT I: Violation of the Fifth Amendment Due Process Clause — Biased Decisionmaker and Intentional Manipulation of a Public Process (U.S. Const. amend. V)

82. Better Markets re-alleges and incorporates by reference all preceding paragraphs as if set forth herein.

83. The Due Process Clause of the Fifth Amendment prohibits a federal official engaged in rulemaking from conducting a proceeding in which she has demonstrated an unalterably closed mind on matters critical to the disposition of the rulemaking. *Ass'n of Nat'l Advertisers*, 627 F.2d at 1154.

84. Bowman's conduct alleged herein clearly and convincingly establishes that she has an unalterably closed mind. Bowman's undisclosed meetings with regulated bank executives, her private coaching and directives to influence the scope, content, and tone of their comments, and her manipulation of the record on which she and other governors must rely demonstrates bias and requires Bowman's recusal.

85. These allegations demonstrate Bowman's pre-judgment on matters that are central to the 2026 Capital Proposals. She secretly assured the CEOs of JPMorgan Chase, Goldman Sachs, and other banks that their complaints had been addressed and that the rule represented an adequate resolution—signaling to the regulated industry that critical aspects of the substantive outcome were settled before the comment period closed. She and other Fed Officials directed those banks to keep their public comments "limited and

specific" and not to oppose the proposals, an instruction that makes sense only if she had already pre-determined critical aspects of the rule and was actively manipulating the record to create the appearance of greater support for those determinations. While each of these Communications standing alone would be cause for grave concern, together, they establish that the comment period was a charade and that Better Markets' comments and subsequent advocacy, however detailed and evidence-based, will not receive genuine consideration. The result will not be an unbiased decisionmaker finalizing a rule based on actual, genuine public comment, but the ratification of a predetermined outcome on a manipulated public record.

86. By telling the Regulated Entities what to say and what not to say, Bowman manipulated the content of the record on which she and other governors will purport to base their decision, engineering a record that publicly appears to support her predetermined outcome. What that record would have contained had she not engaged in such reported conduct is unknowable. Every governor's vote on whether to finalize the 2026 Capital Proposals therefore will rest on that same manipulated record.

87. This corruption of the open and meaningful rulemaking process is a Constitutional defect that renders Bowman (and the other Fed Officials who participated in her corrupt actions) disqualified from presiding over this rulemaking or any rulemaking arising from it, and requires withdrawal and re-proposal of the 2026 Capital Proposals in a new proceeding overseen by an official untainted by the corruption alleged herein.

**COUNT II: Violation of the Fifth Amendment Due Process Clause for Bad-Faith and Pretextual Agency Action (U.S. Const. amend. V)**

88. Better Markets re-alleges and incorporates by reference as if set forth herein all preceding paragraphs.

89. The APA requires that the process of informal rulemaking includes adequate notice of the content and basis for the proposed rule, and provides a meaningful

opportunity for the public to participate through submission of written comments, including data, views, information, and arguments, and otherwise. 5 U.S.C. § 553(b)-(c). The APA also requires that agencies "offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce*, 588 U.S. at 756. A stated rationale that is contrived or pretextual cannot sustain agency action: "[a]ccepting contrived reasons would defeat the purpose of the enterprise," and "[i]f judicial review is to be more than an empty ritual, it must demand something better than the explanation offered for the action taken in this case." *Id.* at 785.

90. Defendants' alleged misconduct, with a coached and stage-managed charade at its core, establishes bad faith and pretext. Critical aspects of the outcome of the 2026 Capital Proposals were privately determined in coordination with the regulated industry before the close of the comment period; Bowman privately assured bank CEOs that their objections had been addressed while she and other Fed Officials directed those same banks to keep their public comments narrow and supportive; and Defendants assembled a public record engineered to create the appearance of greater support for that predetermined outcome than there was. Defendants have indelibly corrupted the rulemaking process, and any justification they offer for adopting the 2026 Capital Proposals will accordingly be contrived—a rationale ostensibly grounded in notice-and-comment deliberation that in fact ratifies determinations made in secret with the very entities the rule is meant to regulate.

