**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BETTER MARKETS, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM and MICHELLE W. BOWMAN (in her official capacity as Vice Chair for Supervision),<br><br>*Defendants*. | Civil Action No. 1:26-cv-3163 (JEB) |

**DEFENDANTS' MOTION TO DISMISS**

Defendants Board of Governors of the Federal Reserve System ("Board") and its Vice Chair for Supervision ("VCS") hereby move to dismiss this action pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of ripeness and standing and for failure to state a claim. In support of their Motion, Defendants respectfully refer the Court to the accompanying Memorandum in Support. A proposed order is attached.

Dated: November 13, 2026

Respectfully Submitted,

*/s/ Katherine Pomeroy*

Joshua P. Chadwick
Assistant General Counsel (#502279)
Katherine Pomeroy
Senior Counsel (#1031557)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
Telephone: (202) 997-9297
katherine.pomeroy@frb.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BETTER MARKETS, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM and MICHELLE W. BOWMAN (in her official capacity as Vice Chair for Supervision),<br><br>*Defendants*. | Civil Action No. 1:26-cv-3163 (JEB) |

# <u>MEMORANDUM IN SUPPORT OF MOTION TO DISMISS</u>

Joshua P. Chadwick
Assistant General Counsel (#502279)
Katherine Pomeroy
Senior Counsel (#1031557)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
Telephone: (202) 997-9297
katherine.pomeroy@frb.gov

*Counsel for Defendants*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... ii

BACKGROUND ..... 1

LEGAL STANDARD ..... 2

ARGUMENT ..... 3

I. The Court Should Dismiss the Complaint Under Rule 12(b)(1) ..... 4

A. Plaintiff's Claims Are Unripe ..... 4

1. Plaintiff's Claims Are Not Fit for Judicial Review ..... 6

2. Plaintiff Faces No Hardship in Waiting for Judicial Review ..... 8

3. Plaintiff's Constitutional Claims Do Not Disturb the Ripeness Analysis ..... 11

B. Plaintiff Lacks Standing ..... 13

1. Plaintiff Has Failed to Show Injury-In-Fact ..... 13

a. Plaintiff Cannot Show Concrete Injury ..... 13

b. Purported Informational Injury Does Not Confer Standing on Plaintiff ..... 16

c. Purported Organizational Injury Does Not Confer Standing on Plaintiff 22

2. Plaintiff Cannot Show Causation and Redressability ..... 25

II. The Court Should Dismiss the Complaint Under Rule 12(b)(6) ..... 29

CONCLUSION ..... 37

## TABLE OF AUTHORITIES

Page

***Cases***

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967), *overruled on other grounds by Califano v. Sanders,*
430 U.S. 99 (1977) .......... 4, 5

*Action for Children's Television v. FCC*,
564 F.2d 458 (D.C. Cir. 1977) .......... 18

*Air Line Pilots Association, International v. Civil Aeronautics Board*,
750 F.2d 81 (D.C. Cir. 1984) .......... 13

*Air Transportation Association of America, Inc. v. National Mediation Board*,
663 F.3d 476 (D.C. Cir. 2011) .......... 7

*Arizona v. Shalala*,
121 F. Supp. 2d 40 (D.D.C. 2000) .......... 12

*Association of American Physicians & Surgeons, Inc. v. FDA*,
539 F. Supp. 2d 4 (D.D.C. 2008), *aff'd*, 358 F. App'x 179 (D.C. Cir. 2009) .......... 15

*Association of National Advertisers, Inc. v. FTC*,
627 F.2d 1151 (D.C. Cir. 1979) .......... 7, 8, 15, 29, 30, 31, 37

*Atlantic States Legal Foundation v. EPA*,
325 F.3d 281 (D.C. Cir. 2003) .......... 8, 11

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 4

*Better Government Association v. Department of State,*
780 F.2d 86 (D.C. Cir. 1986) .......... 6

*C & W Fish Co. v. Fox, Jr.*,
931 F.2d 1556 (D.C. Cir. 1991) .......... 34

*Center for Law & Education v. Department of Education*,
396 F.3d 1152 (D.C. Cir. 2005) .......... 24, 25

*Citizens for Responsibility & Ethics in Washington v. FEC*,
475 F.3d 337 (D.C. Cir. 2007) .......... 19

*Clapper v. Amnesty Intelligence USA*,
568 U.S. 398 (2013) ........ 14, 25, 27

*Committee of 100 on the Federal City v. Foxx*,
140 F. Supp. 3d 54 (D.D.C. 2015) ........ 7

*Conference of State Bank Supervisors v. OCC*,
313 F. Supp. 3d 285 (D.D.C. 2018) ........ 2, 3

*Consumers Union of U.S., Inc. v. FTC*,
801 F.2d 417 (D.C. Cir. 1986) ........ 31, 32

*Continental Air Lines, Inc. v. Civil Aeronautics Board*,
522 F.2d 107 (D.C. Cir. 1974) ........ 5

*Delaware Riverkeeper Network v. FERC*,
243 F. Supp. 3d 141 (D.D.C. 2017), *aff'd*, 895 F.3d 102 (D.C. Cir. 2018) ........ 13, 14, 15

*Delaware Valley Regional Center, LLC v. DHS*,
106 F.4th 1195 (D.C. Cir. 2024) ........ 4

*Delta Air Lines, Inc. v. Export-Import Bank*,
85 F. Supp. 3d 250 (D.D.C. 2015) ........ 11

*Equal Rights Center v. Post Properties, Inc.*,
633 F.3d 1136 (D.C. Cir. 2011) ........ 22, 24

*FDA v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024) ........ 17, 23, 25

*FEC v. Akins*,
524 U.S. 11 (1998) ........ 16

*Finca Santa Elena, Inc. v. U.S. Army Corps of Engineers*,
873 F. Supp. 2d 363 (D.D.C. 2012) ........ 2

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015) ........ 22, 25

*Free Speech for People v. FEC*,
442 F. Supp. 3d 335 (D.D.C. 2020) ........ 18

*Friends of Animals v. Jewell*,
828 F.3d 989 (D.C. Cir. 2016) ........ 18

*Haase v. Sessions*,
835 F.2d 902 (D.C. Cir. 1987) ........................................................................................ 3

*Havens Realty Corporation v. Coleman*,
455 U.S. 363 (1982) ........................................................................................ 22, 23, 24

*Home Box Office, Inc. v. FCC*,
567 F.2d (D.C. Cir. 1977) ........................................................................................ 18

*Housing Study Group v. Kemp*,
736 F. Supp. 321 (D.D.C. 1990) ........................................................................................ 6, 31

*In re FCC 11-161*,
753 F.3d 1015 (10th Cir. 2014) ........................................................................................ 9

*Louisiana Association of Independent Producers & Royalty Owners v. FERC*,
958 F.2d 1101 (D.C. Cir. 1992) ........................................................................................ 35

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)........................................................................................ 13

*Marchiano v. National Association of Securities Dealers, Inc.*,
134 F. Supp. 2d 90 (D.D.C. 2001) ........................................................................................ 12

*Metcalf v. National Petroleum Council*,
553 F.2d 176 (D.C. Cir. 1977) ........................................................................................ 14

*Mississippi Commission on Environmental Quality v. EPA*,
790 F.3d 138 (D.C. Cir. 2015) ........................................................................................ 32

*Mountain States Telephone & Telegraph Co. v. FCC*,
939 F.2d 1021 (D.C. Cir. 1991) ........................................................................................ 4, 5

*Murthy v. Missouri*,
603 U.S. 43 (2024)........................................................................................ 29

*National Association of Home Builders v. EPA*,
667 F.3d 6 (D.C. Cir. 2011)........................................................................................ 24

*National Association of Regulatory Utility Commissioners v. DOE*,
851 F.2d 1424 (D.C. Cir. 1988) ........................................................................................ 10

*National Park Hospital Association v. DOI*,
538 U.S. 803 (2003)........................................................................................ 5, 8

*Natural Resources Defense Council, Inc. v. EPA*,
859 F.2d 156 (D.C. Cir. 1988) ........................................................................ 11

*New York State Inspection, Security & Law Enforcement Employees, District Council 82, AFSCME, AFL-CIO v. New York State Public Employment Relations Board,*
629 F. Supp. 33 (N.D.N.Y. 1984)........................................................................ 29

*Organized Fishermen of Florida, Inc. v. Franklin*,
846 F. Supp. 1569 (S.D. Fla. 1994)........................................................................ 26, 32

*Peter Kiewit Sons' Co. v. U.S. Army Corps of Engineers*,
714 F.2d 163 (1983)........................................................................ 12, 13

*Schmidt v. U.S. Capitol Police Board,*
826 F. Supp. 2d 59 (D.D.C. 2011) ........................................................................ 3

*SEC v. R.A. Holman & Co.*,
323 F.2d 284 (D.C. Cir. 1963) ........................................................................ 8

*Shalala v. Illinois Council on Long Term Care, Inc.*,
529 U.S. 1 (2000)........................................................................ 4

*Sierra Club v. Costle*,
657 F.2d 298 (D.C. Cir. 1981) ........................................................................ 18, 35

*Simmonds v. INS*,
326 F.3d 351 (2d Cir. 2003)........................................................................ 11

*Simon v. Eastern Kentucky Welfare Rights Organization*,
426 U.S. 26 (1976)........................................................................ 25, 26, 27

*Soundboard Association v. FTC*,
888 F.3d 1261 (D.C. Cir. 2018) ........................................................................ 4

*Spann v. Colonial Village, Inc.*,
899 F.2d 24 (D.C. Cir. 1990) ........................................................................ 24

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016)........................................................................ 13

*Stockton v. Brown*,
152 F.4th 1124 (9th Cir. 2025)........................................................................ 11

*Summers v. Earth Island Institute*,
555 U.S. 488 (2009)........................................................................ 14

*Tennessee Cable Television Association v. Tennessee Public Service Commission*,
844 S.W.2d 151 (Tenn. Ct. App. 1992) ............ 15

*Texas v. United States*,
523 U.S. 296 (1998) ............ 11

*Ticor Title Insurance Co. v. FTC*,
814 F.2d 731 (D.C. Cir. 1987) ............ 5, 11, 12

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ............ 16, 17

*Trudeau v. FTC*,
456 F.3d 178 (D.C. Cir. 2006) ............ 3

*United Steelworkers of America, AFL-CIO-CLC v. Marshall*,
647 F.2d 1189 (D.C. Cir. 1980) ............ 29, 30

*Webb v. HHS*,
696 F.2d 101 (D.C. Cir. 1982) ............ 5, 11

*Wertheimer v. FEC*,
268 F.3d 1070 (D.C. Cir. 2001) ............ 19

*Western Wood Preservers Institute v. McHugh*,
925 F. Supp. 2d 63 (D.D.C. 2013) ............ 17, 21

*Withrow v. Larkin*,
421 U.S. 35 (1975) ............ 29

**Statutes**

5 U.S.C. § 704 ............ 4

**Rules**

Fed. R. Civ. P. 12(b)(1) ............ 1, 2, 3

Fed. R. Civ. P. 12(b)(6) ............ 1, 3

**Regulatory Materials**

*2026 Proposed Regulatory Capital Rules*

Notice of Proposed Rulemaking
Regulatory Capital Rule: Category I and II Banking Organizations, Banking Organizations With Significant Trading Activity, and Optional Adoption for Other Banking Organizations, 91 Fed.