91. Independently, these same facts constitute the "strong showing of bad faith or improper behavior" that permits a reviewing court to look beyond the administrative record and inquire into the actual bases of the agency's decision-making. *Dep't of Commerce*, 588 U.S. at 781; *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).

92. The Fed's secret scheme alleged herein denied Better Markets a full and fair opportunity to participate in the rulemaking, to understand the actual bases for the

agency's deliberations and decisions, and to subject those to meaningful judicial review, which itself would be thwarted due to the misleading, incomplete, and corrupt rulemaking record. That record and the process that produced it violate due process and must be set aside. And because the rulemaking process rests on bad faith and any resulting rule would rest on a pretextual justification, the 2026 Capital Proposals are products of an unconstitutional proceeding and must be withdrawn. No final rule may lawfully issue from this tainted process. *See Koniag, Inc. v. Andrus*, 580 F.2d 601, 608-10 (D.C. Cir. 1978) (providing untainted process is proper remedy when original process was tainted by due process violation).

**JURY DEMAND**

Plaintiff Better Markets, Inc., by its undersigned counsel, hereby demands a trial by jury on all Counts of the Complaint so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Better Markets, Inc. respectfully requests that this Court enter judgment in its favor and against Defendants, and specifically:

A. Declare that Defendant Bowman violated the Due Process Clause of the Fifth Amendment by presiding over the rulemaking with a demonstrated closed mind and by intentionally rigging the process to produce a predetermined outcome.

B. Declare that Defendants' conduct of the rulemaking for the 2026 Capital Proposals violated the Due Process Clause of the Fifth Amendment because that conduct was undertaken in bad faith and any justification Defendants offer for a resulting final rule would be pretextual.

C. Issue a preliminary injunction pending final disposition of this action, enjoining Defendants from: (i) finalizing any rule arising from the 2026 Capital Proposals based on the current tainted administrative record; and (ii) Vice Chair Bowman taking any further official action in connection with the capital rulemaking until the Court has ruled on the merits of this Complaint.

D. Order that the 2026 Capital Proposals and any related capital proposals developed under Vice Chair Bowman's supervision as part of the same coordinated rulemaking initiative be withdrawn and that new proposals be developed and issued *de novo*. Disclosure of the withheld Communications and completion of the administrative record cannot cure the violations alleged herein, because the comment record was distorted at its source and what an untainted comment period would have produced cannot be reconstructed; withdrawal and *de novo* re-proposal are therefore the only adequate remedy. Any new proposals shall be developed through a process that: (i) discloses and dockets all prior Communications between Fed Officials and Regulated Entities from March 19, 2026, through the date of withdrawal; (ii) affords Better Markets and all other public participants a full and equal opportunity to submit comments on the new proposals and on the disclosed prior secret Communications; and (iii) is free from the undisclosed *ex parte* contacts, prejudgment, and the manipulated administrative record that tainted the withdrawn proceeding.

E. Order that Vice Chair Bowman and any other Fed Officials who participated in, or were otherwise tainted by, the violations alleged herein be recused from participating in any rulemaking arising from or related to the withdrawn proposals, including any *de novo* re-proposed capital rules addressing the same subject matter. Any new rulemaking process shall be led by a Fed official or other designated official who was not involved in, or otherwise tainted by, the violations alleged herein.

F. Award Better Markets its costs and reasonable attorneys' fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, or other applicable authority.

G. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

**BETTER MARKETS, INC.**

/s/ John P. Mears
John P. Mears, D.C. Bar No. 90005209
jmears@racatty.com
REGAN ASSOCIATES, CHARTERED
1101 Connecticut Avenue NW, Suite 801
Washington, D.C. 20036
(202) 393-6000 ext. 749

/s/ Dennis M. Kelleher
Dennis M. Kelleher, D.C. Bar No. 1009682
*Pro Hac Vice* Pending
Application for Admission Pending
dkelleher@bettermarkets.org
Dominick V. Freda, D.C. Bar No. 470456
*Pro Hac Vice* Pending
Application for Admission Pending
dfreda@bettermarkets.org
Better Markets, Inc.
2000 Pennsylvania Avenue NW, Suite 4008
Washington, D.C. 20006
(202) 618-6464

September 10, 2026