Reg. 14952 (Mar. 27, 2026), Docket ID No. OCC-2026-0265 and RIN 1557-AF52, Fed. Docket No. R-1887 and RIN 7100-AH20, FDIC RIN 3064-AF29 ........................................................ 1

Notice of Proposed Rulemaking
Regulatory Capital Rules: Regulatory Capital and Standardized Approach for Risk-Weighted Assets, 91 Fed. Reg. 15332 (Mar. 27, 2026), Docket ID No. OCC-2026-0034 and RIN 1557-AF49, Fed. Docket No. R-1888 and RIN 7100-AH21, FDIC RIN 3064-AG23 ........................... 1

Notice of Proposed Rulemaking
Regulatory Capital Rule (Regulation Q): Risk-Based Capital Surcharges for Global Systemically Important Bank Holding Companies; Systemic Risk Report (FR Y-15), 91 Fed. Reg. 14908 (Mar. 27, 2026), Fed. Docket No. R-1889 and RIN 7100-AH22 .................................................. 1

*Proposed Regulatory Capital Rules (June 2026 Banking Comment Letters)*
*(Fed. Docket Nos. R-1887, R-1888 and R-1889)*

Comment Letter of Bank of America (June 18, 2026), *available at* www.federalreserve.gov/apps/proposals/comments/FR-2026-0009-01-C34 ................................ 9
(R-1889)

Comment Letter of Bank Policy Institute, American Bankers Association, U.S. Chamber of Commerce, Consumer Bankers Association and Financial Services Forum (June 18, 2026), *available at* www.federalreserve.gov/apps/proposals/comments/FR-2026-0007-01-C39....... 9, 10
(R-1887)

Comment Letter of Bank Policy Institute, American Bankers Association and U.S. Chamber of Commerce (June 18, 2026), *available at* www.federalreserve.gov/apps/proposals/comments/FR-2026-0008-01-C194 ........................................................................................... 9, 10
(R-1888)

Comment Letter of Better Markets (June 18, 2026), *available at* www.federalreserve.gov/apps/proposals/comments/FR-2026-0007-01-C102 ............................................................... 15
(R-1887)

Comment Letter of Better Markets (June 18, 2026), *available at* www.federalreserve.gov/apps/proposals/comments/FR-2026-0008-01-C243 ............................................................... 15
(R-1888)

Comment Letter of Citigroup (June 17, 2026, posted June 18, 2026), *available at* www.federalreserve.gov/apps/proposals/comments/FR-2026-0007-01-C30 ................................ 9
(R-1887)

Comment Letter of Citigroup (June 17, 2026, posted June 18, 2026), *available at* www.federalreserve.gov/apps/proposals/comments/FR-2026-0009-01-C29 ................................ 9
(R-1889)

Comment Letter of Goldman Sachs (June 18, 2026), *available at* www.federalreserve.gov/apps/proposals/comments/FR-2026-0007-01-C111 (R-1887) .............................. 9

Comment Letter of Goldman Sachs (June 18, 2026), *available at* www.federalreserve.gov/apps/proposals/comments/FR-2026-0009-01-C66 (R-1889) .............................. 9

Comment Letter of JP Morgan Chase (June 18, 2026), *available at* www.federalreserve.gov/apps/proposals/comments/FR-2026-0009-01-C54 (R-1889) .............................. 9

Comment Letter of Morgan Stanley (June 18, 2026), *available at* www.federalreserve.gov/apps/proposals/comments/FR-2026-0007-01-C72 (R-1887) .............................. 9

Comment Letter of Morgan Stanley (June 18, 2026), *available at* www.federalreserve.gov/apps/proposals/comments/FR-2026-0009-01-C46 (R-1889) .............................. 9

*2023 Prior Capital Rulemaking*

Notice of Proposed Rulemaking
Regulatory Capital Rule: Risk-Based Capital Surcharges for Global Systemically Important Bank Holding Companies; Systemic Risk Report (FR Y–15), 88 Fed. Reg. 60385 (Sept. 1, 2023), Fed. Docket No. R-1814 and RIN 7100-AG65 .............................. 2

Notice of Proposed Rulemaking
Regulatory Capital Rule: Large Banking Organizations and Banking Organizations with Significant Trading Activity, 88 Fed. Reg. 64028 (Sept. 18, 2023), Docket ID No. OCC-2023-0008 and RIN 1557-AE78, Fed. Docket No. R-1813 and RIN 7100-AG64, FDIC RIN 3064-AF29 .............................. 2

Proposed Rule; Extension of Comment Period
Risk-Based Capital Surcharges for Global Systemically Important Bank Holding Companies; Systemic Risk Report (FR Y–15), 88 Fed. Reg. 73772 (Oct. 27, 2023), Fed. Docket No. R-1814 and RIN 7100-AG65 .............................. 2

Proposed Rule; Extension of Comment Period
Regulatory Capital Rule: Large Banking Organizations and Banking Organizations with Significant Trading Activity, 88 Fed. Reg. 73770 (Oct. 27, 2023), Docket ID No. OCC-2023-0008 and RIN 1557-AE78, Fed. Docket No. R-1813 and RIN 7100-AG64, FDIC RIN 3064-AF29 .............................. 2

*Better Markets' Prior Capital Rulemaking Comment Letters (Fed. Docket No. R-1813)*

Comment Letter of Better Markets (Jan. 16, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C307 ............................ 24

Comment Letter of Better Markets (May 16, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C411 ............................ 24

Comment Letter of Better Markets (July 23, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C423 ............................ 24

Comment Letter of Better Markets (Jan. 6, 2025), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C525 ............................ 24

*Sample Banks' Prior Capital Rulemaking Comment Letters (Fed. Docket No. R-1813)*

Comment Letter of Bank of New York Mellon (Jan. 16, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C176 ............................ 21

Comment Letter of Citigroup (Jan. 16, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C258 ............................ 21

Comment Letter of Goldman Sachs (Jan. 16, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C298 ............................ 21

Comment Letter of Goldman Sachs (Jan. 16, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C185 ............................ 21

Comment Letter of Morgan Stanley (Jan. 16, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C273 ............................ 21

Comment Letter of State Street (Jan. 16, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C240 ............................ 21

Comment Letter of Wells Fargo (Jan. 16, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C308 ............................ 21

Comment Letter of JP Morgan Chase (Jan. 16, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C158 ............................ 21

Comment Letter of Bank Policy Institute and American Bankers Association (May 3, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C410......... 21

Comment Letter of Bank Policy Institute and American Bankers Association (July 12, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C419......... 21

Comment Letter of Bank Policy Institute (June 12, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C416 ............................ 21

**Other Authorities**

Board of Governors of the Federal Reserve System, Meeting Between Staff of the Federal Reserve Board, Office of the Comptroller of the Currency, and Federal Deposit Insurance Corporation and Representatives of Better Markets (July 31, 2026), *available at* https://www.federalreserve.gov/regreform/rr-commpublic/better-markets-meeting-20260731.pdf........... 19, 20

Board of Governors of the Federal Reserve System, Meeting Between Staff of the Federal Reserve Board and Representatives of Better Markets (July 30, 2026), *available at* https://www.federalreserve.gov/regreform/rr-commpublic/better-markets-meeting-20260730.pdf................. 20

Board of Governors of the Federal Reserve System, Meeting Between Governor Cook and Staff of the Federal Reserve Board and Representatives of Better Markets (July 15, 2026), *available at* https://www.federalreserve.gov/regreform/rr-commpublic/better-markets-meeting-20260715.pdf ........................................................................................................................ 20

Board of Governors of the Federal Reserve System, Meeting Between Staff of the Federal Reserve Board and Representatives of Morgan Stanley (May 19, 2026), *available at* www.federalreserve.gov/regreform/rr-commpublic/morgan-stanley-meeting-20260519.pdf ..... 19

Board of Governors of the Federal Reserve System, Meeting Between Vice Chair for Supervision Bowman and Staff of the Federal Reserve Board and Representatives of American Express (May 11, 2026), *available at* www.federalreserve.gov/regreform/rr-commpublic/american-express-meeting-20260511.pdf.......................................................................... 19

Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Office of the Comptroller of the Currency, Joint Press Release, *Agencies request comment on proposals to modernize the regulatory capital framework and maintain the strength of the banking system* (Mar. 19, 2026), *available at* www.federalreserve.gov/newsevents/pressreleases/bcreg20260319a.htm.................................................................................................... 1

Board of Governors of the Federal Reserve System, Transcript of Open Board Meeting (Mar. 19, 2026), *available at* www.federalreserve.gov/mediacenter/files/open-board-meeting-transcript-20260319.pdf ......................................................................................... 25, 26, 34, 35

Dennis Kelleher, *Better Markets Sues the Federal Reserve and Vice Chair Bowman for Corrupt Collusion*, Press Conference Remarks and Transcript, Audience Q&A (Sept. 10, 2026), *available at* www.bettermarkets.org/analysis/better-markets-sues-the-federal-reserve-and-vice-chair-bowman-for-corrupt-collusion-press-conference-remarks-and-transcript-audience-qa/ .............. 10

Katanga Johnson, *Fed's Bowman Cautions Wall Street CEOs Against Capital Gripes*, Bloomberg (Apr. 23, 2026), *available at* www.bloomberg.com/news/articles/2026-04-23/fed-s-bowman-cautions-wall-street-ceos-against-capital-gripes........................................ 27, 28, 33, 35
(Plaintiff's Exhibit A)

Michelle W. Bowman, Vice Chair for Supervision, Board of Governors of the Federal Reserve System, Address at the Cato Institute Policy Forum: Basel III and Bank Capital Rules, *Capital Rules for the Real Economy* (Mar. 12, 2026), *available at* www.federalreserve.gov/newsevents/speech/bowman20260312a.htm........................................................................................ 34

Michelle W. Bowman, Vice Chair for Supervision, Board of Governors of the Federal Reserve System, *Statements on Bank Capital Proposals by Vice Chair for Supervision Michelle W. Bowman* (Mar. 19, 2026), *available at* www.federalreserve.gov/newsevents/pressreleases/bowman-statement-20260319.htm............. 35

Michelle W. Bowman, Vice Chair for Supervision, Board of Governors of the Federal Reserve System, Address at the 2025 Community Banking Research Conference, *Welcome Remarks* (Oct. 7, 2025), *available at* https://www.federalreserve.gov/newsevents/pressreleases/bcreg20260319a.htm............................................................................................................. 36

Michelle W. Bowman, Governor, Board of Governors of the Federal Reserve System, Address at the Conference for Community Bankers, *A Conversation on Community Banking* (Feb. 11, 2019), *available at* https://www.federalreserve.gov/newsevents/speech/bowman20190211a.htm .......................................................................................................................... 36

*Oversight of Prudential Regulators, Hearing Before the H. Comm. on Financial Services*, 119th Cong. (June 4, 2026) (statement of Michelle W. Bowman, Vice Chair for Supervision, Board of Governors of the Federal Reserve System), *available at* https://plus.lexis.com/api/permalink/88d29909-bbf4-47fc-b3dd-b9eebd1ff42b/?context=1530671 ......................... 6, 35, 36
(Defendants' Exhibit 1)

Pete Schroeder & Michelle Price, *U.S. Fed Has Told Big Banks Not to Push Back Aggressively on New Capital Rules*, Reuters (Apr. 17, 2026), *available at* www.reuters.com/world/us-fed-has-told-big-banks-not-push-back-aggressively-new-capital-rules-2026-04-17/ .............................. 33
(Plaintiff's Exhibit B)

Pete Schroeder & Nupur Anand, *U.S. Banks to Make Final Push on Capital Rule Changes as Fed Wraps Up Consultation*, Reuters (June 18, 2026), *available at* www.reuters.com/legal/transactional/us-banks-make-final-push-capital-rule-changes-fed-wraps-up-consultation-2026-06-18/ ........................................................................................................................ 28
(Plaintiff's Exhibit D)

Defendants Board of Governors of the Federal Reserve System ("Board") and its Vice Chair for Supervision ("VCS") respectfully submit this memorandum in support of their motion to dismiss Better Markets, Inc.'s September 10, 2026 Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

**BACKGROUND**

On March 19, 2026, the Board, Federal Deposit Insurance Corporation (FDIC), and Office of the Comptroller of the Currency (OCC) issued requests for comment on "three proposals to modernize the regulatory capital framework for banks of all sizes," hereinafter referred to as the "2026 Proposed Regulatory Capital Rules." Joint Press Release, *Agencies request comment on proposals to modernize the regulatory capital framework and maintain the strength of the banking system* (Mar. 19, 2026), *available at* www.federalreserve.gov/news events/pressreleases/bcreg20260319a.htm. The proposals, two of which were issued jointly by all three banking regulators and the third solely by the Board, "would streamline capital requirements and better align regulatory capital with risk while maintaining the safety and soundness of the banking system." *Id.* The notices of proposed rulemaking were published in the Federal Register on March 27, 2026,[1] and the comment period remained open through June 18, 2026. *See id.* The 2026 Proposed Regulatory Capital Rules supplanted proposed rules that the

[1] Regulatory Capital Rule: Category I and II Banking Organizations, Banking Organizations With Significant Trading Activity, and Optional Adoption for Other Banking Organizations, 91 Fed. Reg. 14952 (Mar. 27, 2026), Docket ID No. OCC-2026-0265 and RIN 1557-AF52, Fed. Docket No. R-1887 and RIN 7100-AH20, FDIC RIN 3064-AF29; Regulatory Capital Rules: Regulatory Capital and Standardized Approach for Risk-Weighted Assets, 91 Fed. Reg. 15332 (Mar. 27, 2026), Docket ID No. OCC-2026-0034 and RIN 1557-AF49, Fed. Docket No. R-1888 and RIN 7100-AH21, FDIC RIN 3064-AG23; Regulatory Capital Rule (Regulation Q): Risk-Based Capital Surcharges for Global Systemically Important Bank Holding Companies; Systemic Risk Report (FR Y-15), 91 Fed. Reg. 14908 (Mar. 27, 2026), Fed. Docket No. R-1889 and RIN 7100-AH22.

regulators had previously issued in 2023.[2] The banking regulators have not yet taken final action on the 2026 Proposed Regulatory Capital Rules.

Plaintiff, a nonprofit that engages in advocacy related to the financial system, is opposed to the 2026 Proposed Regulatory Capital Rules. *See* Compl. ¶¶ 13, 19; www.bettermarkets.org/who-we-are/. On September 10, 2026, Plaintiff filed this lawsuit, alleging that comments the VCS purportedly made during meetings with financial institutions demonstrate that she harbors unconstitutionally impermissible bias that warrants her disqualification from the rulemaking process and agency withdrawal of the 2026 Proposed Regulatory Capital Rules. *See id.* ¶¶ 8, 17.

**LEGAL STANDARD**

"A motion to dismiss for lack of standing proceeds under Rule 12(b)(1) because the defect of standing is a defect in subject matter jurisdiction. Similarly, motions to dismiss on ripeness grounds consistently proceed under Rule 12(b)(1) because "[t]he question of ripeness goes to subject matter jurisdiction." *Conf. of State Bank Supervisors v. OCC*, 313 F. Supp. 3d 285, 294 (D.D.C. 2018) (quotations and citations omitted); *see also Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 873 F. Supp. 2d 363, 371 (D.D.C. 2012) (Boasberg, J.) (granting defendant's partial 12(b)(1) motion to dismiss on prudential ripeness grounds). "Because Rule

[2] Regulatory Capital Rule: Risk-Based Capital Surcharges for Global Systemically Important Bank Holding Companies; Systemic Risk Report (FR Y–15), 88 Fed. Reg. 60385 (Sept. 1, 2023), Fed. Docket No. R-1814 and RIN 7100-AG65; Regulatory Capital Rule: Large Banking Organizations and Banking Organizations with Significant Trading Activity, 88 Fed. Reg. 64028 (Sept. 18, 2023), Docket ID No. OCC-2023-0008 and RIN 1557-AE78, Fed. Docket No. R-1813 and RIN 7100-AG64, FDIC RIN 3064-AF29; Risk-Based Capital Surcharges for Global Systemically Important Bank Holding Companies; Systemic Risk Report (FR Y–15), Extension of Comment Period, 88 Fed. Reg. 73772 (Oct. 27, 2023), Fed. Docket No. R-1814 and RIN 7100-AG65; Regulatory Capital Rule: Large Banking Organizations and Banking Organizations with Significant Trading Activity, 88 Fed. Reg. 73770 (Oct. 27, 2023), Docket ID No. OCC-2023-0008 and RIN 1557-AE78, Fed. Docket No. R-1813 and RIN 7100-AG64, FDIC RIN 3064-AF29.

12(b)(1) concerns a court's ability to hear a particular claim, the court must scrutinize the plaintiff's allegations more closely when considering a motion to dismiss pursuant to Rule 12(b)(1) than it would under a motion to dismiss pursuant to Rule 12(b)(6)." *Schmidt v. U.S. Capitol Police Bd.*, 826 F. Supp. 2d 59, 65 (D.D.C. 2011). "In deciding a motion to dismiss challenging the Court's subject-matter jurisdiction under Rule 12(b)(1), a court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff, but courts are not required to accept inferences unsupported by the facts or legal conclusions that are cast as factual allegations." *Id.* "In 12(b)(1) proceedings, it has been long accepted that the judiciary may make appropriate inquiry beyond the pleadings to satisfy itself on authority to entertain the case." *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) (quotations omitted); *see also Conf. of State Bank Supervisors*, 313 F. Supp. 3d. at 294 (a court "may consider documents outside the pleadings to evaluate whether it has jurisdiction").

When considering a Rule 12(b)(6) motion, the court "must treat the complaint's factual allegations as true and must grant plaintiff the benefit of all reasonable inferences from the facts alleged," but it is "not bound to accept as true a legal conclusion couched as a factual allegation, or to accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (quotations omitted).

## ARGUMENT

Plaintiff asserts two counts alleging violation of the Fifth Amendment due process clause. The first claims "biased decisionmaker and intentional manipulation of a public process" and the second claims "bad-faith and pretextual agency action." *See* Compl. at 27, 29. Although the second of these closely related counts cites to provisions of the Administrative Procedure Act (APA) and authorities interpreting it, *see* Compl. at 28-29, Plaintiff has not lodged an APA claim

given the lack of final agency action. *See id.* ¶¶ 89, 91; *Delaware Valley Reg'l Ctr., LLC v. DHS*, 106 F.4th 1195, 1204 (D.C. Cir. 2024) ("Under the APA, courts may review only 'final agency action.'" (quoting 5 U.S.C. § 704)); *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) ("[T]wo conditions must be satisfied for agency action to be 'final': First, the action must mark the consummation of the agency's decisionmaking process"; "second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." (quotations omitted)); *see also Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1274 n.6 (D.C. Cir. 2018) (presence of constitutional claims does not relax the Supreme Court's two-part *Bennett* test for final agency action).

Given this undisputed lack of final agency action, and for the additional reasons discussed below, Plaintiff's constitutional due process claims fail on three independent grounds: (1) lack of ripeness, (2) lack of standing, and (3) failure to state a claim.

## I. The Court Should Dismiss the Complaint Under Rule 12(b)(1)

### A. Plaintiff's Claims Are Unripe

The "basic rationale" of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). "[T]o enable determination as to when judicial intervention is warranted, courts look to see whether [1] the issues are fit for judicial decision and [2] whether deferral of review will visit hardship upon a party." *Mountain States Tel. & Tel. Co. v. FCC*, 939 F.2d 1021, 1028 (D.C. Cir. 1991) (citing *Abbott Lab'ys*); *see also Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 13 (2000) (exception to ripeness

doctrine when the "legal question is 'fit' for resolution and delay means hardship" (citing *Abbott Lab'ys*, 387 U.S. 148–49)).

First, "[i]n assessing fitness for judicial review, it is important to consider whether agency policy has crystallized, whether the issue is purely legal, and whether the agency or the court will benefit from postponing review until the question arises in some more concrete and final form." *Mountain States*, 939 F.2d at 1028 (citations omitted). If the position is likely to be "modified before it is actually put into effect, then its review wastes the court's time and interferes with the process by which the agency is attempting to reach a final decision." *Cont'l Air Lines, Inc. v. Civil Aeronautics Board*, 522 F.2d 107, 125 (D.C. Cir. 1974) (en banc).

Second, ripeness "always requires some showing of hardship." *Ticor Title Ins. Co. v. FTC*, 814 F.2d 731, 755 (D.C. Cir. 1987) (Opinion of Green, J.).

> The doctrine is typically not concerned with respecting congressional determinations as to the relative balance of specific harms and interests, but focuses instead on the institutional relationships of courts and agencies, and the competence of courts to resolve disputes without further refinement of the issues. Since administrative agencies, as autonomous bodies, always have an interest in avoiding judicial interruption of their proceedings, courts require some showing of hardship to warrant judicial intrusion into the agency's domain, even where the issues are otherwise generally fit for review. . . . [W]ithout the requirement of some showing of hardship, courts could interrupt agency proceedings whenever judges felt competent to decide the question under agency consideration. Such a rule would make agencies but a poor relation of the courts, reducing their function in many instances to the mere collection of data and refinement of issues for judicial resolution.

*Id.* at 755–56 (quotation omitted). "[I]f the hardship to the parties is slight, only a minimum showing of countervailing judicial or administrative interest is needed to tip the balance against judicial review," *Webb v. HHS*, 696 F.2d 101, 106 (D.C. Cir. 1982) (quotation omitted), and the Supreme Court has rejected the notion that "mere uncertainty as to the validity of a legal rule" may constitute hardship for purposes of ripeness analysis. *Nat'l Park Hosp. Ass'n v. DOI*, 538 U.S. 803, 811 (2003).

As discussed below, Plaintiff fails both prongs of the ripeness evaluation.

**1. Plaintiff's Claims Are Not Fit for Judicial Review**

Here, Plaintiff raises constitutional challenges to a *pending* rulemaking. The 2026 Proposed Regulatory Capital Rules have not been crystalized into final rules, and the Board retains ample opportunity to determine whether to modify the proposed rules based on the hundreds of comments it received—whether favorable or unfavorable—including those from banks, Plaintiff, and others. It is thus premature for a court to review whether the rules at issue will be impacted by alleged bias or alleged bad faith harbored by the Board's VCS (which she has firmly denied), or any other of the Board's seven Governors. And because two of the three rules were proposed in conjunction with the OCC and FDIC, there will be input and evaluation from those agency heads in addition to final review by the members of the Board. *Compare Hous. Study Grp. v. Kemp*, 736 F. Supp. 321, 332 (D.D.C. 1990) (dismissing claim on ripeness grounds where defendants had "not actually commenced, much less completed, rulemaking proceedings"), *with Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 93 (D.C. Cir. 1986) (finding fitness for judicial review because "the agency action in question has taken its final form" and the "guidelines at issue have been in effect well over two years").

Moreover, the assessment of whether the VCS conveyed an "unalterably closed mind" about the 2026 Proposed Regulatory Capital Rules to the banks—Plaintiff's central but disputed allegation—is not a purely legal question. *Compare* Compl. ¶¶ 34, 83, *with Oversight of Prudential Regulators: Hearing Before the H. Comm. on Financial Services*, 119th Cong. (June 4, 2026) (statement of Michelle W. Bowman, Vice Chair for Supervision, Bd. of Governors of the Fed. Reserve Sys.), *available at* https://plus.lexis.com/api/permalink/88d29909-bbf4-47fc-b3dd-b9eebd1ff42b/?context=1530671, attached as Defendants' Exhibit 1 (VCS testimony to Congress that "I did not direct anyone about their comments for the rule"). Indeed, the

Complaint demonstrates that Plaintiff does not have evidence to support the speculative claims it raises given that it uses the terms "reported" and "reportedly" thirty-six times in describing statements allegedly showing bias, and its delivery of litigation preservation notices to eight different banks underscores the point. *See* Defendants' Exhibit 2 (notices for Bank of New York Mellon, Bank of America, Citigroup, Goldman Sachs, Morgan Stanley, State Street, Wells Fargo, and JP Morgan Chase). Any such claims, to the extent they need be adjudicated at all, *see* Section I.B and II *infra*, should presumptively be resolved through a review of the administrative record *after* final agency action, if any, which could of course lead Plaintiff to modify its claims or to their elimination altogether. *See Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 486–88 (D.C. Cir. 2011) (affirming denial of discovery into possible bias by decisionmaker because the sole fact relied upon by the trade organization "f[ell] short of the 'strong' evidence of 'unalterably closed minds' necessary to justify discovery in the Board's decisionmaking process"); *Comm. of 100 on the Fed. City v. Foxx*, 140 F. Supp. 3d 54, 59 (D.D.C. 2015) ("Discovery is generally not available in cases reviewing agency action.").

Plaintiff points to *Association of National Advertisers, Inc. v. FTC*, 627 F.2d 1151 (D.C. Cir. 1979), to support its position that the present dispute is ripe for adjudication. Compl. ¶ 39. But the jurisprudential analysis in that case is wholly distinguishable. There, the court permitted consideration of a constitutional due process challenge to a pending rulemaking—which it ultimately rejected as unfounded—where the plaintiff alleged impermissible bias by a decisionmaker based on known, public statements previously made by the decisionmaker, something that does not exist here. 627 F.2d at 1155–57. When finding that the dispute was fit for judicial review, the court specified that "the challenge to [the decisionmaker's] further participation involves no disputed factual issues that demand the creation of a better

administrative record. The agency has had an adequate opportunity to explain why [the decisionmaker] need not be recused." *Id.* at 1156–57 (explaining that a record had already been created because the plaintiffs previously presented the disqualification issue to the agency). The court noted that "the doctrine that permits review of a disqualification claim prior to final agency action is restrictive," and "extremely narrow," but concluded that the claims could be heard "[u]nder the particular circumstances of th[e] case." *Id.*

By contrast, Plaintiff seeks to engage in extensive factfinding in the present matter, even though courts have repeatedly rejected this approach before the record of the agency's proceedings is complete. *See, e.g.*, *Nat'l Park Hosp. Ass'n*, 538 U.S. at 812 (dismissing challenge to regulation where the Court "believe[d] that further factual development would significantly advance our ability to deal with the legal issues presented"); *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 285 (D.C. Cir. 2003) (holding that additional factual developments would be "likely to assist the court in deciding the case" and finding claims unripe); *cf. SEC v. R.A. Holman & Co.*, 323 F.2d 284, 287 (D.C. Cir. 1963) ("[A]dministrative proceedings cannot be stopped to allow for excursions in the courts with prolonged evidentiary hearings. . . . To stay the administrative processes while a court was engaged in an extended inquiry into the claimed disqualification of members of the administrative body could lead to a breakdown in the administrative process which has long been criticized for its slow pace."). This Court should likewise reject Plaintiff's premature claims.

**2. Plaintiff Faces No Hardship in Waiting for Judicial Review**

Not only is this matter not presently fit for judicial review, but no hardship will come to Plaintiff if it must wait until after issuance of final rules. Although Plaintiff alleges that it "continues" to be "deprived of a meaningful opportunity to participate in the APA-mandated rulemaking process by being informed of—and being able to comment on—a complete and

uncorrupted public record," the comment window for the 2026 Proposed Regulatory Capital Rules closed well before commencement of this lawsuit. Compl. ¶ 39. Because there is no right to submit further comments, there can be no ongoing harm with respect to Plaintiff's submission of comments to the proposed rules.

Plaintiff's suggestion that it faced (and is currently facing) harm due to an inability to comment on hypothetical feedback that banks allegedly would have submitted if not for the VCS's involvement should similarly be rejected. First, Plaintiff never had a right to respond to the banks' comments in the first place. *See In re FCC 11-161*, 753 F.3d 1015, 1138–39 (10th Cir. 2014) ("The APA ensures an opportunity to comment on the notice of proposed rulemaking, but not to reply to the rulemaking record."). Second, even if there was a right to respond to any early-filed comment letters, public records show that the banks that received litigation hold notices from Plaintiff, as well as prominent bank-related advocacy groups including the Bank Policy Institute, American Bankers Association, and U.S. Chamber of Commerce, did not have their comment letters to the 2026 Proposed Regulatory Capital Rules publicly posted until June 18, 2026—the deadline for submission. *See* "June 2026 Banking Comment Letters" (collectively).[3] Thus, under no circumstances would Plaintiff have had an ability to comment on

[3] Comment Letter of Bank of America (June 18, 2026), *available at* www.federalreserve.gov/apps/proposals/comments/FR-2026-0009-01-C34; Comment Letters of Citigroup (June 17, 2026, posted June 18, 2026), *available at* www.federalreserve.gov/apps/proposals/comments/FR-2026-0007-01-C30 and www.federalreserve.gov/apps/proposals/comments/FR-2026-0009-01-C29; Comment Letters of Goldman Sachs (June 18, 2026), *available at* www.federalreserve.gov/apps/proposals/comments/FR-2026-0007-01-C111 and www.federalreserve.gov/apps/proposals/comments/FR-2026-0009-01-C66; Comment Letters of Morgan Stanley (June 18, 2026), *available at* www.federalreserve.gov/apps/proposals/comments/FR-2026-0007-01-C72 and www.federalreserve.gov/apps/proposals/comments/FR-2026-0009-01-C46; Comment Letter of JP Morgan Chase (June 18, 2026), *available at* www.federalreserve.gov/apps/proposals/comments/FR-2026-0009-01-C54; Comment Letters of Bank Policy Institute, American Bankers Association, U.S. Chamber of Commerce, Consumer Bankers Association and Financial Services Forum (for Docket No. R-1887) (June 18, 2026), *available at* www.federalreserve.gov/

these institutions' submissions, regardless of their content. Plaintiff is thus left with its alleged deprivation of the opportunity to be fully informed by an "uncorrupted" record—an alleged harm that is not made any worse by waiting until this matter is ripe for review.

Plaintiff's public statements about this lawsuit are consistent with the conclusion that the Complaint fails to meet the hardship prong of the ripeness test. When asked why it was suing now rather than waiting for completion of the rulemaking process, Plaintiff merely stated that the alleged "due process constitutional violation has happened, is ongoing, and will continue," without making any reference to a direct or immediate impact on itself or any of its constituents. *See* Dennis Kelleher, *Better Markets Sues the Federal Reserve and Vice Chair Bowman for Corrupt Collusion*, Press Conference Remarks and Transcript, Audience Q&A (Sept. 10, 2026), *available at* www.bettermarkets.org/analysis/better-markets-sues-the-federal-reserve-and-vice-chair-bowman-for-corrupt-collusion-press-conference-remarks-and-transcript-audience-qa/. Moreover, Plaintiff articulated an intent to challenge the rulemaking process again if and when the proposed rules are finalized, in addition to the substance of the final regulations, which further undermines a finding of hardship. *See id.* ("[A]s you know, the future is difficult to predict, but I think it's a fairly good bet that we will be challenging the substance of the rule as well as the process related to the rule when it's enacted. . . . [T]his conduct and these actions violate innumerable aspects of the Administrative Procedures [sic] Act, and at the appropriate time, we'll be asserting those claims too . . . ."); *Nat'l Ass'n of Regulatory Util. Comm'rs v. DOE*, 851 F.2d 1424, 1430 (D.C. Cir. 1988) (holding claims unripe where "judicial economy

---

apps/proposals/comments/FR-2026-0007-01-C39 and www.federalreserve.gov/apps/proposals/comments/FR-2026-0008-01-C194.

favors considering all challenges . . . , both substantive and procedural, in one proceeding"); *Delta Air Lines, Inc. v. Exp.-Import Bank*, 85 F. Supp. 3d 250, 272 (D.D.C. 2015) (same).

Where the only hardship a party will endure as a result of delaying consideration of the issue is the burden of filing another suit, dismissal on ripeness grounds is appropriate. *Webb*, 696 F.2d at 107 (dismissing suit as unripe after finding no hardship imposed by delayed consideration of the legal issue, as contrasted with situations where a party's conduct is "directly governed by the regulation [at issue] and stiff penalties [a]re attached for noncompliance"); *see also Nat. Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 166 (D.C. Cir. 1988) ("[N]either the possibility that the petitioner may have to make capital budgeting decisions under a cloud of uncertainty, nor the fact that it may incur future expense in challenging the regulations in a later permit or enforcement proceeding, will qualify as hardship." (citations omitted)); *cf. Ticor Title Ins.*, 814 F.2d at 758 ("It may be, as a practical matter, that . . . most constitutional challenges to ongoing agency proceedings will be dismissed as premature."). Because Better Markets and its constituents are "not required to engage in, or to refrain from, any conduct" while the 2026 Proposed Regulatory Capital Rules remain pending, there can be no hardship at this juncture. *See Atl. States Legal Found.*, 325 F.3d at 285 (quoting *Texas v. United States*, 523 U.S. 296, 301 (1998)).

### 3. Plaintiff's Constitutional Claims Do Not Disturb the Ripeness Analysis

The assertion of constitutional claims does not permit evasion of the ripeness analysis. *Stockton v. Brown*, 152 F.4th 1124, 1149 (9th Cir. 2025) ("The prudential considerations of ripeness are amplified where constitutional issues are concerned." (quotation omitted)); *Simmonds v. INS*, 326 F.3d 351, 357 (2d Cir. 2003) ("Prudential ripeness is . . . a tool that courts may use to enhance the accuracy of their decisions and to avoid becoming embroiled in

adjudications that may later turn out to be unnecessary or may require premature examination of, especially, constitutional issues that time may make easier or less controversial."); *cf. Ticor Title Ins. Co.*, 814 F.2d at 748 n.4. (Opinion of Williams, J.) ("cases seem to apply finality requirements to constitutional claims with full force"). Plaintiff's reliance on *Peter Kiewit Sons' Co. v. U.S. Army Corps of Engineers*, 714 F.2d 163, 169 (1983), is therefore misplaced. *See* Compl. ¶ 39. In that case, the D.C. Circuit articulated the general principle that "[f]inality and exhaustion requirements *may* be dispensed with *only* where the agency has *very clearly* violated an important constitutional or statutory right." *Peter Kiewit Sons' Co.*, 714 F.2d at 169 (quotation omitted) (emphases added). This statement focuses on finality and exhaustion and does not suggest a special exception for ripeness. *See, e.g.*, *Ticor Title Ins. Co.*, 814 F.2d at 745–46 (explaining that finality may be part of exhaustion, ripeness, or jurisdiction, and that while "exhaustion is directed to the steps a litigant must take, finality looks to the conclusion of activity by the agency," and "ripeness depends on the fitness of issues for judicial review"); *Arizona v. Shalala*, 121 F. Supp. 2d 40, 47 (D.D.C. 2000) ("Although essentially intertwined the three doctrines are distinct in that finality relates to the conclusion of action by the agency, exhaustion addresses the use of administrative remedies available to redress such action, and ripeness focuses on the fitness of issues for judicial review.").

Even if such an exception did apply to the ripeness analysis, Plaintiff cannot survive dismissal because there is currently no clear violation of an important constitutional right, the standard set forth in the *Peter Kiewit* case. Indeed, there, the court "conclude[d] that there was no clear violation of Kiewit's due process rights to justify the district court's extraordinary interruption of the administrative process." 714 F.2d at 170; *accord Marchiano v. Nat'l Ass'n of Sec. Dealers, Inc.*, 134 F. Supp. 2d 90, 94–95 (D.D.C. 2001) (applying the standard set forth in

*Peter Kiewit Sons' Co.* when determining that, "[b]ased on the claims raised in this complaint, it is not 'very clear' that [the] Defendants violated any constitutional rights"). Here, Plaintiff has lodged a series of speculative allegations based on news reports that fail to establish that any constitutional right has been violated, and such allegations of constitutional harm are insufficient to merit judicial intervention into the Board's ongoing rulemaking. *Id.*; *cf. Air Line Pilots Ass'n, Int'l v. Civil Aeronautics Board*, 750 F.2d 81, 88 (D.C. Cir. 1984) ("The usual presumption in favor of withholding judicial review until after final agency action applies with even greater force in the context of a bias claim than it does with a claim of unreasonable delay.").

### B. Plaintiff Lacks Standing

A plaintiff invoking federal jurisdiction bears the burden of establishing the "irreducible constitutional minimum" of standing by demonstrating that it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)).

#### 1. Plaintiff Has Failed to Show Injury-In-Fact

##### *a. Plaintiff Cannot Show Concrete Injury*

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Lujan*, 504 U.S. at 560). "Particularization is necessary to establish injury in fact, but it is not sufficient. An injury in fact must also be 'concrete.'" *Id.* at 339. "[A]dministrative decision-maker bias is a subset of procedural due process, not an independent area of law." *Delaware Riverkeeper Network v. FERC*, 243 F. Supp. 3d 141, 152 (D.D.C. 2017), *aff'd*, 895 F.3d 102 (D.C. Cir. 2018). "The Supreme Court has explicitly rejected the argument that a procedural injury alone is sufficient for standing: 'deprivation of a procedural

right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing. Only a person who has been accorded a procedural right to protect *his concrete interests* can assert that right without meeting all the normal standards for redressability and immediacy.'" *Id.* at 149 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)) (emphases in original).

Beyond a grievance with the process for propounding as-of-yet unfinalized and still uncertain rules about the regulatory capital framework, *see* Compl. ¶¶ 6–7, Plaintiff posits no imminent injury to a concrete interest. Plaintiff's theory is that it has been injured by the participation of an allegedly biased decisionmaker who made alleged comments to a subset of regulated entities who in turn allegedly softened their negative comments to the 2026 Proposed Regulatory Capital Rules in a manner that will artificially create "a record that publicly appears to support [the VCS's] predetermined outcome" such that "[e]very [G]overnor's vote on whether to finalize the 2026 Capital Proposals . . . will rest on that same manipulated record." *See id.* ¶ 86. Such a theory is akin to a case where a citizen consumer "claim[ed] to have been injured on the theory that the challenged structure of the [Council] causes it to make certain biased recommendations, which in turn cause[d] government agencies to adopt policies favoring the petroleum industry, which in turn cause[d] the appellants to be injured as consumers and citizens." *Metcalf v. National Petroleum Council*, 553 F.2d 176, 185 (D.C. Cir. 1977). When rejecting that standing had been satisfied in that context, the court explained that "[t]he major defect in the allegations related to consumer and citizen injury is that the occurrence of the asserted harm is speculative and conjectural in the purest sense." *Id.* at 186; *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (holding that a theory of standing that "relies on a highly attenuated chain of possibilities" fails to "satisfy the requirement that threatened injury

must be certainly impending”). Contrary to the standing analysis in *Delaware Riverkeeper Network*, 243 F. Supp. 3d at 150, Plaintiff has not submitted any affidavits or made any allegations in support of an alleged injury or adverse impact beyond injury to the rulemaking process itself. *See Ass’n of Am. Physicians & Surgeons, Inc. v. FDA*, 539 F. Supp. 2d 4, 21 (D.D.C. 2008) (rejecting standing argument that plaintiffs “were denied the opportunity to participate in notice and comment rulemakings” because the alleged procedural injury was insufficient to demonstrate “injury suffered by the organizations themselves” or “a concrete injury in relation to their members”), *aff’d*, 358 F. App’x 179 (D.C. Cir. 2009).

Moreover, Plaintiff’s theory is puzzling insofar as it posits injury from the submission of watered-down comments by certain banks. Had the banks submitted negative comments about the 2026 Proposed Regulatory Capital Rules above and beyond those actually submitted, they would have very likely been in further support of the banking industry and antithetical to Plaintiff’s substantive position. *Compare generally* June 2026 Banking Comment Letters, *with* Plaintiff’s June 2026 Comment Letters.[4] Changes made to the proposed rules to accommodate these hypothetical comments would have provided more frustration to Plaintiff’s purpose than any supposed restraint exercised by the banks. Thus, if anything, the VCS’s alleged actions would appear to be *helpful* to Plaintiff’s interests. *Cf. Tennessee Cable Television Ass’n v. Tennessee Pub. Serv. Comm’n*, 844 S.W.2d 151, 165–66 (Tenn. Ct. App. 1992) (rejecting request for disqualification of Commission members under the *Association of National Advertisers* standard by citing an order where the Commissioners noted their “open minds” and pointing out that the policy implicated in the order favored the plaintiff’s industry).

---

[4] Comment Letters of Better Markets (June 18, 2026), *available at* www.federalreserve.gov/apps/proposals/comments/FR-2026-0007-01-C102 and www.federalreserve.gov/apps/proposals/comments/FR-2026-0008-01-C243.

*b. Purported Informational Injury Does Not Confer Standing on Plaintiff*

Plaintiff's reliance on informational injury principles is unavailing. "[A] plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *FEC v. Akins*, 524 U.S. 11, 21 (1998) (citation omitted). Plaintiff's chief grievance is that alleged remarks from the VCS influenced banks to temper comments that otherwise would have allegedly been more unfavorable. *See* Compl. ¶ 42. But Plaintiff has no statutory right to information that is tantamount to financial institutions' mental impressions, or to any other information that financial institutions may have, in their judgment, chosen to exclude from their comment letters to the Board. Notably, Plaintiff does not allege that the Board has failed to provide the comment letters in its possession, and any such claim would fail as the comment letters are publicly available. *See* www.federalreserve.gov/apps/proposals/FR-2026-0008-01/details; www.federalreserve.gov/apps/proposals/FR-2026-0009-01/details. This Court should reject Plaintiff's awkward attempt to graft informational injury principles onto allegations that a *third party*—*i.e.*, banks—declined to provide information to Defendants. Because such hypothetical information is not in Defendants' custody or control, to the extent it exists at all, Defendants have not failed to provide any required information to Plaintiff, and therefore informational injury does not confer standing. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 441 (2021) (finding no informational injury standing where "[t]he plaintiffs did not allege that they failed to receive any *required* information" (emphasis added)).

There is also no standing because there is no "concrete" informational injury, nor any "downstream consequence" from *Plaintiff*'s lack of receipt of such information. *See id.* While Plaintiff alleges that the absence of this information "denied Better Markets its rights to meaningfully participate in the rulemaking," Compl. ¶ 79, this cannot be the case where its right

to participate in the rulemaking process ended on the last day of the notice-and-comment period—the same day that the banks focused on by Plaintiff submitted their comment letters. "An asserted informational injury that causes no adverse effects cannot satisfy Article III." *TransUnion*, 594 U.S. at 442 (quotation omitted).

Furthermore, Plaintiff's assertion of a downstream consequence that Board Governor votes will be based on a "manipulated record," Compl. ¶ 86, is not the result of an informational injury *to Plaintiff*. This is a much more generalized grievance shared by all members of the public that a federal agency may make decisions based on an allegedly incomplete record about bank capital requirements, which—according to Plaintiff—are "the most important protection against financial crises that devastate America's families, businesses, banking and financial systems, economy, and fiscal condition." *See* Compl. ¶ 22. "An informational injury, like any other injury-in-fact, must be concrete and particularized, rather than generalized." *W. Wood Preservers Inst. v. McHugh*, 925 F. Supp. 2d 63, 72 (D.D.C. 2013) (quotation omitted). A generalized grievance—in contrast to a particularized injury that affects the plaintiff "in a personal and individual way"—is insufficient to confer standing. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).

Plaintiff alternatively asserts informational injury related to the nondisclosure of meetings with certain regulated entities. Compl. ¶ 42. Even assuming for present purposes that the VCS's alleged statements were made in a setting and context that constitutes a "meeting or other contact," any expectation of disclosure is only set forth in a "Transparency Policy" that the Board voluntarily adopted, with no mandatory disclosure required by law. *See* Compl. ¶ 9. "A plaintiff suffers sufficiently concrete and particularized informational injury where the plaintiff alleges that: (1) it has been deprived of information that, on its interpretation, a statute requires

the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (dismissing case on standing grounds where plaintiff did "not yet have a right to either category of information" sought under the statute at issue). Because there is no statutory right to information about *ex parte* meetings, there can be no informational injury related to their nondisclosure, even if such voluntary disclosure comports with "well-established principles of good governance," Compl. ¶ 9 (citing *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 57 (D.C. Cir. 1977), for the erroneous proposition that *ex parte* contacts are subject to a general disclosure requirement). *See Action for Children's Television v. FCC*, 564 F.2d 458, 477 (D.C. Cir. 1977) (adopting the limitations set forth in *Home Box Office*'s concurring opinion when explaining "Congress' intent not to prohibit or require disclosure of all *ex parte* contacts during or after the public comment stage," such that *ex parte* communications need only be disclosed "where the rulemaking proceedings involve 'competing [private] claims to a valuable privilege'" (quoting *Home Box Office*, 567 F.2d at 61 (MacKinnon, J., concurring specially))); *see also Sierra Club v. Costle*, 657 F.2d 298, 402 (D.C. Cir. 1981) ("decisions of this court . . . have declined to apply *Home Box Office* to informal rulemaking" where "general policymaking" is involved).

Moreover, given that Plaintiff is now aware of the purported communications from public news sources, *see id.* ¶ 8, it does not have any standing to claim injury from Defendants' alleged failure to "disclose and docket" such contacts. *See id.* ¶ 42; *Free Speech for People v. FEC*, 442 F. Supp. 3d 335, 343 (D.D.C. 2020) ("[A] plaintiff cannot establish injury based on the desire to obtain publicly available information 'from a different source.' If the information sought 'would add only a trifle to the store of information about the transaction already publicly available,' a

plaintiff lacks standing." (quoting *Wertheimer v. FEC*, 268 F.3d 1070, 1075 (D.C. Cir. 2001), and *Citizens for Responsibility & Ethics in Wash. v. FEC*, 475 F.3d 337, 340 (D.C. Cir. 2007))). As can be seen from exemplars of "communications with the public" disclosed on the Board's public website, the records only generally describe the topics discussed. *See, e.g.*, Meeting Between Vice Chair for Supervision Bowman and Staff of the Federal Reserve Board and Representatives of American Express (May 11, 2026), *available at* www.federalreserve.gov/regreform/rr-commpublic/american-express-meeting-20260511.pdf (stating in toto: "Vice Chair for Supervision Bowman and staff of the Federal Reserve Board met with representatives of American Express to discuss the agencies' Basel III notice of proposed rulemaking and the importance of reforms to the Board's approach to tailoring and indexing regulatory requirements."); Meeting Between Staff of the Federal Reserve Board and Representatives of Morgan Stanley (May 19, 2026), *available at* www.federalreserve.gov/regreform/rr-commpublic/morgan-stanley-meeting-20260519.pdf (stating in toto: "Staff of the Federal Reserve Board met with representatives of Morgan Stanley regarding the Board's GSIB surcharge proposal and the agencies' Basel III notice of proposed rulemaking (Basel III proposal). Morgan Stanley representatives discussed various elements of the proposals, including the proposed revisions to the credit risk framework and considerations around effective dates and transition arrangements for a final revised capital rule.").

Not surprisingly, Board representatives met with Plaintiff on multiple occasions to discuss Plaintiff's views about the 2026 Proposed Regulatory Capital Rules, and these were described with similar brevity. *See, e.g.*, Meeting Between Staff of the Federal Reserve Board, Office of the Comptroller of the Currency, and Federal Deposit Insurance Corporation and Representatives of Better Markets (July 31, 2026), *available at* https://www.federalreserve.gov/

regreform/rr-commpublic/better-markets-meeting-20260731.pdf ("Representatives of Better Markets discussed aspects of the Basel III proposal, standardized proposal, and GSIB surcharge proposal and reiterated significant concerns raised in their three comment letters on each of the three proposals."); Meeting Between Staff of the Federal Reserve Board and Representatives of Better Markets (July 30, 2026), *available at* https://www.federalreserve.gov/regreform/rr-commpublic/better-markets-meeting-20260730.pdf ("Better Markets representatives discussed elements of the operational risk and market risk frameworks in the Basel III proposal, as well as elements of the credit risk framework in the Basel III proposal and the standardized proposal. Better Markets representatives also discussed the short-term wholesale funding component of the GSIB surcharge proposal."); Meeting Between Governor Cook and Staff of the Federal Reserve Board and Representatives of Better Markets (July 15, 2026), *available at* https://www.federalreserve.gov/regreform/rr-commpublic/better-markets-meeting-20260715.pdf ("Representatives of Better Markets discussed aspects of the Basel III proposal, standardized proposal, and GSIB surcharge proposal and reiterated significant concerns raised in their three comment letters on each of the three proposals.").

Thus, even if the communications reported via news outlets merited disclosure under the Transparency Policy, formal disclosure on the Board's website would add, at most, a "trifle" of information that would neither illuminate Plaintiff's claims nor add anything to the detailed information contained in the substantive public comments. Indeed, the substance of the banks' positions about the regulatory capital framework as a whole has long been known. In response to the 2023 notices of proposed rulemaking, the banks submitted a multitude of comment letters

that made their positions very clear,[5] and they were filed in conjunction with a very public "advertising and lobbying campaign." *See* Compl. ¶ 61. And financial institutions have of course engaged in substantial public criticism and filed voluminous comment letters related to the 2026 Proposed Regulatory Capital Rules. *See id.* ¶ 66; June 2026 Banking Comment Letters.

In sum, this Court should prevent Plaintiff from attempting to shoehorn informational injury into its claims of procedural due process. Informational injury is derived from a statutory right, whereas the present Complaint does not allege any statutory violations. Instead, Plaintiff alleges constitutional due process violations caused by a biased decisionmaker. Informational injury is not implicated by this type of alleged procedural violation. *See W. Wood Preservers Inst.*, 925 F. Supp. 2d at 71 (holding that claims related to "rulemaking procedures" were "not even amenable to analysis based on informational injury-in-fact").

---

[5] *See, e.g.*, "Sample Banks' Prior Capital Rulemaking Comment Letters" (collectively) in response to Fed. Docket No. R-1813: Comment Letter of Citigroup (Jan. 16, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C258; Comment Letters of Goldman Sachs (Jan. 16, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C298, and (Jan. 16, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C185; Comment Letter of JP Morgan Chase (Jan. 16, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C158; Comment Letter of Morgan Stanley (Jan. 16, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C273; Comment Letter of Bank of New York Mellon (Jan. 16, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C176; Comment Letter of State Street (Jan. 16, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C240; Comment Letter of Wells Fargo (Jan. 16, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C308; Comment Letters of Bank Policy Institute and American Bankers Association (May 3, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C410, and (July 12, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C419; Comment Letter of Bank Policy Institute (June 12, 2024), *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C416).

*c. Purported Organizational Injury Does Not Confer Standing on Plaintiff*

Plaintiff's reliance on organizational standing is also unavailing. Organizational standing requires an organization, "like an individual plaintiff, to show actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision. To accomplish this, the [organization] must point to a concrete and demonstrable injury to its activities; a mere setback to its abstract social interests is not sufficient." *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011) (quotation omitted). "Making this determination is a two-part inquiry—we ask, first, whether the agency's action or omission to act injured the organization's interest and, second, whether the organization used its resources to counteract that harm." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015).

Plaintiff alleges that it has "devoted substantial organizational resources to bank capital rulemakings over more than a decade" and has "submitted its comments on a manipulated record, has engaged (and is currently engaging) in multiple forms of advocacy based on the incomplete and misleading record, and faces the imminent prospect that the Fed will finalize the 2026 Capital Proposals on that same corrupt record absent judicial intervention." Compl. ¶ 43. At bottom, Plaintiff's supposed organizational injury is premised on the resources it has dedicated to commenting on the 2026 Proposed Regulatory Capital Rules and engaging in advocacy efforts related to the issues raised in this litigation. But as discussed in further detail below, resource expenditures on the former activity are not fairly traceable to the VCS's alleged bias, and expenditures on the latter activity are insufficient to confer organizational standing.

Plaintiff cites *Havens Realty Corporation v. Coleman*, 455 U.S. 363 (1982), *see* Compl. ¶ 41, which found organizational standing satisfied where the "consequent drain on the organization's resources" was *caused by* alleged illegal activity. *Havens*, 455 U.S. at 379

(determining that the alleged wrongdoing "perceptibly impaired [the organization's] ability to provide counseling and referral services for low-and moderate-income homeseekers" based on the claim that the organization needed to "devote significant resources to identify and counteract the defendant's racially discriminatory steering practices"). Notably, the Supreme Court has since held that "*Havens* was an unusual case, and this Court has been careful not to extend the *Havens* holding beyond its context." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 396 (2024) (noting that the organization in *Havens* was unique because it "not only was an issue-advocacy organization, but also operated a housing counseling service").

*Havens* is inapplicable to the present matter because Plaintiff's dedication of resources to commenting on proposed rulemakings is untethered from any alleged statements made by the VCS. Indeed, Plaintiff highlights that it "has invested more than 10 years of sustained effort and organizational resources" into "the 2026 Capital Proposals," a process which long pre-dated VCS Bowman's confirmation in mid-2025. *See* Compl. ¶¶ 41, 60, 62. Plaintiff positions itself as "the leading nonprofit public interest organization active in federal financial regulation and rulemaking" with staff "who engage substantively in the rulemaking process, including: pre-proposal advocacy and research; commenting and comment file analysis; meeting with agency staff and principals; working with allies and other interested parties; litigation; and post-finalization implementation, oversight, and enforcement." *Id.* ¶ 20. Thus, it is clear from the face of the Complaint that—regardless of any alleged bias by the VCS or, for that matter, *any* involvement by her—Plaintiff would have been heavily invested in engaging in the rulemaking process for the 2026 Proposed Regulatory Capital Rules. Not only did Plaintiff dedicate resources to the submission of several comment letters under the prior iteration of the proposed

regulations,[6] but the relief sought is the recusal of VCS Bowman so that Plaintiff can "participate in a rulemaking" without her involvement, Compl. ¶ 45. This demonstrates that Plaintiff's dedication of resources to the rulemaking process is core to its mission, and is not fairly traceable to any alleged conduct of the VCS. The allegations therefore do not support the conclusion that Plaintiff has been injured as an organization by investing more resources into the current rulemaking process than it would have absent the VCS's involvement. *See Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (finding no organizational standing where association failed to show that the expenditures claimed were for "operational costs beyond those normally expended to carry out its advocacy mission" (quotation omitted)). The D.C. Circuit has held that "where the only 'service' impaired is pure issue-advocacy," *Havens* is not implicated. *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1162 (D.C. Cir. 2005).

Any attempt to establish standing due to Plaintiff's expenditures in this lawsuit must also fail because litigation efforts are insufficient to demonstrate organizational injury. "An organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit. Were the rule otherwise, any litigant could create injury in fact by bringing a case, and Article III would present no real limitation." *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990); *see also Equal Rts. Ctr.*, 633 F.3d at 1140 ("litigation expenses cannot establish standing"). More broadly, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing

---

[6] *See, e.g.*, Comment Letters of Better Markets in response to Fed. Docket No. R-1813: (1) Jan. 16, 2024, *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C307; (2) May 16, 2024, *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C411; (3) July 23, 2024, *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C423; Compl. ¶¶ 24, 60; (4) Jan. 6, 2025, *available at* www.federalreserve.gov/apps/proposals/comments/FR-0000-0086-01-C525.

simply by expending money to gather information and advocate against the defendant's action." *All. for Hippocratic Med.*, 602 U.S. at 394. Thus, Plaintiff's vague reference to the expenditure of resources on "multiple forms of advocacy" in response to the allegedly biased administrative record, Compl. ¶ 43, is insufficient to confer standing. *See id.* (rejecting the contention that the agency "forced the associations to expend considerable time, energy, and resources drafting citizen petitions to [the agency], as well as engaging in public advocacy and public education" (quotations omitted)); *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) ("[A]n organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury.").

**2. Plaintiff Cannot Show Causation and Redressability**

"[T]he 'case or controversy' limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976). Where an alleged causal chain has an attenuated connection "between the beginning and end of the purported chain," the injury cannot be fairly traceable to the beginning of the chain—here, the VCS's alleged bias—as opposed to "the result of the independent action" by the banks or other Board Governors. *See Ctr. for L. & Educ.*, 396 F.3d at 1161. Plaintiff suggests potential injury from Governors who vote to finalize the 2026 Proposed Regulatory Capital Rules because they may do so based on a "manipulated record." *See* Compl. ¶ 86. However, the fact that the majority of the Governors previously decided to vote in favor of issuing the 2026 Proposed Regulatory Capital Rules shows their independent support for considering the proposals, and thus voting to finalize the rules would not be "fairly traceable to [ the VCS's] purported activities," *Clapper*, 568 U.S. at 418. *See* Board of Governors of the Federal Reserve System, Transcript of Open Board Meeting, at 34–37

(Mar. 19, 2026), *available at* www.federalreserve.gov/mediacenter/files/open-board-meeting-transcript-20260319.pdf (showing that six of the Board's seven Governors voted in favor of issuing the proposed regulations).

Indeed, "[a]t the point of public notice and comment, the agency has already formulated a policy decision which will likely be adopted in some form unless the public notice and comment brings new information or policy considerations to bare on the issue." *Organized Fishermen of Fla., Inc. v. Franklin*, 846 F. Supp. 1569, 1574 (S.D. Fla. 1994)." And the banks' general positions were already well-known long before issuance of the 2026 Proposed Regulatory Capital Rules due to their lengthy comment letters in response to the prior iteration of the rules that had been noticed for comment in 2023. *See, e.g.*, Sample Banks' Prior Capital Rulemaking Comment Letters, *supra* n.5; Compl. ¶¶ 59, 61. As a result, any injury arising from a Board Governor's independent decision—and decisions by the OCC and FDIC—to approve a set of regulations with which Plaintiff disapproves could not be fairly traced to any *de minimis* effect on the administrative record that Plaintiff theorizes.

The current proceedings can be analogized to the standing analysis in *Simon*. 426 U.S. at 40–45. In that case, the Supreme Court reviewed a challenge to an IRS revenue ruling that allowed favorable tax treatment to hospitals that offered only emergency-room services to indigents. *Id.* at 28. The individuals claimed injury due to the denial of hospital services as a result of the revenue rule. *Id.* at 40–41. The court reasoned:

> [I]t does not follow . . . that the denial of access to hospital services in fact results from petitioners' new Ruling, or that a court-ordered return by petitioners to their previous policy would result in these respondents' receiving the hospital services they desire. It is purely speculative whether the denials of service specified in the complaint fairly can be traced to petitioners' "encouragement" or instead result from decisions made by the hospitals without regard to the tax implications.

*Id.* at 42–43. Because "[s]peculative inferences [we]re necessary to connect their injury to the challenged actions of petitioners," and "the complaint suggests no substantial likelihood that victory in this suit would result in respondents' receiving the hospital treatment they desire," the Court held that the parties lacked standing. Similarly here, speculative inferences are required to connect the (non-concrete) injury of Board members' predicted votes in favor of the 2026 Proposed Regulatory Capital Rules and the VCS's alleged statements. Thus, victory here in the form of recusal of the VCS and withdrawal of the proposed rules could not stop the financial regulators from reissuing the same set of rules, the banks from resubmitting the same comment letters, and the subsequent approval of the rules by the Board. Courts are "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Clapper*, 568 U.S. at 413.

Separately, the root of Plaintiff's (procedural-only) injury that it was unable to "meaningfully participate in the rulemaking," Compl. ¶ 79, is that the banks allegedly decided to curtail their comment letters. "To the extent that such assertions are based on anything other than conjecture, they do not establish injury that is fairly traceable." *Clapper*, 568 U.S. at 417 n.7. While the Bloomberg article relied upon by Plaintiff suggests that banks felt encouraged by the VCS to "limit their public comments . . . to constructive feedback that helps to advance the plans," the article does not support the allegation the banks actually did so. *See id.* ¶¶ 68–70. In fact, Bloomberg reported on April 23, 2026, that "*[s]ince that meeting with Bowman*, Wall Street leaders have criticized some of the Trump-era measures, with JPMorgan's Jamie Dimon saying the plans would lock up funds 'for no good reason'" and that "big banks have *continued* to slam the proposals and call for more changes." Katanga Johnson, *Fed's Bowman Cautions Wall Street CEOs Against Capital Gripes*, Bloomberg (Apr. 23, 2026), *available at* www.bloomberg.com/

news/articles/2026-04-23/fed-s-bowman-cautions-wall-street-ceos-against-capital-gripes (Plaintiff's Exhibit A) (emphases added). This reporting—which notes JPMorgan's criticism about the proposed rules—post-dates the cursory and ambiguous April 14, 2026 comment from a JPMorgan representative that Plaintiff speculatively asserts as a basis for claiming that JPMorgan changed its behavior based on the VCS's alleged statements. *Compare id.*, *with* Compl. ¶ 70.

Plaintiff also contorts reporting from Reuters. It alleges that, "[a]ccording to one report, five anonymous executives told Reuters that banks 'pared back their asks' after Bowman's meetings and Communications . . . ." Compl. ¶ 71. What the article actually states is:

> Large U.S. banks on Thursday formally pitched the central bank on tweaks to a regulatory proposal aimed at reducing funds they must set aside to absorb potential losses, as the central bank enters the last leg of a marathon overhaul of U.S. capital rules. . . . The officials spoke anonymously to discuss ongoing regulatory matters and the contents of some comment letters that are not yet public. . . . Lenders believe the new proposal is a dramatic improvement from the central bank's original 2023 plan . . . . Banks do not plan to push back hard the way they did in 2023. Multiple executives said banks have pared back their asks, focusing on the most significant issues.

Pete Schroeder & Nupur Anand, *U.S. Banks to Make Final Push on Capital Rule Changes as Fed Wraps Up Consultation*, Reuters (June 18, 2026), *available at* www.reuters.com/legal/transactional/us-banks-make-final-push-capital-rule-changes-fed-wraps-up-consultation-2026-06-18/ (Plaintiff's Exhibit D). There is no mention of the VCS until the very end of the article, where it merely pointed out previous reporting about her allegedly conveying to banks that "they should be measured in their feedback." *Id.* The article thus shows that any decision to pare back comments is fairly attributable to the "dramatic improvement" between the 2023 proposals and the 2026 Proposed Regulatory Capital Rules, and Plaintiff's suggestion in the Complaint that the VCS's alleged statements caused banks to pare back their comments is pure speculation insufficient to establish standing.

That the banks are independent third parties also raises a redressability issue. In *Murthy v. Missouri*, 603 U.S. 43, 48 (2024), for example, the plaintiffs alleged that federal officials pressured social-media platforms into censoring certain social media content in violation of the First Amendment. The Court held that the requested injunction to "stop[] certain Government agencies and employees from coercing or encouraging the platforms to suppress speech" lacked redressability because the platforms remained free to take whatever positions they liked. *Murthy*, 603 U.S. at 73. There is likewise no redressability here, where the banks are free to advocate for themselves, and the removal of the VCS from the rulemaking process may well lead them to engage with the rulemaking process just as they had done before.

## II. The Court Should Dismiss the Complaint Under Rule 12(b)(6)

Plaintiff fails to state a claim for decisionmaker bias because, even assuming for present purposes that all of the factual allegations in the Complaint are true, it has failed to plead facts sufficient to meet the legal standard for decisionmaker recusal. *See New York State Inspection, Sec. & L. Enf't Emps., Dist. Council 82, AFSCME, AFL-CIO v. New York State Pub. Emp. Rels. Bd.*, 629 F. Supp. 33, 40 (N.D.N.Y. 1984) ("Allegations of circumstances where the risk of bias is constitutionally acceptable do not state a claim for relief."). Administrative decisionmakers enjoy a "presumption of honesty and integrity" that parties alleging unconstitutional bias must overcome. *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). "Whether the official is engaged in adjudication or rulemaking, mere proof that she has taken a public position, or has expressed strong views, or holds an underlying philosophy with respect to an issue in dispute cannot overcome that presumption." *United Steelworkers of Am., AFL-CIO-CLC v. Marshall*, 647 F.2d 1189, 1208 (D.C. Cir. 1980).

Under *Association of National Advertisers*, "[a]n agency member may be disqualified from [a rulemaking] proceeding only when there is a clear and convincing showing that he has

an unalterably closed mind on matters critical to the disposition of the rulemaking." 627 F.2d at 1154. The D.C. Circuit is clear that this standard for establishing prejudgment in rulemaking proceedings imposes a very high bar, which is higher than the standard employed in administrative adjudications. *United Steelworkers of Am.*, 647 F.2d at 1209. "The 'clear and convincing' test is necessary to rebut the presumption of administrative regularity." *Ass'n of National Advertisers*, 627 F.2d at 1170. It would "eviscerate the proper evolution of policymaking" if a court was to "disqualify every administrator who has opinions on the correct course of his agency's future action." *Id.* at 1174. While the public has a "right to . . . an impartial decisionmaker," "[i]mpartial, however, does not mean uninformed, unthinking, or inarticulate." *Id.* at 1174. *Association of National Advertisers* reemphasized that "informal contacts between agencies and the public are the bread and butter of the process of administration," *id.* at 1169 (quotation omitted), and explained that:

> Administrators, and even judges, may hold policy views on questions of law prior to participating in a proceeding. The factual basis for a rulemaking is so closely intertwined with policy judgments that we would obliterate rulemaking were we to equate a statement on an issue of legislative fact with unconstitutional prejudgment. The importance and legitimacy of rulemaking procedures are too well established to deny administrators such a fundamental tool. Finally, we eschew formulation of a disqualification standard that impinges upon the political process. An administrator's presence within an agency reflects [a] political judgment.

*Id.* at 1174.

In practice, aggrieved parties have rarely been able to meet the stringent threshold for unconstitutionally impermissible bias. *Association of National Advertisers* held that the association failed to demonstrate the decisionmaker should be disqualified where—prior to a proposed rulemaking that would restrict certain television advertising directed towards children—he had made public statements expressing his views about how children's advertising could be unfair or deceptive. *Id.* at 1154–55, 1171–74. The court "view[ed] the statements

offered as grounds for disqualification *as a whole* to discern whether they evidence[d] a clear and convincing showing" that the decisionmaker had an unalterably closed mind. *Id.* at 1170–71 (emphasis added). Taking into account that in one statement the decisionmaker said "[w]e must be rigorous and open-minded in our analysis of both law and fact," the court concluded that the "remarks, considered as a whole, represent discussion, and perhaps advocacy" that was "not sufficient to disqualify an administrator." *Id.* at 1171.

In *Housing Study Group*, the court granted the defendants' motion to dismiss the unconstitutional bias count for failure to state claim because the plaintiff failed to show how the decisionmaker's statements announced an intention that was "set in stone." 736 F. Supp. at 332–34. The Secretary of HUD had made statements concerning his intent to terminate the agency's coinsurance program. *Id.* at 333. The plaintiff was unsuccessful in its quest to disqualify the Secretary from the agency's intended rulemaking proceedings related to whether and how to end the coinsurance program because his comments were "part of an evolving and ongoing dialogue between HUD and the coinsuring lender industry" that did not meet the standard for clear and convincing evidence of "an unalterably closed mind on matters critical to the disposition of the proceeding." *Id.* at 332–33.

Statements expressing the decisionmaker's then-current position on a provision, or a prediction of the agency's action, are not tantamount to a demonstration "that the view could not be changed by the rulemaking proceedings that were to follow." *Consumers Union of U.S., Inc. v. FTC*, 801 F.2d 417, 426–27 (D.C. Cir. 1986) ("Assuming that both statements were made as alleged, neither approaches the clear and convincing evidence that must be produced to prove that [the decisionmaker] had an unalterably closed mind on matters critical to the disposition of the proceeding." (quotation omitted)). Notably, the statements made by the decisionmaker in

*Consumers Union* were made during the comment period. *Id.* at 427. Although the court criticized the timing of the decisionmaker's alleged comments, it held that the "impropriety (still assuming it occurred) gives no indication of a mind that has been closed to the evidence in the past or that would disregard any significant new material subsequently introduced." *Id.* Even in far more extreme alleged circumstances, such as where the decisionmaker supposedly (albeit unsuccessfully) ordered the destruction of certain data compilations, "this attempt to exclude evidence from the record raise[d] some suspicion of foul play," but it "d[id] not rise to the level of clear and convincing evidence of [the decisionmaker's] unconstitutional prejudgment of the issue." *Organized Fishermen of Fla.*, 846 F. Supp. at 1574; *see also Mississippi Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 183 (D.C. Cir. 2015) (finding that a speech given by a decisionmaker after joining the agency "that analogized his aggressive enforcement policy against oil and gas companies that are not complying with the law to the way Romans used to conquer those villages in the Mediterranean by crucifying the first people they saw" was "offensive" but—even if the statements had related to the specific proceedings at issue—"would not alone demonstrate an unalterably closed mind on the subject" (quotations omitted)).

Plaintiff alleges that the VCS's unconstitutional bias is demonstrated by news reports of meetings during which—according to Plaintiff—she reportedly made statements "urging, directing, and coaching" the chief executive officers of regulated entities to "maximize their public support for the proposed rule and minimize their opposition" and "that industry comments should be 'limited and specific' and warned against commenters adopting an 'aggressive' tone." Compl. ¶ 8; *see also id.* ¶¶ 66–67. The VCS allegedly "urged those CEOs to publicly support the capital proposals and to stop seeking further concessions and carve-outs" and "instructed the

banks to 'avoid submitting letters related to the big-bank surcharge and Basel III plans that resemble the industry's demanding tone on stress tests.'" *Id.* ¶ 68 (citing Plaintiff's Exhibit A).

As a preliminary matter, it is important to note that Plaintiff has mischaracterized the statements reported by news outlets. While the Bloomberg article relied upon by Plaintiff stated that the VCS "urged officials to consider the overall effect of the capital proposals which will reduce industry requirements as a whole," neither that article nor the Reuters article relied upon by Plaintiff reported that she "coached" or "directed" the financial institutions to take certain actions with respect to the 2026 Proposed Regulatory Capital Rules. *See* Compl. ¶ 8 (citing Plaintiff's Exhibits A (Apr. 23, 2026 Bloomberg article discussed above, *supra* at 27) and B (Pete Schroeder & Michelle Price, *U.S. Fed Has Told Big Banks Not to Push Back Aggressively on New Capital Rules*, Reuters (Apr. 17, 2026), *available at* www.reuters.com/world/us-fed-has-told-big-banks-not-push-back-aggressively-new-capital-rules-2026-04-17/)). Nor did the Bloomberg article report that the VCS "instructed" the banks to avoid the submission of demanding comment letters. Instead, the article reported that "[s]ome of the people familiar with Bowman's recent meeting said that . . . bankers should avoid submitting letters related to the big-bank surcharge and Basel III plans that resemble the industry's demanding tone on stress tests." *See* Plaintiff's Exhibit A. In other words, the articles relied upon by Plaintiff as supposed evidence of bias do not actually demonstrate the things that Plaintiff claims; instead, they at best reflect alleged encouragement or urging to consider the overall effect of the capital proposals, from which bankers who spoke with news outlets potentially took away as a reflection of the approach they "should" take in subsequent comment letters.

But even if the VCS made statements in the manner alleged by Plaintiff, which the VCS has denied and for which Plaintiff has not provided anything beyond speculation and

mischaracterized news reports, that would reflect nothing more than advocacy for the 2026 Proposed Regulatory Capital Rules, which had been developed after "a comprehensive review of the capital requirements undertaken over the past nine months." *See* Transcript of Open Board Meeting, at 3; *C & W Fish Co. v. Fox, Jr.*, 931 F.2d 1556, 1565 (D.C. Cir. 1991) (concluding that neither decisionmaker's "earlier advocacy nor his policy view as publicly expressed demonstrates an unalterably closed mind that would disqualify him as an impartial decisionmaker"). On their face, these statements do not indicate that the VCS's views were set in stone; rather, they reflect a desire to expedite the final steps of a rulemaking process that—taking into account the prior iteration of the proposed rules—had been years in the making. *See* Transcript of Open Board Meeting, at 15, 25. These statements are insufficient to evince a "clear and convincing" showing that the VCS had an unalterably closed mind with respect to the proposed rules.

Moreover, the VCS has made numerous public statements that she is open to comments about the 2026 Proposed Regulatory Capital Rules. On March 12, 2026, the VCS gave a speech "to discuss [the Board's] approach to bank capital requirements" that concluded: "The proposals that will be published in the coming week will bring us closer to fulfilling the U.S. commitment to implement the 2017 Basel III agreement and will complete the first step of our comprehensive review of the capital framework. We look forward to publishing all of these proposals and receiving public comments." Michelle W. Bowman, Vice Chair for Supervision, Bd. of Governors of the Fed. Reserve Sys., Address at the Cato Institute Policy Forum: Basel III and Bank Capital Rules, *Capital Rules for the Real Economy* (Mar. 12, 2026) at 1, 9, *available at* www.federalreserve.gov/newsevents/speech/bowman20260312a.htm. At the March 19, 2026 Board meeting that introduced the proposed rules, the VCS stated: "I look forward to receiving

public comment on these proposals, including whether they are appropriately calibrated on their consequences for real-world activity. The feedback that we receive will be critical in determining whether our approach appropriately balances safety and soundness with credit availability." Transcript of Open Board Meeting, at 21; *see also* Michelle W. Bowman, *Statements on Bank Capital Proposals by Vice Chair for Supervision Michelle W. Bowman* (Mar. 19, 2026), *available at* www.federalreserve.gov/newsevents/pressreleases/bowman-statement-20260319.htm. During congressional testimony on June 4, 2026—prior to closure of the comment period—the VCS made clear that "[w]e consider all comments" and "we look forward to receiving comments through the comment process." *See Oversight of Prudential Regulators: Hearing Before the H. Comm. on Financial Services*, *supra* at 6 (Defendant's Exhibit 1); *cf. id.* (explaining that with respect to the 2023 version of the proposed rules, "we've learned a significant amount from the number of comments that were submitted from that proposal"). Even Plaintiff acknowledges that the VCS relayed to the regulated entities during their alleged meetings that she is "open to all comments." Compl. ¶ 68 (citing April 23, 2026 Bloomberg article (Plaintiff's Exhibit A)).

Plaintiff more broadly appears to imply that the act of simply meeting with the leadership of banks constitutes impropriety. *See, e.g.*, Compl. ¶¶ 11, 16. But maintaining industry contacts does not show impermissible bias. In fact, the opposite is true: "Agency officials may meet with members of the industry" for various reasons, including "to maintain the agency's knowledge of the industry it regulates." *Louisiana Ass'n of Indep. Producers & Royalty Owners v. FERC*, 958 F.2d 1101, 1113 (D.C. Cir. 1992) (finding no prejudgment under the lower bar for such a finding applicable to administrative adjudications); *see also Sierra Club*, 657 F.2d at 401 ("[T]he importance to effective regulation of continuing contact with a regulated industry, other affected

groups, and the public cannot be underestimated. Informal contacts may enable the agency to win needed support for its program, reduce future enforcement requirements by helping those regulated to anticipate and shape their plans for the future, and spur the provision of information which the agency needs."). To this end, the VCS has long maintained a practice of meeting with members of the industry and others, which is entirely appropriate. *See, e.g.*, Michelle W. Bowman, Vice Chair for Supervision, Bd. of Governors of the Fed. Reserve Sys., Address at the 2025 Community Banking Research Conference, *Welcome Remarks* (Oct. 7, 2025), *available at* https://www.federalreserve.gov/newsevents/speech/bowman20251007a.htm ("Outreach to banks of all sizes, including community banks, has been a top priority for my work because your voices must be a part of the conversation in Washington."); Michelle W. Bowman, Governor, Bd. of Governors of the Fed. Reserve Sys., Address at the Conference for Community Bankers, *A Conversation on Community Banking* (Feb. 11, 2019), *available at* https://www.federalreserve.gov/newsevents/speech/bowman20190211a.htm (describing meetings with community bankers as "important learning opportunities where I can hear directly from leaders in the field about the challenges and opportunities in community banking"); *Oversight of Prudential Regulators: Hearing Before the H. Comm. on Financial Services*, *supra* at 6 (Defendant's Exhibit 1) ("I meet with bank CEOs on a regular basis.").

Finally, Plaintiff's Complaint simultaneously suggests bias in favor of the banking industry—by "collud[ing] with the regulated industry" and assuring bank CEOs "that their complaints had been addressed"—and bias against the banking industry—by directing the banks to refrain demanding more changes to the proposed rules that would be favorable to the industry. *See* Compl. ¶¶ 13, 67, 85. Allegations of conduct that both favor and disfavor the banking industry underscores the conclusion that the VCS does not harbor impermissible bias towards a

particular policy position. Taken "as a whole," *Association of National Advertisers*, 627 F.2d at 1171, consideration of all of the VCS's alleged and actual statements collectively can only support one conclusion—that Plaintiff has failed to state a claim for an unalterably closed mind.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiff's Complaint.

Dated: November 13, 2026

Respectfully Submitted,

*/s/ Katherine Pomeroy*

Joshua P. Chadwick
Assistant General Counsel (#502279)
Katherine Pomeroy
Senior Counsel (#1031557)
Board of Governors of the Federal Reserve System
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
Telephone: (202) 997-9297
katherine.pomeroy@frb.gov

*Counsel for Defendants*