# Exhibit 1

# House Financial Services Committee Holds Hearing on Prudential Regulators

CQ Transcriptions

June 4, 2026 Thursday

Copyright 2026 CQ-Roll Call, Inc. All Rights Reserved

All materials herein are protected by United States copyright law and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of CQ Transcriptions. You may not alter or remove any trademark, copyright or other notice from copies of the content.

## Body

House Financial Services: Oversight of Prudential Regulators

JUNE 04, 2026 10:00 A.M.

SPEAKERS:

[*]FRENCH HILL: The Committee on Financial Services will come to order. Without objection, the chair is authorized to declare recess of the committee at any time. Today's hearing is entitled: Oversight of Our Prudential Regulators. Without objection, all members will have five legislative days within which to submit extraneous material to the chair for inclusion in the record.

I now recognize myself for four minutes for an opening statement. The Trump Administration is returning prudential regulators to their core regulatory and supervisory mission of promoting safety and soundness in the financial system. Today's hearing will provide an opportunity to discuss how their recent actions, priorities, and policies align with their statutory mission entrusted to each of them by Congress.

We will also highlight the work of this committee to right-size prudential regulations for institutions of all sizes, focus on the supervisory framework on material financial risks and facilitate the formation of new depository institutions. Prudential regulations should foster economic opportunity, support responsible lending and encourage long-term growth while maintaining confidence across our banking system.

A sound prudential framework must be transparent, appropriately tailored and rules that are clear, efficient and proportionate to the size, complexity and risk profile of the institution. In my view, a one size fits all approach, by contrast, disproportionately harms community banks, credit unions, and our regional institutions.

That's why this committee has held numerous hearings throughout the 119th Congress on our mission to make community banking great again, which has culminated in our proposed Main Street Capital Access Act. Many of the reforms contained in this legislation directly track the actions being taken before us today by our supervisory agencies.

We also will highlight the progress being made to reverse some damaging Biden-era regulations and guidance that increase compliance costs, constrained lending and threatened access to credit for American families and small businesses without providing clear benefits to overall safety and soundness.

Among them was the original proposed Basel III Endgame, which would have significantly raised costs for home buyers, consumers and financial institutions without meaningfully improving financial stability.

The revised Basel III proposal and the corresponding changes to the standardized approach and the G-SIB surcharge, will better align capital with risk, address concerns about gold plating, and increase lending capacity while maintaining a very safe and sound banking system. I'm also proud of the work of this committee has done to advance legislation to provide a functional regulation framework, regulatory framework, for our emerging, innovative digital asset ecosystem.

The Trump Administration has taken important steps to turn the page on the Biden approach to digital assets. These steps, including withdrawing burdensome supervisory non-objection regimes, providing greater clarity for banks using blockchain technology and implementing the GENIUS Act to establish a clear framework for payment stablecoins.

The administration is demonstrating a commitment to supporting innovation while preserving consumer protection and orderly markets. Clear, predictable rules allow financial institutions to manage compliance, reduce unnecessary costs, and expand access to credit, and invest in innovation as our financial system consistently evolves day after day, week after week.

Policymakers must foster an environment that supports innovation while ensuring confidence in the strength and stability of our financial system. I look forward to our panel today our discussion among members on both sides of the aisle, and I yield back the balance of my time. I now recognize the Ranking Member of our Full Committee, Mrs. Waters, for four minutes for an opening statement.

MAXINE WATERS: Good morning. Trump's reckless and unlawful war in Iran has cost every American $450 more at the gas tank. In parts of my district gas is nearly $7 a gallon, yet when asked about this, Trump's reply is, quote, "Couldn't care less." Well, Mr. Chairman, Democrats do care and we urge this committee and the president to focus on affordability.

It's not just gas, families are also being crushed by rising rents, higher utility bills and skyrocketing grocery prices fueled by Trump's failed economic policies. But Trump doesn't care, and it shows. When he's not ruining the economy, he's busy tearing down the White House to build $1 billion ballroom, promoting fight night on the South Lawn and trying to slap his name and picture on everything as if he were an idol to be worshiped.

At the same time, his administration is busy dismantling the agencies and safeguards that protect consumers, workers and small businesses. In fact, since returning to office, Trump has launched the most aggressive, the most deregulatory campaign we've ever seen. His administration has gutted the Consumer Financial Protection Bureau, undermined the independence of our central bank, and handed Wall Street big banks, fintech firms, AI companies and crypto bros pardons and the freedom to take risks with Americans money.

The consequences are already hitting working families. A recent report found that Trump's attacks on the CFPB alone have cost Americans nearly $19 billion in just one year. And while he has largely shut down the CFPB, Americans have filed more consumer complaints about predatory lending and other financial abuses in the past 14 months than the previous 14 years combined.

And it does not stop there. The prudential regulators here today have weakened Megabank capital, stress testing and other requirements designed to prevent another financial crisis. They are rubber stamping bank mergers, rolling back the civil rights laws like the Community Reinvestment Act and

loosening guardrails for crypto and fintech businesses who act like banks but don't want to be regulated as such.

They have downplayed climate related financial risks just in time for hurricane and wildfire season, and gone easy on bank executives and their pay skyrockets. Sadly, Republicans have stood by, stood by, and enabled all of it instead of standing up for families. Republicans idolize Trump, doing little to push back when he weakens consumer protections and strips away the safeguards that prevent another financial crisis.

Instead of addressing the affordability crisis, they side with Wall Street, mega banks and crypto bros. Committee Democrats are focused on lowering costs for working families and ensuring Americans can access [ph] affordable mortgages, small business loans and financial products. We're fighting to support our community banks and credit unions, and making sure consumers, not mega banks or other powerful corporations, come first.

This is a difference between protecting the wealthy and the well-connected and fighting for the American people, and an economy that works for everyone. Mr. Chairman and members, you all know what I just said is the truth and I want to tell you --

FRENCH HILL: The gentleman's time has expired.

MAXINE WATERS: -- we are fighting against all of this deregulation.

FRENCH HILL: Gentlewoman's time has expired.

MAXINE WATERS: Well --

FRENCH HILL: I recognize the Chair of the Subcommittee on Financial Institutions -- [Crosstalk]

MAXINE WATERS: I want to tell you about --

FRENCH HILL: -- Mr. Barr, for one minute.

ANDY BARR: Thank you, Mr. Chairman. Thank you to our witnesses also for joining us today. It's encouraging to see prudential regulators in this committee aligned in our work to -- to return regulation and supervision back to their core mission of safety and soundness. To realize this goal, banks and credit unions must be evaluated on objective, clear standards.

That's why I introduced the Firm Act, which prohibits consideration of reputational risk in the supervisory process, ensuring regulators focus on material financial risks rather than subjective or process oriented concerns. The same commitment to transparency and objective decision making should extend to the merger approval process as well.

The Bank Failure Prevention Act increases clarity in the merger process by setting clear expectations and timelines for merger reviews to prevent prolonged reviews that unnecessarily consume time and resources. Ensuring a risk focused regulatory system also requires tailoring requirements appropriately to the financial institution's size and risk profile.

I'm glad to see that the regulators listen to bipartisan calls from this committee and apply these principles in their agencies, including in recently Basel III re-proposal.

FRENCH HILL: Gentleman's time has expired.

ANDY BARR: Thank you, I yield back.

FRENCH HILL: I now recognize the Ranking Member for the Subcommittee on Financial Institutions, Dr. Foster of Illinois. You're recognized for one minute for an opening statement.

BILL FOSTER: Thank you, Chairman Hill. America's banks and credit unions are operating during a time of unprecedented change in the financial system, consumers and markets are moving faster than ever with improved access to information, 24-hour banking and the reduced friction of modern payment systems, and soon personal agentic AI financial agents.

FinTech partnerships promote innovation and competition but come with unique risks. Banks and credit unions are also facing a wave of fraud, driven by artificial intelligence and deep fakes while bad actors continue to exploit older banking tools, such as paper checks, for illicit purposes. Our prudential regulatory agencies must be agile and well-resourced to respond to these risks.

Preparing for liquidity risks of internet driven bank runs and cyber threats from emerging AI tools should be a top priority, and our regulatory bodies need to maintain the necessary technology and human resources to do so effectively. This administration's move to cut supervision and staff across the Federal Reserve, FDIC and OCC is a step in the wrong direction.

Thank you again, Chairman Hill, and I yield back.

FRENCH HILL: Gentleman yields back. We're delighted today to welcome the testimony of our bank supervisory leaders, the Honorable Michelle Bowman, Vice Chairman of Supervision at the Board of Governors for the Federal Reserve System. The Honorable Jonathan Gould, our Comptroller of the Currency. The Honorable Kyle Hauptman, the Chair of the National Credit Union Administration and the Honorable Travis Hill, Chairman of the Federal Deposit Insurance Corporation.

We thank all of you for participating with us today. Thanks for taking your time to be here. Each of you will be recognized for five minutes to give an oral presentation of your testimony. Without objection, your written statements will be made part of the record. Vice Chairman Bowman, you're now recognized for five minutes.

MICHELLE BOWMAN: Thank you, Chairman Hill, Ranking Member Waters and members of the committee. I want to thank you for the opportunity to provide an update on the Federal Reserve's supervisory and regulatory activities. Today, my testimony will cover --

FRENCH HILL: Vice Chairman, could you move a little closer to the mic? Thank you so much.

MICHELLE BOWMAN: Thank you. Today, my testimony will cover three areas, current banking conditions, regulatory and supervisory reforms implemented since the committee's last hearing, and our path forward as we continue to promote safety and soundness and the stability of the US financial system. The banking system remains sound and resilient, banks continue to report strong capital ratios and significant liquidity buffers, which position them well to support the US economy.

Bank lending to households and businesses also continues to grow. The landscape for financial services has become more complex. NBFI lending has increased, raising competition for regulated banks without facing similar prudential standards. The financial system continues to adapt to advances in technology, including AI and cyber related risks.

The fed is committed to working with banks as they navigate this complex threat environment. Since I last appeared before the committee, we have made substantial progress to modernize the regulatory and

supervisory framework. And, of course, community banks remain a priority. These banks provide critical financial services to their communities, supporting families, businesses and the local economy.

Earlier this year, bank regulators finalized a Community Bank Leverage Ratio Framework. A broader range of qualifying banks can now use a simple leverage ratio to measure capital adequacy, instead of the complex risk based capital framework with the CBRL at 8 percent and an extended grace period from two to four quarters.

In March, the bank banking agencies published proposals to modernize the US regulatory capital framework. The proposals clarify requirements, align them with actual risks, reduce overlaps and support credit, while also preserving strong capital levels. Turning to supervision, we are using a risk-based, tailored approach that is calibrated to each bank's size, complexity, business model and risk profile.

Our supervision focuses on a bank's material financial risks and its overall strength. Earlier this year, we launched a comprehensive review of all outstanding matters requiring attention. The findings showed that many MRAs cited deficiencies unrelated to bank safety and soundness instead of focusing on -- and instead focusing on procedural or documentation shortcomings or departures from best practices that were designed for banks with very different business models and risk profiles.

Often, these best practices originated from the largest and most complex banks that were applied industrywide. Under my leadership at the FFIEC, the agencies and state bank regulators proposed long overdue revisions to the CAMELS ratings framework, which was largely unchanged since 1979. The revisions include a more transparent, objective approach that better captures material risks to a bank's financial condition and its overall strength.

Innovation is essential to meeting customer expectations and maintaining a dynamic banking industry. The fed is relying on a forward-looking approach that encourages innovation while maintaining appropriate safeguards. Additional work remains on multiple fronts. We are recalibrating thresholds across our regulatory framework to account for economic growth and inflation.

We are developing stablecoin issuer regulations as Congress directed in the GENIUS Act. We are also strengthening liquidity requirements to support banking system stability and to promote sound liquidity management. Our work follows three fundamental principles -- or a single fundamental principle, appropriately calibrated regulations, strengthened banking conditions, financial stability and economic growth while maintaining the robust safeguards the American people expect and deserve.

Thank you for the opportunity to appear before you this morning, and I look forward to answering your questions.

FRENCH HILL: I thank the gentlewoman. Mr. Gould, you're recognized for five minutes.

JONATHAN GOULD: Chairman Hill, Ranking Member Waters and members of the committee, thank you for the opportunity to appear before you. It is an honor to discuss the Office of the Comptroller of the Currency's work implementing the president's economic agenda by ensuring that America's federal banking system is safe and sound, and remains the world's most trusted, dynamic, and resilient.

After the 2008 financial crisis, Washington too often sought to eliminate rather than manage risks, resulting in a less relevant and diverse banking system. This approach drove financial activities into less regulated and visible parts of our economy, making risks harder to monitor and mitigate. The Dodd-Frank act, far from ending Too Big to Fail, created a moat around the largest banks and introduced too small to succeed.

Unelected bureaucrats discourage prudent risk taking and reduce credit availability in many communities. In particular, community banks suffered from these misguided policies. The number of banks with less than $1 billion in total assets declined by 50 percent. The OCC has introduced reforms to address this decline.

We've removed fixed examination requirements, tailored examinations to actual risk and imposed workday limits on examinations. We also created a supervision group focused on community banks. These actions, among others, represent a down payment on future reforms to promote a more relevant and diverse banking system.

Community banks are not the only casualty of the post Dodd-Frank banking system. In the years that followed, new bank formation in this country nearly ceased. From 1990 to 2008, the OCC received and approved over 1,000 de novo charter applications. After 2008, application volume and approvals fell by 90 percent, but the OCC is open for business again.

The agency received as many applications in 2025 alone as it did in the previous four years. For the first time in five years, a full service national bank opened its doors and we have conditionally approved ten more banks this year. This is the result of us once again following the law and our publicly stated procedures.

The OCC is also returning to risk-based supervision, rooted in law and emphasizing examiner judgment, not arbitrary checklists. We are hardwiring the foundations of supervision, such as the definition of unsafe and unsound practices into regulation and are reviewing past supervisory criticisms and enforcement actions to ensure alignment with our standard for material financial risks.

But we, like the banking system itself, must always look towards the future. Our job is to facilitate, not stymie, responsible innovation. We are working to respond to comments on our GENIUS Act proposal and finalize it. Just as the National Bank Act brought an end to the wildcat banking of the 1800s, the GENIUS Act in our rule will help ensure appropriate consumer protections for stablecoin users.

In other words, our regulation will help ensure that all OCC institutions are able to satisfy their obligations, including both deposits and stablecoins. The OCC is working to facilitate innovation outside the GENIUS Act as well. We, along with the other federal banking agencies, revised our model risk management guidance to avoid impeding banks use of AI. We also plan to seek information from the public on what additional guidance would be helpful.

Our banking system will only remain relevant and trusted if it resists pressure to deny access based on political or religious beliefs or lawful business activity. We have made considerable progress in reviewing the activities of the largest national banks and are investigating complaints -- complaints of alleged debunking consistent with the president's executive order.

We will continue to follow the evidence and report on our findings as appropriate. We have moved quickly to fix long-standing problems of agency management. The OCC too often relied on costly outside contractors for many core IT functions. Since I arrived, we have eliminated the need for 165 contractors, saving $75 million in the process.

Our bank examiners also lacked modern technology to do their jobs. This summer, we will begin replacing IT platforms from the early 2000s with modern tools. These efforts help fulfill our core mission while reducing assessment costs. Since its creation during the Civil War, the OCCs nationwide banking markets created the economic union necessary to support the political union forged on the battlefields.

We at the OCC are proud of our role, particularly as we celebrate our country's 250th anniversary, but we take nothing for granted, and we work hard to support the growth and dynamism that had defined our federal banking system since its inception. Thank you.

FRENCH HILL: Thank you, Mr. Gould. Mr. Hauptman, you're recognized for five minutes, sir.

KYLE HAUPTMAN: Thank you, Chairman Hill, Ranking Member Waters, members of the committee, thank you for the opportunity. As the current chair, I remain dedicated to serving in this role and no other until my successor is confirmed. President Trump has nominated Mr. John Kruse to the NCUA board. He's a seasoned, committed leader, track-record of balancing innovation.

In other words, he's well suited for the role. I'm confident Mr. Kruse will strengthen the agency even further, and I wish him best as he goes through the Senate confirmation process. Over the past year, NCUA has experienced significant changes. My primary goal as chairman have been to lead NCUA -- were ready to embrace their future, supporting a robust and innovative credit union industry and protect our share insurance fund through effective, appropriate supervision that is both focused on material risks.

I'm also proud we delivered cost savings, averaging about $9,000 per federal credit union through our cost reductions. I pursued all of our goals by championing regulatory improvements, embracing innovations like stablecoins, and improving our customer service. As digital currency and stablecoins reshaped the global financial system, credit unions have an opportunity to embrace this transformation from a solid foundation of safety and soundness.

Stablecoins can make payments faster, cheaper, and more inclusive. On May 15, we announced a proposed rulemaking for permitted payment stablecoin issuers, our second rulemaking required under the GENIUS Act. This rule puts credit unions on equal footing with banks. Credit unions are well poised to benefit from this long overdue update to America's payment system.

As Americans become -- as stablecoins become more widely adopted, we Americans may no longer be made fun of for speaking up how many business days a payment will take to settle. Every day is a business day with stablecoins, all 365 days of the year and all 24 hours of the day are equal in terms of sending payments with stablecoins.

Our tax refunds may eventually arrive on Sundays or holidays, and if we ever have a repeat of COVID in March 2020, Americans should be able to receive stimulus funds in a much more timely and secure manner. Beyond the consumer benefits, the big picture benefit of stablecoins is maintaining the US dollar status.

The GENIUS Act should stimulate demand for treasuries, thereby lowering borrowing costs for both the US government and consumers. Even repo rates on treasuries may fall, all else being equal, given that the GENIUS Act allows for investing in Treasury reverse repos and treasuries are more attractive when they can be used to obtain cheap financing.

And for all the debate about the effect on deposits held at our domestic banks and credit unions, a large portion of the money is expected to flow into stablecoins from abroad. Over 80 percent of existing dollar stablecoin usage is outside the United States. When Americans use the phrase dollar stablecoins, we tend to focus on the stablecoin part because stablecoins are a much better settlement token in dollars.

They're a bit like using poker chips and that the transactions are easier, but they only work if they are indeed stable and interchangeable with US dollars. But for people abroad, it's the dollar part of the word, the phrase, dollar stablecoin, that's what's important to them. We as Americans may have gotten so used to the dollar's global dominance that we don't notice what an advantage we have.

But just ask the British what it's like to lose reserve currency status. The GENIUS Act and dollar denominated stablecoins are ways of striking back against those in Beijing, Tehran or Moscow who continually push for the US dollar to be less important, less ubiquitous, and less useful. So, I'm pleased to work with my colleagues here at the table to do our part in that effort.

Turning to financial literacy efforts, that's a big part of the administration's observance of America's 250th anniversary. Last month, I joined my colleagues at this table for a financial literacy event hosted by the OCC. It was a wonderful opportunity to hear from banks and credit unions of all sizes, how they empower people and their communities by educating people of all ages from the elderly, all the way to kids in kindergarten.

I want to note that my five-year-old has read both of these books, including The Berenstain Bears Visit the Credit Union. Um -- I spoke about how financial security is essentially an amazing product, and one that can be purchased on the open market via saving and investing. Today, approximately 4,300 credit unions serve over 145 million members and managed more than $2 trillion in assets.

The industry is healthy and continues to balance innovation, access and safety and soundness. As of the end of last year, the aggregate net worth -- net worth ratio, that's how credit unions refer to capital levels, was strong at 11.3 percent, slightly higher than the year before. Asset growth was a solid five percent, up from two percent growth.

From a safety and soundness perspective, the system is in a good place. And finally, given my successor has been announced, I'd like to -- and this is probably my last appearance before this committee, I want to make one final point. Regulation falls hardest on the smallest institutions, but we are a better, more prosperous country because of the unique American system that contains over 8,000 banks and credit unions, many of them serve niche communities.

We don't want to be one of those countries where four or four big banks like Canada, we're best served with the system we have, with every corner of this country, every industry being served by a bank or a credit union. Thank you, Mr. Chairman.

FRENCH HILL: Thank you, sir, and thank you for your service since 2020 at the NCUA. We appreciate that. Chairman Hill?

TRAVIS HILL: Chairman Hill, Ranking Member Waters and members of the committee, thank you for the opportunity to testify today about the FDICs ongoing work to strengthen our regulatory and supervisory framework while we continue to fulfill our core mission of ensuring deposits, promoting bank safety and soundness, and resolving failed institutions.

Over the past year and a half, we have advanced a number of key policy priorities, including reforming supervision to focus on material financial risks, modernizing capital standards, improving our resolution readiness and implementing the GENIUS Act, among others. Beginning with supervision reform, we issued a proposed rule last fall with the OCC to define key terms related to supervisory criticisms, which we are working to finalize in the coming weeks.

In parallel, we have been conducting a comprehensive lookback of all outstanding supervisory criticisms as we work to implement the new approach in a consistent manner. We have also been working with our FFIC counterparts to modernize the CAMELS rating system, and we issued a proposal last month that would place greater emphasis on factors most critical to safety and soundness of institutions, and better align the overall rating with the bank's true risk profile.

With respect to capital standards, we recently issued two proposals to modernize risk-based capital requirements. These proposals improve risk sensitivity, simplify core components of the framework and provide more appropriate capital treatment across mortgage, retail and business lending. In addition, we finalized revisions to the Community Bank Leverage Ratio Framework to encourage broader adoption for community banks.

We also continue to strengthen our readiness to resolve failed banks. Among other things, we are working on changes to our resolution planning rule for insured depository institutions and have taken steps to enhance the competitiveness of our bidding process. Relatedly, we are working to remove barriers for non-banks to provide capital and failed bank auctions, including rescinding a 2009 policy statement that imposed overly restrictive conditions on private capital investors and exploring potential changes to the shelf charter process to allow a non-bank entity to act quickly in the event of a sudden, unexpected failure.

In the digital asset space, implement -- implementation of the GENIUS Act remains a top priority. We have issued proposed rules to establish an application framework, prudential requirements and BSA and sanctions compliance for FDIC supervised stablecoin issuers. We are also advancing other important policy initiatives; these include modernizing BSA, AML program requirements, updating our information disclosure rules and revising model risk and third-party risk management guidance to remove unnecessary barriers and encourage appropriate use of new technologies.

We are -- we are also reevaluating our bank merger review process to improve clarity, timeliness and transparency and are working to make the de novo application process more efficient. Earlier this year, we finalized a rule removing reputation risk as a basis of supervisory criticism. The rule makes clear that the FDIC will not require, instruct, or encourage an institution to close customer accounts or take other actions on the basis of a persons or entities political, social, cultural or religious views or beliefs, constitutionally protected speech or solely on the basis of politically disfavored but lawful business activities perceived to present reputation risk.

Finally, the FDIC continues to make progress in improving workplace culture. We have taken significant steps to improve accountability, enhance reporting and response processes, and reinforce expectations for professional conduct across the organization. I remain committed to ensuring that the FDIC maintains a culture grounded in professionalism, accountability, and respect to ensure that our workforce continues to fulfill our important mission.

Thank you for the opportunity to testify today. I look forward to answering your questions.

FRENCH HILL: Gentleman yields back. Thank you all for your opening statements. We'll now turn to member questions. I recognize myself for five minutes for some questions. I referenced in my opening statement that among our core work on improving bank supervision and echoing some of the good work you're doing in each of your agencies, that we've been advancing a series of bills under our Main Street Capital Access Act, which we hope to bring to the House floor in coming weeks.

And you've touched on it in your hearings, that our banking sector has faced numerous challenges, ranging from a drought in new bank formation, and thank you, Mr. Gould, for setting the record straight on what the OCC has been doing there. A post-crisis prudential framework that's pushed activity away from banks and squeezed many of our community and mid-sized institutions, uh, from the rules that I think, again, are not effectively tailored and discriminate against home lending, for example, to the politicization that we all witnessed of bank supervision and regulation in recent years.

So now, 15 years following the Great financial crisis and the resulting Dodd-Frank Act, it warrants that we take careful assessment of what's happened in that past 15 years and how we need to propose changes, and I think that is at the heart of the work we've done on Main Street Capital Access. So, let me ask each of the witnesses.

Start with you, Vice Chairman Bowman, can you talk about how these principles in Main Street Capital Access mirror the work that's being done by the Federal Reserve and its supervisory process, and how statutory changes can make that work durable, and submit that effort to give the certainty to our financial institutions, depository institution management, that they can count on that in the out years.

MICHELLE BOWMAN: Well, thank you for that important question, Chairman Hill. As you know, as a former community banker, a former state bank commissioner, I am very committed to the community bank model, and I appreciate your efforts to ensure that there's viability in this banking model going forward. Uh, a number of the of the issues that are covered within your bill are things that we are working on at the Federal Reserve and working together in the interagency context.

One of those in particular is ensuring that asset thresholds are appropriate moving forward and that are indexed for economic growth and inflation. So, I'll stop there.

FRENCH HILL: Yeah. Thank you, cell, Chairman Barr and I have just worked so hard on this over many, many years, and we really appreciate the work of the agencies, but we're trying to put it into law. This -- our nation is best governed by laws agreed to by the Congress, and not just on executive orders that vary radically between, you know, different executive branches.

Recently, the White House issued an executive order promoting access to mortgage credit, which underscored how tackling housing affordability requires not just more housing supply, but also better access to the financing. Let me stick with you, uh, Vice Chairman. Do you agree that housing affordability depends not only on just whether homes can be built, but whether banks have the capacity, funding and regulatory flexibility to undertake that one to four-family construction.

And you've heard me say, and we've said in this committee many times, six out of ten, uh, home construction loans on bank balance sheets are by banks under $10 billion. And many of our largest institutions are just out of that business. So, clearly, there's a -- there's a regulatory mix in there that I think is at the heart in some of the post-crisis decisions.

Can you reflect on that?

MICHELLE BOWMAN: Yes, thank you for that question. I -- a few weeks ago I made it -- or actually several months ago now, before we introduced the Basel capital proposal, I spoke in great detail about how a lot of the mortgage origination and servicing business has left the banking system. So, as a part of that proposal, we have more appropriately calibrated risk weightings for mortgage and mortgage -- mortgage origination and mortgage servicing activities so that banks will be incentivized to -- or not disincentivize to return to the mortgage market to serve their customers.

As a part of, um -- in support of that, the president's executive order also limits some of the complexity related to, uh -- to the origination of mortgages and the paperwork required. I think, in totality, those together will be very helpful for the banking system to return to that very critical traditional bread and butter activity of mortgage origination.

FRENCH HILL: Thank you. Well, I think it's very important and it was in the Joe Biden last Council of Economic Advisers report, a whole chapter acknowledging that, saying those were important changes to

make. And Ranking Member Waters and I have collaborated on our ROAD to 21st Century Housing bill, which got 396 votes here on the House floor.

But we believe that with that and with the tailoring of community banking proposals in it, more needs to be done. And so, I thank you for your comments. Let me recognize the Ranking Member from California of the Full Committee, Ms. Waters, for her five minutes of questions.

MAXINE WATERS: Thank you very much, Mr. Chairman. I am so focused on affordability and what our constituents are saying about their ability to have a decent quality of life. Let me ask each of the members here. Um, could you tell me what city you're from and how much the gasoline prices are in your city? Starting with Ms. Bowman.

What city?

MICHELLE BOWMAN: Congresswoman Waters, I live now in Arlington, Virginia, and gasoline is -- is --

MAXINE WATERS: I'm sorry, I can't hear you. Did you say you will not answer that?

MICHELLE BOWMAN: No, I'm sorry. I live in Arlington, Virginia. So, absolutely I'll answer that. Inflation affects both households and --

MAXINE WATERS: What city are you from?

MICHELLE BOWMAN: I'm originally from, uh, Council Grove, Kansas, which is a very small community.

MAXINE WATERS: How much is gasoline in whatever city you want to claim?

MICHELLE BOWMAN: Uh, well, in Arlington, it's about $4.50 a gallon, which is comparable to during COVID.

MAXINE WATERS: Let me move on. Mr. Mr. Gould, what city are you from?

JONATHAN GOULD: Well, I'm originally from Lynchburg, Virginia, but I --

MAXINE WATERS: And how much is gasoline there?

JONATHAN GOULD: I haven't been there in a while, I can't speak to the prices of gasoline there.

MAXINE WATERS: I'm sorry, I can't hear you.

JONATHAN GOULD: I haven't been to Lynchburg, Virginia, for a while, where I was -- where I grew up. So, I can't speak to the prices of gasoline there.

MAXINE WATERS: OK, who's next on the list over there? What city are you from?

KYLE HAUPTMAN: I'm originally from Bar Harbor, Maine. I think it's about four dollars.

MAXINE WATERS: What's the price of gasoline?

KYLE HAUPTMAN: Four and a quarter, $4.30, around there.

MAXINE WATERS: Mr. Hill?

TRAVIS HILL: Um, originally from New York. I don't know the exact price of gas, but I believe nationally it's around somewhere between $4.00 and $5.00 a gallon.

MAXINE WATERS: Do you know what it is in California? Between $6.30 and $7.00 a gasoline -- gasoline. Seven dollars a gallon for gasoline, and I think it's important for --

FRENCH HILL: Order, please.

MAXINE WATERS: I think it's important for us to know exactly what's going on in America with affordability, and so, that's why I'm asking you if you know and understand what your constituents are paying, even if you're here in Washington, where are you really from and where are you going back to and how much they are paying.

And it appears that there is not a consensus here that you all know what the cost of gasoline is. Um, again, it can cost $6.00 or even $7.00 a gallon in California and that's real money hitting family budgets, especially for those who need to drive to work. It has gotten so bad that 1 in 10 Americans skipped a meal yesterday.

Why? Because everything is too expensive, from putting gasoline in the car to buying a home, to putting food on the table, wages are not keeping up with affordability crisis, fueled by Trump's reckless policies. Last year, Americans were taking out loans and buying now pay later products to buy groceries.

Do you know what that is? Do you know what buy now, pay later is? Do you understand how that works? Raise your hand if you understand it, and you know how it works.

JONATHAN GOULD: Yes, I know what buy now, pay later loans are.

MAXINE WATERS: Mr. Gould, what did you say?

JONATHAN GOULD: I said, yes, I know what a buy now, pay later loan is.

MAXINE WATERS: Would you tell your constituents right now what it means?

JONATHAN GOULD: Well, my -- my constituents are the American public. I'm not --

MAXINE WATERS: That's right, it's the American public.

JONATHAN GOULD: -- official.

MAXINE WATERS: What does that mean? Buy now, groceries, pay later. What does that mean?

JONATHAN GOULD: Par -- pardon me?

MAXINE WATERS: OK, all right we'll move on. And do you know who is doing well? Corporate executives. Their compensation grew 20 times faster than working Americans last year. Did you know that, Ms. Bowman?

MICHELLE BOWMAN: Yes.

MAXINE WATERS: Did you know that, Mr. Gould?

JONATHAN GOULD: Not aware of the facts, what you're talking about. Be happy to look into them.

MAXINE WATERS: OK. Their compensation grew 20 times faster than working Americans last year. Who knows that and who understands that? Mr. Hill, did you know that?

TRAVIS HILL: Uh, like -- like the comptroller, we'd have to look into that, but happy to follow-up.

MAXINE WATERS: Now, we're not that far removed from a close call we had to a big financial crisis when Silicon Valley Bank and two other regional banks failed three years ago. Community banks and credit unions are having a tougher time to compete with the mega banks. But looking at your actions, you seem to be doing all you can to make life easier for the biggest banks and their executives.

This includes the Trump Administration's efforts to shut down the Consumer Financial Protection Bureau. As a result, there are no exams being done of mega banks to see if they're complying with consumer protection laws. Does anyone think the mega banks, which have paid hundreds of billions of dollars in fines for violating the law, are now perfect angels?

Are they doing OK?

JONATHAN GOULD: Congresswoman, the CEO of the biggest --

FRENCH HILL: Gentlewoman's time has expired. Chair now recognizes our Vice Chairman of the Full Committee --

MIKE LAWLER: Mr. Chairman I have a --

FRENCH HILL: Gentleman from New York?

MIKE LAWLER: I just want to submit for the record that California currently has the highest gas prices in the United States, averaging $5.80 to $6.00 --

FRENCH HILL: Mr. Lawler -- Mr. Lawler, that's not --

MIKE LAWLER: -- per gallon.

FRENCH HILL: Not a point of order.

MIKE LAWLER: These prices are driven up by high excised taxes --

FRENCH HILL: Thank you, Mr. Lawler.

MIKE LAWLER: -- strict -- [Crosstalk]

FRENCH HILL: The chair recognizes the Vice Chairman of the Full Committee -- Mr. Lawler --

UNKNOWN: Order. Mr. Chairman, I'd like to say that the price of gas has skyrocketed since President Trump has been in office. If that's a point of order I'd like to make the same --

FRENCH HILL: Order. The committee will come to order.

UNKNOWN: I just want to make sure the price -- Point of order. [Crosstalk]

FRENCH HILL: Mr. Lawler.

UNKNOWN: Mr. Chairman, Mr. Lawler is out of order and I ask --

FRENCH HILL: I've already ruled Mr. Lawler out of order. Everyone is out of order.

MAXINE WATERS: No, we're in order when we're talking about the American public.

FRENCH HILL: The gentlewoman's time has expired. The gentleman from --

MAXINE WATERS: I want more time.

FRENCH HILL: The vice chair --

MAXINE WATERS: I need more time.

FRENCH HILL: I'll give you more time later.

MAXINE WATERS: All right, thank you.

FRENCH HILL: You have a friend that will yield it to you. I know, I promise. I know. Uh, the Vice Chairman of the Full Committee, who is patiently waiting, Mr. Huizenga of Michigan, you're recognized for five minutes. Thank you.

BILL HUIZENGA: Well, thank you, Mr. Chairman. And not to add to the cacophony, but I bought gas at $3.93 a gallon at my local Sam's Club in Holland, Michigan on -- on Saturday, and $3.99 was the predominant price. I too have my own understandings of why gas might be 50 percent more than that in California, but nonetheless.

I'm going to start with -- with you, Vice Chair Bowman, um, and I was going to ask before I launched into SVB, I was going to ask you, how's it going? But I think we see the state of how it's going all the way around. So, let's just get right to SVB. It's been more than three years since the failure of Silicon Valley Bank, which was regulated at the federal level by the Federal Reserve System.

The Biden Administration had a limited review for regarding the failure and it conducted by fed staff and hastily published only a week later, or weeks later. Uh, it was used to justify a slew of misguided regulatory proposals that not only punished all the rest of the banks that actually acted as sources of strength and during the fallout, but also proposed to impose burdens on banks in ways that had nothing to do with SVBs failure.

So, Vice Chairman Bowman, now that we -- we have had the benefit of more time to reflect on the SVB failure, I understand and appreciate that you've been commissioned to do an independent review. So, are you addressing the aforementioned shortcomings in the independent review that we saw coming out of that staff-led fed review?

And are you seeking the cooperation of those who are in positions of responsibility at that time, as -- as you were exploring the reasons why that happened?

MICHELLE BOWMAN: Congressman, thank you for that question. I think it's very important that as we had the most costly bank failure in history at $42 billion, at the cost to the to the DIF fund, that we understand exactly what the failures were in supervision and in bank management that led to the failures of that institution and several others soon thereafter.

What's important is that we identify those actions that were taken by supervisors, that were -- that kept us from understanding the condition of the bank and acting appropriately and in a timely way. So, it's my expectation that the -- that the group that's doing this independent review for us will engage with those who were responsible for overseeing supervision and the supervisory process during that time period.

BILL HUIZENGA: And you felt it was necessary to do an additional independent review, not just rely on what had been hastily put together previously?

MICHELLE BOWMAN: Yes, I committed to commissioning an external review during my confirmation process.

BILL HUIZENGA: And who is leading that review? It's a group called Starling. OK, and they have they --

MICHELLE BOWMAN: They have experience with -- with doing these types of activities, yes.

BILL HUIZENGA: OK. Well, I appreciate your work on that because there are still lessons to be learned from that. Uh, and by the way, I echo the chairman's, uh -- uh, concern about the lack of involvement on local banks with mortgages. I -- when I graduated my oh so employable political science degree, I went into real estate full time and I said at the closing table many a time with those local community banks who held those mortgages in their portfolio.

Uh, and I believe it made their risk assessment and their decision making better, not worse. Um, Mr. Chairman, the other Chairman Hill, uh, let me go to this, uh, I've introduced legislation, HR 3446, the FDIB -- FDIC Board Accountability Act to replace the CFPB director on the FDIC Board and instead require one FDIC board member to have actual experience with small banks less than $10 billion.

I might actually nominate Mickey [ph] Bowman to join that with her experience as a community banker and a state regulator. This bill was included in the Main Street Act. How important is it for the FDIC board itself to include members with direct experience working with community banks, and could have the -- could having that expertise at the board level lead to better informed policy making?

TRAVIS HILL: Well, thank you, congressman. Um, as you know, the FDIC is the -- is the primary federal supervisor for the majority of community banks in America, um, and so I think having direct experience with community banks is vital, um, and would be extremely valuable for the FDIC. Um, we would certainly welcome Vice Chair Bowman if she wanted to join our board, though I think she --

BILL HUIZENGA: She's going to be the Marco Rubio of regulators, I think. Yeah one more hat. But -- well, it just seems to me that while we have some colleagues calling this, quote, reckless -- reckless deregulation, it seems to me that most should actually call this common sense. Uh, when I look at a CFPB director who's politically appointed versus an actual practitioner, I side with the practitioner.

So, with that, Mr. Chairman, unless apparently I could have the ranking members extra time that she had requested, uh, I will yield back to the chair.

FRENCH HILL: The chair recognizes the Ranking Member of our Subcommittee on Capital Markets, gentleman from California, Mr. Sherman, you're recognized for five minutes.

BRAD SHERMAN: First, I want to comment on the proposal to create a $250 bill. Now, most Democrats are concerned about the proposal as to whose picture will be on that bill but the real question for me is who needs a $250 bill? Clearly, drug dealers in America face a major problem in dealing with large amounts of currency, and the issuance of such a bill would make their lives two and a half times better.

There is no other reason for the creation of a $250 bill. Basel III is -- when you finally implement it, and your regulations is going to have some unexpected, unintended, consequences and I look forward to each of the regulators providing for the record what mechanisms you have for future adjustments and recalibrations as you take your, uh, your vehicle out on the road and test drive it. Dodd-Frank kept America safe from 2008, it continues to keep America safe.

And, uh, I see the -- uh, in this room, the picture of Barney Frank and appreciate all of the work that was done in this room to protect us from that meltdown. One hole in the, uh -- in that bill, was it left to the regulators how to deal with interest rate risk and, of course, the regulators failed to deal with interest rate risk with regard to Silicon Valley Bank and others.

This proposal moves us in the right direction in terms of mark to market for held for sale securities, but there needs to be a comprehensive review of interest rate risk, uh, looking not only at -- at, uh, held to maturity securities, but even very long term, uh, non-marketable securities. The proposals for Basel III have had a number of improvements in the area of clean energy credits, uh, some progress on private mortgage insurance and a whole lot of progress in dealing with the capital markets and fee income.

So, at least the regulators and your predecessors and you have listened to us. Mr. Hauptman, uh, you talk about government payments in stablecoin. I can't think of a worse idea. It would sanctify an alternative to the US dollar, an alternative designed to facilitate a tax evasion economy. Uh, and I would point out to all of our regulators here that the GENIUS Act requires that there be no interest paid on stablecoin.

The smartest, or at least the best paid lawyers in the country are being paid to try to evade that requirement, and I'm counting on you to write regulations that withstand that. Um, Mr. Gould, thank you for talking about not debunking unpopular, uh, businesses. And, uh, I now have a question for, uh, Ms. Bowman um, we're supposed to account for, uh, economic growth in drafting these regulations, the use scoring methodology, using a base year of 2019 rather than 2015. Uh, so, you're not reflecting economic growth that occurred after the regulation process began.

Uh, is there any justification to explain why the proposal does not account for economic growth from 2015 to 2019? And how, uh -- and does that put us at a disadvantage in competing with foreign banks?

MICHELLE BOWMAN: Well, I appreciate that question. You're referring to the G-SIB surcharge calibration?

BRAD SHERMAN: Exactly.

MICHELLE BOWMAN: Uh, I'll -- I'll be honest with you, the reason that we started at 2019 was because in working with my board to understand how I could get support for moving this proposal forward, this was the compromise that we were able to strike.

BRAD SHERMAN: But what justifies not -- other than saying, well, we got together and we picked it. Uh, what justifies, uh, ignoring growth between 2015 and 2019?

MICHELLE BOWMAN: Well, we also recognize that in 2019, uh, many of my board members stated that the level in the -- the level of capital in the banking system was just about right. So, it was, as I said, it was a compromise. We did discuss and review going back to 2015. It would have lowered the capital requirements to a level that some were uncomfortable with.

So we --

BRAD SHERMAN: Yes, the chairman commented that the capital levels were just about right in 2019. So, then you go back to 2015. Um, I'm surprised you -- the only defense, uh, you have for this rule is, well, we got together and we discussed it and some people wanted to do it. So, that -- wanted to go in one direction or the other direction.

I don't think there's any reason not to, uh, to ignore the four years of economic growth. I yield back.

FRENCH HILL: The gentleman's time has expired. Thank you for that, Mr. Sherman. I recognize the Chair of our Housing and Insurance Subcommittee, the gentleman from Nebraska, Mr. Flood. You're recognized for five minutes.

MIKE FLOOD: Thank you, Mr. Chairman. I'd like to focus my questions this morning on two subtopics. Number one, the rollout of the Basel III Endgame proposal and the implementation of the GENIUS Act for stablecoins. I sent a letter with Senator Ricketts back in February requesting that you all address the cap on mortgage servicing assets, as applied to the Common Equity Tier 1 formula for banks across the country.

This cap is a significant barrier, particularly for smaller banks that have very little capacity to participate in mortgage servicing with the cap. I was very pleased to see that the current proposal removes the mortgage servicing deduction entirely and I do believe that this change will make it easier for institutions, both large and small, to participate in mortgage servicing.

This question is for Vice Chair Bowman, Comptroller Gould and Chairman Hill. Can you each address why you thought the cap should be removed on mortgage servicing assets in the proposal? And then can you also talk about any other changes that you'd like to highlight in the rulemaking that you feel will help get banks back in the mortgage business?

We'll start with Ms. Bowman.

MICHELLE BOWMAN: Thank you for the question. As I mentioned earlier, the mortgage servicing business and the mortgage origination business has been a very traditional banking activity and is a primary source of relationship lending for community banks in particular. So, we wanted to find ways to incentivize and encourage banks to return to the mortgage business so that they could serve their customers.

This was one way that we could do that.

MIKE FLOOD: Thank you very much. Mr. Gould?

JONATHAN GOULD: Thank you. I would just note that we made a number of changes post 2008 that pushed some of these activities, including mortgages, outside of the banking system, I think to our detriment. If I could make a broader contextual point, if I may. Um, last week, Secretary Bessent gave a tour de force -- a tour de force speech at the Reagan Economic Summit.

Some of you, I think, were there, entitled: While America Slept. And he linked specifically the connection between economic security and national security. A lot of what we are doing today, a lot of what I am doing at the OCC, is making sure that we are empowering banks and restoring them to their proper role of being able to promote economic growth in this country, which is essential to economic security, which, as Secretary Bessent has so eloquently linked it, is also essential to national security.

So, that is a broader context in which I think you should view many of the actions that I, at least at the OCC, am taking.

MIKE FLOOD: Thank you, chairman. Chairman Hill?

TRAVIS HILL: Yeah, I would just echo that I think removing some of the obstacles to banks engaging in the mortgage -- mortgage business is extremely important. Um, one other piece of the Basel proposal that is also, I think, very important is the improved risk sensitivity for mortgages that are held on balance sheet, um, by tying it to -- to loan to value ratios.

Um, I think that will go a long way in encouraging banks to originate and retain more mortgages and -- and reduce the amount of mortgages that are being funneled through the through the GSEs.

MIKE FLOOD: Thank you. Next, I'd like to talk about the implementation of the GENIUS Act. In April, the Department of Treasury issued an advance notice of proposed rulemaking for determining whether an existing state level stablecoin regulatory regime is substantially similar to the federal regime pursuant to the GENIUS Act. This is the first step towards a process that will ultimately allow some stablecoin issuers to be regulated at the state level.

I passed a bill to make Nebraska the second state in the nation to have -- to allow state chartered banks to custody digital assets. Once these rules are finalized, an entity called the Stablecoin Certification Review Committee will review state laws to ensure they meet the criteria for GENIUS Act. The committee will be the Secretary of Treasury, either the chair of the Federal Reserve or the Vice Chair of Supervision and the chair of the Federal Deposit Corporation.

Vice Chair Bowman, have you discussed this with Chairman Warsh? And do you know whether you'll be the representative from the Federal Reserve on the a Stablecoin Certification Review Committee, or if it will be Chairman Warsh?

MICHELLE BOWMAN: Well, thank you for including the Federal Reserve in this initiative. We have not yet had the opportunity to discuss that, but it clearly is an important issue.

MIKE FLOOD: Thank you. It's important to me that we continue to keep this state and federal pathway and stablecoins served in the state legislature for ten years. States are little laboratories for democracy, and there's a lot of innovation that's happening there. Um, I guess with the remaining time I have, I would advise this committee that thanks to Nebraska corn, gasoline is 40 percent cheaper if you use ethanol.

And so, if we want to bring down gas prices, buy more ethanol, year round E15 and go Huskers. I yield back.

FRENCH HILL: Gentleman yields back. My pleasure to recognize the gentleman from New York, our Ranking Member of our House Foreign Affairs Committee, Mr. Meeks. You're recognized for five minutes.

GREGORY W. MEEKS: Thank you, Mr. Chairman, and just to that, let me just say, I think it's -- just to get the record straight since I am the Ranking Member on the House Foreign Affairs Committee, that since the president's war of choice in Iran, across America, Americans are paying more than 50 percent, between 40 percent and 50 percent more per gallon since the Iran war.

That's according to the AAA. Just want that record to be clear that Americans are paying more across the country, including in Mr. Lawler's district where it's about $4.50, if I don't -- if I recall correctly, because I'm in New York also. But let me ask this question. Uh, let me make this quote, folks, "The business of banking is built on trust and confidence.

Competent bank supervision is a prerequisite to restoring that trust and confidence," does that statement sound familiar to anybody? No? Well, I'll tell you where the statement came from, that statement was made by Mr. Gould back in 2023 in front of this body, in a subcommittee hearing. Do you recall that, Mr. Gould?

JONATHAN GOULD: I don't recall the exact quote, but -- but it sure sounds like my words. Thank you, congressman.

GREGORY W. MEEKS: And would you stand by that today?

JONATHAN GOULD: Yes, and specifically, I would note that we lacked competent bank supervision in the lead up to Silicon Valley Bank.

GREGORY W. MEEKS: OK, good. So, you would probably also agree that competent bank supervision requires holding everyone to the same standard, regardless of who they are, is that also correct? Yes or no because I've --

JONATHAN GOULD: Is that is that to me, congressman?

GREGORY W. MEEKS: Yes, to you.

JONATHAN GOULD: Well, congressman, I would note that we do tailor our regulation and supervision based on the nature of the bank and the complexity of its business ---

GREGORY W. MEEKS: OK, gotcha. So, I hear you. So, let me give you an example then of what I believe equal standards should look like, and you tell me. There's a fintech company called Wise who doesn't seem to have any direct links with top officials in the administration. So, they don't have any pull or anything of that nature.

When its sponsor bank had AML problems, it was your agency who issued a consent order. And when Wise itself had AML problems, state regulators and the CFPB acted. So, I think that the OCC seems to have the tools necessary to conduct adequate oversight. I think that they do have that. Now, Mr. Gould, can an applicant obtain an OCC charter without demonstrating adequate BSA or AML compliance?

Yes or no?

JONATHAN GOULD: Well, congressman, um, the OCCs guidelines are established by statute and are detailed and exquisite --

GREGORY W. MEEKS: I just need to know, do they have to have BSA and/or AML compliance?

JONATHAN GOULD: Well --

GREGORY W. MEEKS: Yes or no?

JONATHAN GOULD: Congressman, it's not as simple as a yes or no, and I think I'd be --

GREGORY W. MEEKS: So, they could be out of compliance?

JONATHAN GOULD: I'd be doing a disservice to the members of the committee if I pretended that it was a simple yes or no.

GREGORY W. MEEKS: OK, I just try to --

JONATHAN GOULD: When we're talking about a bank --

GREGORY W. MEEKS: Let me go this far. Let me ask you this.

JONATHAN GOULD: They don't actually have the --

GREGORY W. MEEKS: Let me ask you this. Let's -- let's talk about something else then. Let's talk about President Trump and his son's crypto company called World Liberty Financial. That company applied to the OCC for a federal banking license to issue their own digital dollar and at the same time, a foreign government linked investor reportedly acquired nearly half of the company.

And I'm sure you're aware that the crypto exchange, Binance, which holds nearly 90 percent of the digital dollar issued by the World Liberty Financial, pleaded guilty in 2023 to sanctions and money laundering violations. And it doesn't stop there. That same exchange permitted more than $1 billion in cryptocurrency transactions to Iran and terrorist organizations.

But that didn't stop the president and his sons from putting their flagship digital assets on the criminal exchange. And that same company directly involved and actively lines the pockets of the president's family today. So, let's not beat around the bush, Mr. Gould, because I'm going to ask you a few questions and I know you may want to filibuster.

Will you commit today that you will do your job as a regulator and ensure that the World Liberty Financial is held to the same level of scrutiny as every other applicant, like Wise, before the OCC, and because this has given you an opportunity to prove if you're still working on behalf of the American people, or have you ceded your role to serve as a fixer for the Trump family?

Which is it, Mr. Gould? Are you working for the American people

FRENCH HILL: The gentleman's time has expired.

GREGORY W. MEEKS: -- or are you working for the Trump family?

MAXINE WATERS: Let the gentleman answer.

FRENCH HILL: The gentleman can answer in writing. It's a good question, he'll answer it in writing.

MAXINE WATERS: Now.

FRENCH HILL: The chair recognizes the House Majority Whip, Mr. Emmer of Minnesota, for five minutes.

TOM EMMER: Thank you, Mr. Chair, and thank you all for being here today. I'd like to start by commending the agencies for the meaningful improvements that have been made to the original 2023 Basel III proposal. There is a significant amount of technical and highly complex work that went into developing this updated proposal, and we recognize that calibrating a modern capital framework requires careful judgment across a range of competing objectives.

There is no hiding that the 2023 Proposal cost serious heartburn across a broad spectrum of industries and political viewpoints, with criticism emerging from multiple sectors of the economy and spanning across party and ideological lines. Chief among those concerns was the, why. US banks are some of the most resilient and well capitalized in the world, yet former Vice Chair Barr and the rest of the Biden-era prudential regulators believed that there needed to be higher capital requirements -- requirements without adequately demonstrating the need for them through quantitative analysis.

Unfortunately, all of this was done at the expense of everyday Americans; higher capital requirements, reduced credit availability, increasing borrowing costs and limiting access to financing for first time home buyers and small businesses. That said, it's evident that those concerns were carefully considered, and I believe this updated proposal is in a much better place today than it was two and a half years ago.

One of those improvements is the continued focus on tailoring, recognizing that not all institutions pose the same level of risk, and that regulatory frameworks should reflect difference in size, complexity and business model. Vice Chair Bowman, as you move toward a final rule, how are you ensuring that the

framework remains appropriately tailored and risk sensitive over time so firms are not inadvertently captured simply due to growth or broader economic changes?

MICHELLE BOWMAN: Thank you for that question, I appreciate your -- your praise, I think, on the new Basel III proposal.

TOM EMMER: It was praise.

MICHELLE BOWMAN: -- worked very, very diligently to ensure that we were striking the right balance between capital and risk weighting requirements. The way that we're working to ensure that we are capturing the right banks at the right levels is to ensure that there is an indexing for the requirements and responsibilities.

We're using, uh -- sorry, nominal GDP as our index weight for that.

TOM EMMER: OK, great. I was also pleased, by the way, to see that the 2026 proposal excludes client facing cleared derivatives from credit valuation adjustment capital requirements. However, I noticed that there isn't a full CVA exemption for end users, with the proposal increasing capital on these transactions by 96 percent.

I -- Vice Chair Bowman, again, can you briefly walk us through your thinking on this, as it's vitally important to allow our farmers and ag businesses to hedge risk in the most effective way possible.

MICHELLE BOWMAN: I share your concern. This is a very important issue. Our comment period closes on June 18, and we look forward to comments on this proposal to ensure that we've got the balance right in this particular area.

TOM EMMER: Well, and I know you want to get this done as soon as possible, but would you be open to additional feedback even from us on this issue?

MICHELLE BOWMAN: Absolutely, we look forward to your feedback and would be happy to visit with you about that.

TOM EMMER: Separately, under the 2026 proposal, Category III and IV banks must now include accumulated other comprehensive income in Common Equity Tier 1 capital. It's my understanding that this change is subject to a multi-year phase in. However, for banks, the cross into Category 2, there would be an immediate inclusion.

Uh, Vice Chair Bowman, how are you thinking about structuring the final rule to avoid unintended cliff effects so firms can make an orderly transition into a new category without disrupting credit availability or market functioning?

MICHELLE BOWMAN: It's not necessarily addressed in the Basel proposal, but there are a number of considerations that we're taking in different forms that would address the categories and the delineations of those categories as we're thinking about asset thresholds more generally.

TOM EMMER: Well, thank you. I see the time is running short. I may have some things that I'll follow up with separate from the hearing. And with that, Mr. Chairman, I yield back.

FRENCH HILL: Gentleman yields back. We're going to suspend for a moment. Chair now recognizes the Ranking Member of our Subcommittee on Digital Assets, Mr. Lynch of Massachusetts. You're recognized for five minutes.

STEPHEN F. LYNCH: Thank you, Mr. Chairman. Uh, at this time, I'd like to yield some time to, uh, the Ranking Member of the Foreign Affairs Committee, the gentleman from New York, Mr. Meeks.

GREGORY W. MEEKS: Thank you, Mr. Lynch. I just want to go back to Mr. Gould. Uh, because he didn't have the opportunity to answer the question of whether or not he is working for the American people or working as a Trump fixer. Which one is it?

JONATHAN GOULD: Well, thank you for the opportunity to respond. You can recite unsubstantiated allegation after unsubstantiated allegation, and you can attempt to pressure me as your Democratic colleagues --

GREGORY W. MEEKS: I'm not reciting anything. I'm just saying that --

JONATHAN GOULD: Extraordinary --

GREGORY W. MEEKS: I know what -- I gave you two examples. Wise --

JONATHAN GOULD: An unprecedented extent. But we at the OCC --

GREGORY W. MEEKS: I gave you Wise and I gave you Trump.

JONATHAN GOULD: -- we follow the law.

GREGORY W. MEEKS: So, let me just ask you this.

JONATHAN GOULD: [inaudible]

GREGORY W. MEEKS: Let me just ask you this.

JONATHAN GOULD: Thank you, sir.

GREGORY W. MEEKS: Let me just -- let me just ask you this, and I'm gonna give Mr. Lynch back his time. So, if the OCC approves this application, will you commit that you will come back to this committee to personally -- and personally appear before this committee and explain your decision? Because we talk about transparency here.

Transparency for the American people.

JONATHAN GOULD: Congressman --

GREGORY W. MEEKS: Will you come back --

JONATHAN GOULD: Your attempts to continue to pressure me --

GREGORY W. MEEKS: -- if you --

JONATHAN GOULD: The only political pressure I have --

GREGORY W. MEEKS: You are acting as --

JONATHAN GOULD: -- other than your Senate colleagues.

GREGORY W. MEEKS: Will --

JONATHAN GOULD: That is very unfortunate.

GREGORY W. MEEKS: I reclaim my time. I reclaim my time. [Crosstalk]

JONATHAN GOULD: -- executive --

GREGORY W. MEEKS: I reclaim my time. Obviously, you will not come back. Obviously, you do not want the American people to see transparency. Obviously, you are Trumps fixer.

JONATHAN GOULD: What we will obviously do, congressman --

GREGORY W. MEEKS: I yield my time back.

JONATHAN GOULD: -- under the statute and consistent with --

STEPHEN F. LYNCH: Reclaiming my time.

JONATHAN GOULD: -- procedures.

STEPHEN F. LYNCH: Ms. Bowman, I've got an overriding concern about just generally the -- the convergence of traditional banking, where we have a lot of safeguards and guardrails and what's happening in crypto. Uh, as I'm sure you're aware, we've been experiencing a so-called crypto crash, uh, recently. And I know that, uh -- I know that the Kraken was, was recently -- well, a while back was given a, uh, a Federal Reserve master account, uh, that was -- that was granted even before we had the framework, uh, set up. Um, are we looking closely at what's going on with, with Kraken and whether they're in full compliance, given the nosedive that, uh, that crypto has taken recently?

MICHELLE BOWMAN: Thank you for that question uh, Congressman Lynch. The Federal Reserve has a process for approving applications, a tiered approach for approving applications for access to the payment system. Our approach for Kraken was for a limited purpose and for a limited period of time. The Kansas City Reserve Bank approved that limited purpose application, and the 12 months will lapse early next year.

We look forward to understanding how that entity will be using its access, very limited access to the payment system to understand how other similar entities might use that account as well.

STEPHEN F. LYNCH: OK, that's fair, thank you. Uh, I do want to comment though each of the regulators has rescinded its earlier guidance. So, we go back a year and a half two years ago, we had a standard guidance to banks just to use caution because crypto is a speculative asset, as we've seen recently. And, yet, uh, all the, all of the lessons we've learned, you know, from going back to the Great Depression, the bank crisis, uh, even -- even as recently as 2008, was to try to create stability in the banks.

So, those -- those missions seem to be in conflict. The -- the speculative asset aspect of crypto and yet the stability and safety and soundness of these banks seem to be in conflict. And now we don't have the CFPB. So, they're not a cop on the beat anymore. You've relinquished the one guidance that was out there, uh, that -- that told banks, be careful, be careful about investing in crypto.

So, what are we what are we doing now? What's out there that's going to protect depositors and retail investors and, and the banks themselves in terms of safety and soundness now that we're not giving them that type of guidance?

MICHELLE BOWMAN: One of the concerns that we had about that guidance was that it was much more broad than the single issue that you're talking about. What we want to make sure is that our banking system is positioned to adopt innovation where it's necessary for them to meet the expectations of their

customers and consumers, and to be able to be positioned to support the US economy as it's growing and it's evolving to adopt some of these technologies.

As we're looking at our supervision of banks under our purview at the Federal Reserve, we work closely with them to ensure that they're adopting innovation in a safe and sound manner, but that we're working together with them as we're working to develop our GENIUS Act responsibilities and introduce our frameworks.

SCOTT FITZGERALD: Gentleman's time has expired.

STEPHEN F. LYNCH: Can -- I can I just ask, will there be a report at the end when Kraken, uh -- when that period expires and would you offer that to the committee?

MICHELLE BOWMAN: I don't have anything for you on that right now, but I'd be happy to -- to talk to the Kansas City Reserve [ph].

SCOTT FITZGERALD: Gentleman's time has expired.

STEPHEN F. LYNCH: I yield back.

SCOTT FITZGERALD: I now recognize the gentleman from New York, Mr. Lawler, for five minutes.

MIKE LAWLER: Thank you, Mr. Chairman. I'd like to submit for the record an article from US News, a look at gas prices around the world, which explains why California has the highest gas prices in America.

SCOTT FITZGERALD: Without objection.

MIKE LAWLER: Thank you, Mr. Chairman, and thank you to our witnesses for your testimony today. I appreciate the work and leadership each of you has put into revising the original Basel III proposal. I support the revised proposal, it represents a significant improvement. The new proposal attempts to address the overlap between risk-based capital and stress tests in the treatment of market and operational risk.

While I appreciate the consideration behind the agency's approach, more comprehensive amendments to include stress testing would be needed to address this overlap fully. Vice Chair Bowman, how do you plan to more finely tune the requirements to optimize the balance between capital requirements and costs?

MICHELLE BOWMAN: Well -- the comment period on the Basel proposal and the other capital proposals ends on January -- sorry, June 18, and we look forward to reviewing all of the comments and would be happy to discuss any concerns that you have with you directly. On other issues and other matters, we have the stress testing proposal has not yet been finalized.

It will be hopefully by the end of this year, and we're optimistic that we will address the overlaps that existed between the original stress testing framework and the Basel proposals as we're completing that work.

MIKE LAWLER: Now, we've seen a dramatic rise in fraud from AI generated impersonation scams to criminals exploiting gaps in the telecom and payments ecosystem. The reality is that fraudsters are innovating faster than the system built to stop them, and consumers and financial institutions are paying the price. Comptroller Gould, how can the government do more to help consumers and financial institutions prevent fraudsters from being successful?

JONATHAN GOULD: Well, thank you very much for the -- for the question, congressman. Um, the agencies together did a RFI last year and from that RFI, I think, or at least I learned a number of things, including the necessity of increasing data sharing around fraud so that more stakeholders have access to potential fraud actors.

I think it was also a humbling experience because I believe that at least, again, I learned that we, the OCC, are not alone, meaning we can't solve the problem on our own. This is something that transcends just the federal banking agencies and involves other aspects of the US government as well and so, as my colleague mentioned with the FLEC, you know, we also work together on financial literacy across the board.

I would note here that, um, financial literacy is at least potentially a part of the solution and President Trump's accounts, I think, will be very valuable in that regard, since it teaches financial literacy at a young age. I actually signed up my -- my youngest son for it the other day. So, I'm excited about that.

So, again, I think this is going to require a multifaceted approach across a number of government agencies to address. I recognize there are issues around, um, who bears the burden of some of these fraud events, including just among and within banks across the industry, and I know there's been some tension between larger banks and smaller banks and the OCC has given our -- given the fact that we supervise many of the largest banks has been attempting to facilitate some of those disputes.

MIKE LAWLER: Last year, you said that the failure to innovate is itself a risk, and I agree. But innovation also brings new risks that must be understood and managed. And AI is going to be a defining feature of the future of banking from fraud detection to underwriting to compliance. The question is, how we capture the benefits while guarding against bias, model drift and operational vulnerabilities.

So, can you describe the approach you are taking to examine the use of AI and share your views on both the benefits and the risks associated with its development and deployment? And what issues do you believe we should be monitoring more closely as AI advances?

JONATHAN GOULD: Well, thank you very much for the question, and I think you hit the nail on the head in terms of striking the right balance between innovation and safety. Obviously, the president has spoken to this issue recently with an EO that came out, I think, just a couple of days ago. In terms of the OCC, you know, we view AI as both a potential opportunity both to improve how we manage our own agency as well as how we supervise banks, including larger banks, where it is very hard for us to do enough kind of statistical sampling and credit file reviews to get direct experience of the risks in those banks.

So, AI is an opportunity. On the other hand, of course, as we've read about more recently in the newspaper, around things like Mythos and other frontier models. we recognize it can also be used to identify vulnerabilities. So, I think we at the OCC, working with main Treasury and, of course, our federal banking agency and credit union colleagues, want to make sure that frontier models and AI is also being used responsibly by banks of all sizes, as well as importantly, their service providers.

SCOTT FITZGERALD: Gentleman's time has expired. We now recognize the Ranking Member of the Subcommittee on Oversight and Investigations, Mr. Green of Texas, for five minutes.

AL GREEN: Thank you, Mr. Chairman. I thank the ranking member, thank the witnesses for appearing. Uh, I would like to ask Vice Chair Powell [ph] a question. Uh, Vice Chair Powell, do you agree that as a general rule to control high inflation, the fed will raise interest rates?

MICHELLE BOWMAN: Congressman --

SCOTT FITZGERALD: Mr. Green, who is the -- who is the question directed to?

AL GREEN: Ms. Bowman, excuse me.

SCOTT FITZGERALD: OK.

MICHELLE BOWMAN: Thank you for the question, Congressman Green. We recognize that inflation has been well above two percent.

AL GREEN: Can I do this, please? Just as a general rule, if you have high inflation that you desire to control, do you raise interest rates as a general rule?

MICHELLE BOWMAN: Well, congressman, as you know, Congress gave us a dual mandate of maximum --

AL GREEN: But I'm interested in this -- I understand the dual mandate. Do you raise interest? Are you -- well, maybe you don't know. Do you know whether you would raise interest rates?

MICHELLE BOWMAN: Well, I just discussed my framework for making decisions about monetary policy, which would include raising, lowering or leaving --

AL GREEN: OK, would you raise interest rates if -- if inflation is high and you want to control it?

MICHELLE BOWMAN: It depends on the condition of the economy and all of the --

AL GREEN: As a general rule, when inflation is high and you want to control it, would you raise interest rates?

MICHELLE BOWMAN: In certain circumstances, yes we would.

AL GREEN: OK. And as a general rule, would you want -- what would happen if you lowered the interest rates when inflation is high?

MICHELLE BOWMAN: Well, what we found during COVID, when we had inflation in excess of nine percent by some measures, having low -- low inflation or low federal funds rate stimulated the economy.

AL GREEN: And when you stimulate the economy, what happens? If you -- if you have high inflation?

MICHELLE BOWMAN: Inflation can continue to increase.

AL GREEN: Inflation continues to go up, correct?

MICHELLE BOWMAN: That's correct.

AL GREEN: OK. Well, if you have a president who desires to lower the interest rates for political purposes, and the fed believes that the interest rate should be raised, then you will have a president who is at odds and who would probably increase inflation. I mentioned this because I'm concerned about the independence of the fed.

And you have a president who wants control of that process. If the president can control that process, the president can do something that can be very harmful to the economy, especially this president, who does things to benefit himself as opposed to the people who actually need the benefit, which is the American people.

I, um -- I said Powell earlier, that's because I have such great respect for him, uh, and I am absolutely a person who believes that he has done the right thing by standing up to this president. He has made a difference. He has shown us how one person, who is bold enough to take a stand, can make a difference for the American people.

I believe so strongly in this that I will personally have a flag flown over the Capitol to support him and to acknowledge him for the courage that he has shown at a very difficult time in our country's history. He is no longer the chair. I trust that this chair will have the courage of Chair Powell. And pardon me for initially starting with his name, but it was on my mind because I think so highly of him, and I had planned to make these comments.

Now, let's talk for just a moment about meme coins. Generally speaking, there is something that is known as the greater fool theory. Um, and this greater fool theory depends upon someone who has made a purchase, having another person pay more for that purchase than this someone that made the initial purchase.

Uh, that's how you make your money. A meme coin is highly dependent on the greater fool theory, someone buying at a higher price than the person who bought initially. Uh, is there anybody who differs with me on that? Good. Because a meme coin means literally that you buy nothing when you make your purchase, but you do have the opportunity to either make money or lose money.

Well, the president has found a way to manipulate meme coins, and he and his family, they've made hundreds of millions of dollars with the manipulation of these meme coins. I stand against it and I also stand against the crypto criminals who are making it possible for this to occur. At some point, people who invest in nothing will get what they are purchasing.

I'm going to protect the American people as long as I have the opportunity to do so. Yes, I'm Al Green, unbought -- unbought, liberated Democrat who's also unelected but is still fighting. Yield back.

SCOTT FITZGERALD: The gentleman's time has expired. I'll now recognize myself for five minutes. Mr. Gould, in recent years, merger reviews have often been conducted using competitive effects analysis that treat insured depository institutions as if they operate in an isolated marketplace, even as fintech lenders, credit unions, farm credit institutions, and other non-bank financial firms now provide overlapping loan and deposit products at scale.

Um, as the OCC evaluates future transactions, how do you intend to incorporate kind of the non-bank competitors into the assessment of the market concentration?

JONATHAN GOULD: Thank you very much for the question. I mean, you're right that deposits are, and can be, a poor proxy of market power, particularly given the fact that many banks do compete with non-banks across a range of services -- services, excuse me, and that is why back in 2020, when the then Justice Department was reevaluating -- reevaluating their 1995 bank merger guidelines, the OCC submitted a letter to that effect, making that very point that I've just made here today.

We would, I think, continue to look to work with the DOJ, um, and their antitrust team in terms of ensuring that when we evaluate mergers and we look to the DOJ for their advice on the competitiveness factors that they are in fact reflecting the fact that the -- the banking system and the members of it compete with a much broader range of -- of entities than they did, say, back in 1995.

SCOTT FITZGERALD: Can you give me any idea on the analytical framework that you would think is most appropriate to ensure that kind of the competition reviews reflect the full range of providers serving consumers?

JONATHAN GOULD: Sir, I'd be happy to get back to you on that. But in general, the OCC looks to and receives guidance from the DOJ around that, so their antitrust department gives us advice on that.

SCOTT FITZGERALD: Very good thank you. Vice Chair Bowman, you previously noted that the banks now competitively, uh, kind of compete directly with credit unions, which I'm well aware of. I've been in many meetings with bankers and credit unions. Um, and fintech firms and other non-banks offering kind of similar financial products.

Uh, in the context of the bank merger reviews, would it be helpful for the Federal Reserve to update kind of the competitive analysis to reflect the broader landscape and kind of including all of these different entities? Uh, because it probably would give us a better snapshot on the concentration of findings that probably match the reality of the markets out there right now.

MICHELLE BOWMAN: Thank you for that question, congressman. Yes, it would be incredibly helpful for us to update that merger analysis, especially the competitive factors and the landscape of competition and how we, uh, how we weight each presence of different types of entities in that review.

SCOTT FITZGERALD: Very good. Mr. Gould, I'm going to go back to you. Under the prior administration, the OCCs merger posture largely ignored the reality that small and midsize banks face escalating compliance burdens and competition from regulated institutions. We often hear that community banks say consolidation is no longer optional, but almost a means of survival out there.

Um, is, uh -- is a survival mechanism due to compliance costs and, uh, competitive asymmetrics? What -- how do you view that kind of landscape right now?

JONATHAN GOULD: I thank you for the question. And just to make sure I understand, you're talking about smaller banks or midsize regionals or just the whole gamut?

SCOTT FITZGERALD: Yeah, I mean, when people come into my office and we visit with the banks, it's kind of a myriad of discussion about, what's developing kind of regionally in that -- in a state, or how might they kind of better position themselves?

JONATHAN GOULD: Well, I think it's definitely been the case, as the vice chairman noted, that some of the expectations, particularly supervisory expectations, have over time bled down since 2008 to smaller and smaller banks, requiring them to seek economies of scale so that they can cover the cost of that additional supervision and compliance.

Um, you know, we are, and have been, I think the other federal bank agencies as well have been keen to address this too, which is to reduce some of those regulatory and supervisory burdens, at least where we have discretion to do so as authorized by Congress in statute, to alleviate some of those pressures, such that ultimately, if banks want to merge or consolidate, that's a business decision for them.

It's not solely driven by regulatory and supervisory considerations, but the needs of their customers and the evolution of the markets that they purport to serve.

SCOTT FITZGERALD: Right. Very good. I will yield back and now I recognize the Ranking Member of the Subcommittee on Housing and Insurance, Mr. Cleaver of Missouri, for five minutes.

EMANUEL CLEAVER II: Thank you, Mr. Chairman. Um, Ms. Bowman, thank you and all of our witnesses for being here. Um, over the last year and a half, I think, um, some of us, uh, Mike Flood, Chair of the Housing Committee, myself, uh, Chairman Hill, our Ranking Member, Maxine Waters, uh, we've spent a rather a large amount of time, uh, putting together the 21st Century Road to Housing Act and amazingly,

uh, some would probably say, uh, magically, uh, it passed the House 396 to 13, which is, uh, almost, uh, weird, but, uh, we did.

And so, I mentioned that only because I'm, uh, right now and maybe most of my life preoccupied with issues related to housing. Um, and the US, uh, Commodities Futures Trading Commission, uh, put out a report a couple of years ago and in that report, they -- they essentially said climate change poses a major risk to the stability of the US financial system and to its ability to sustain the American economy.

Um, climate change is already impacting, uh, every facet of our economy, including, uh, the infrastructure, including, uh, commercial and private -- privately held, uh, property, uh, and agriculture. Uh, and in 2021, the Financial Stability Oversight Council identified climate change as an emerging and increasing threat to US financial stability.

Uh, right now, um, some of us, and I wish the whole -- the whole Congress would focus on this, uh, are concerned about climate risk, uh, and, trying to figure out right now, given the physical risk from severe weather events, uh, and transmission risk associated with changing market technologies and policies continue to affect financial institutions.

Uh, what specific steps can the Federal Reserve take or, uh, any of us, uh, to, uh, ensure that banks, uh, appropriately identified this issue, uh, and that they monitor and manage climate change related financial risk? And can the Federal Reserve -- and -- and is the Federal Reserve committed to and involved in climate risk as it relates to financial world?

MICHELLE BOWMAN: Thank you, Congressman Cleaver, for that question. The Federal Reserve does not have climate change in its remit, but we do recognize that there are risks to banks and to their bank balance sheets from weather events and other related natural disasters. We do require our banks to mitigate those risks and to take those into account as they're doing underwriting activities, but we don't see climate as a bigger risk than other related risks, like financial risks to the balance sheet, but we do require our banks to pay very close attention, especially as they're thinking about real estate, where flooding often occurs or in agricultural contexts where bankers always have to understand the impacts of related events on a farmer's crops, for example.

EMANUEL CLEAVER II: Well, let me ask any of the other members, how do you assess the United States current supervisory approach to climate related financial risks compared to our international peers? Mr. Hill?

TRAVIS HILL: Um, yeah, thanks for the question, congressman. Um, we look at things similarly to the -- to the Federal Reserve. We do expect banks to be, um, prepared for risks in their operating environment and that generally would include the potential for weather events. Um, historically, uh, extreme weather events generally has not presented safety and soundness risks to banks.

We have no evidence of banks failing as a result of weather events. That always could change in the future and so --

EMANUEL CLEAVER II: Yes, that's the point.

TRAVIS HILL: We always want banks to be prepared but -- but we don't view this as a risk that deserves outsized attention compared to other risks.

EMANUEL CLEAVER II: OK. Thank you. Yeah, thank you. Thank you, very much.

MIKE HARIDOPOLOS: Thank you, sir. I'll now recognize myself for five minutes. I'd first like to ask our, uh, Comptroller Gould on a question on the GENIUS Act, which we recently passed, of course, here in Congress. How is the OCC preparing to implement the GENIUS Act? What is the timeline and what are the key rules that you'll put in place so that those folks who are in the stablecoin business can have clear direction in which to move forward?

JONATHAN GOULD: Thank you very much for the question, sir. As you -- as you probably know, we have proposed a pretty significant rulemaking. The comment period closed, I think we received over 300 comments. We're in the process of reviewing those comments as quickly as we can and making changes and responding to those comments as necessary to make sure that our final output is something we're proud of and something that appropriately balances both the potential, as well as some of the risks that many have noted associated with payment stablecoins.

Separately, and I would say, sir, we are very well aware of the statutory deadlines that Congress has imposed on us, and we're doing our utmost to -- to meet those statutory deadlines without compromising, hopefully, the quality of the work product. Separately, there are efforts underway, other rulemakings that we're doing, including with Maine [ph] Treasury on the BSA, AML side, which are very important as well.

And so, those are also going on to.

MIKE HARIDOPOLOS: You recognize the idea of the timeline. Do you feel you'll meet that Congressional timeline?

JONATHAN GOULD: Uh, sir, I couldn't, in good faith, uh, tell you right now whether we will or will not, but we are working very hard. Our teams have been working almost since before the -- the law was signed into, uh, excuse me -- the bill was signed into law by the president. So, we've been working very, very hard.

MIKE HARIDOPOLOS: Uh, I'd like to ask Ms. Bowman, if I could, ask a question as we all recognize, with the sharp rise in interest rates starting in 2022, banks like Silicon Valley Bank, uh, of course, just simply failed. And I'd like to know from your perspective, what are we doing now to mitigate those risks moving forward on liquidity issues, capital balance sheets, you name it, what are we doing to make sure that that might happen?

We all recognize the challenges with interest rates as they rose dramatically in the previous administration. And I know Chairman Powell is before us. In fact, he answered my question, I asked him the question, why did interest rates rise so quickly? His answer was pretty simple, he said the government was spending too much money.

But that -- that being said, on the interest rate question and the effect of SVB Bank, what are we doing to mitigate those risks moving forward?

MICHELLE BOWMAN: Well, thank you for that question. So, a few things that we've already done and a few that are in train, the first is that we've just recently introduced our Basel capital proposals, and the comment period ends on those June 18. We look forward to reviewing the feedback on that. That proposal includes a provision on mark to market for AOCI, and that may have some impact on that.

We look forward to comments. The other issue is you mentioned liquidity. Together, the regulators are working toward putting together a proposal to address liquidity, weaknesses and requirements that we could look at going forward. The Federal Reserve is uniquely positioned in that we're both responsible for bank supervision, but also for monetary policy.

So, it seems as though these things, uh, while unrelated, really are related, as we saw during the COVID period when we were increasing interest rates on such a rapid basis at such a large amount in increments. Uh, as the -- the governor responsible for the smaller bank portfolio, we were watching carefully that impact as we were increasing rates so dramatically and so quickly on the smaller banks.

And we recognize that there were issues that were arising and we were working with our banks to, one, educate them, about what our expectations would be going forward. And two, trying to understand fully what the implications would be and working to shock portfolios to understand the conditions that could arise that would be significantly detrimental to the banking industry.

I think it's important that we have people with banking experience that serve in these roles. You know, I sit in the role on the Federal Reserve Board that's reserved for someone with community banking or state bank commission experience and I think that allowed me to see and understand in a different way than some of my colleagues did at the time.

MIKE HARIDOPOLOS: Thank you so much. I'll just close with this. As -- as we've had this very kind comments about our former chair, Mr. Powell, again, in this very committee earlier this year, or maybe late last year, it was the recognition of the chairman that the reason why we had such high interest rates was just the out of control spending that took place in that time period and that was his own testimony when I asked him in this committee.

With that, um, the chair recognizes the Ranking Member of our Subcommittee on Financial Institutions, Dr. Foster, for five minutes.

BILL FOSTER: Thank you, Mr. Chair, and to our witnesses. Early last month, the Treasury Department convened an emergency briefing with the CEOs of America's G-SIBs and other CEOs to discuss the cybersecurity risks of Anthropic's Mythos model, which excels at finding and exploiting cyber vulnerabilities at an alarming rate.

To-date, Anthropic claims that the model has been used to find more than 10,000 high and critical level security flaws in otherwise trusted software. Anthropic has provided early access to Mythos to large companies, including US G-SIBs so that they may scrub their software for vulnerabilities. But I worry that smaller financial institutions have not received equivalent access in a timely manner.

So, what's the policy here? Who exactly received access to Mythos on what time scale? And I guess I'll just go down the line here. Vice Chair Bowman?

MICHELLE BOWMAN: Thank you, Congressman Foster. This is a very important issue and one that we're working together on in the --

BILL FOSTER: I'm just -- Just what has happened so far? Which --

MICHELLE BOWMAN: So, I can't -- I can't disclose who has had access, but I can tell you that we're working both with service providers and within the banking industry to work together to understand what impacts we may need to have them mitigate and address. We have not ceased our cyber exams. In fact, we continue to work with our institutions to understand how they're planning to -- to respond.

BILL FOSTER: OK, but still, it's unquestionably true that small, small, banks with their private systems have not been given the same level of cyber defense that the large ones have, which is not irrational, but it seems to me that you're going to need a very clear position on this. You're going to have to define the defensive position perimeter and say this is the software stack that we're going to defend to the best of our abilities.

And other -- other institutions that are using different software stacks are going to have to just accept that they're a lesser priority. And I think there's -- there's a lot to be done here. I think first and foremost, frankly, to have the federal government define a software stack that we are going to defend.

This is done on the Cloud computing infrastructure. There are well defended -- you know, the core -- you know, even small banks use Cloud-based systems and at the heart of these small -- these -- these Cloud-based systems are open source software things that are communally defended and where some of the highest priorities in defending when Mythos hit.

And so we -- I think that it should be -- all the regulators should -- should focus on defining the set of software that we are going to defend the same way that the cloud infrastructure stuff is defended as open source projects. I think that's the best and really the only way forward on this. So, I urge you to think about that.

Um, yeah, Comptroller Gould, who's received what so far?

JONATHAN GOULD: I'm sorry, sir?

BILL FOSTER: Yeah, who's received -- who's got access to Mythos of everyone?

JONATHAN GOULD: Sir, I also can't disclose that.

BILL FOSTER: In general terms?

JONATHAN GOULD: Um --

BILL FOSTER: What -- what fraction? What fraction of all of the entities under your --

JONATHAN GOULD: Well, I can't give you an answer on what fraction under our entities. But -- but apropos to the conversation we had before the hearing started, sir, I, like you, I'm also concerned about the perception of a cyber mode, again, real or perceived, around the very largest banks and I think particularly around the smaller banks as well as mid-size and regionals.

It's very important for us to focus on the service providers that support them. I think this --

BILL FOSTER: OK, yeah, to that end yeah, Mr. Hauptman? You know, I've been working for years to try to get, um, you know, to have visibility into the back office providers for credit unions and which is so far, you know, not made it through Congress and we're going to keep trying on that. But -- but you have the back office -- to your knowledge, have the back office providers numb [ph] that so many credit unions depend on, have they at least been given access to Mythos to defend themselves?

KYLE HAUPTMAN: I couldn't speak to who is using Mythos or not. I don't want to disclose any of that, but I will say this, Anthropic, like OpenAI, they're both in San Francisco. I think we should make sure that this country has a regulatory environment, that we don't take it for granted those are American companies, and you can easily convene a meeting like the one you discussed.

It -- that is -- the main thing is --

BILL FOSTER: I agree. We just need we need policy clarity and we need to have a well-defined defensive perimeter.

KYLE HAUPTMAN: The next meet though is maybe in Beijing or Tehran or somewhere, and it's not going to work as well for us. We want to make sure that those companies at least are American. But to your exact question, I can't disclose who has access to Mythos or not.

BILL FOSTER: OK, yeah. Mr. Hill?

TRAVIS HILL: Yeah, consistent with my colleagues. Can't disclose who has access to what, but we'll just say this is something we're all keenly focused on and recognize it's -- it's a vital issue for us to be focused on.

BILL FOSTER: Yeah, all right. And so, I don't have much time left, but I just want to raise the point that I don't think that we are prepared for agentic AI bank run. That if you look at what happened in Silicon Valley and -- and then ask yourself the question, what would have happened in a world where agentic finance makes things happen, not at the speed of internet gossip, but the speed of agentic AI, that would have caused the run to take not 40 hours, but 40 minutes or 40 seconds.

We are not ready for that, and you should come up with a plan to deal with that, because we can have that hearing now or we can have it later. I'm out of time now and yield back.

MIKE HARIDOPOLOS: Gentleman yields. The chair recognizes the gentleman from Florida, Mr. Donalds, for five minutes.

BYRON DONALDS: Thank you, chairman. Thank you guys for coming in, appreciate it. Um, Vice Chair Bowman, what's the Fed's current view of the of the interest rate yield curve and the bond market overall? I -- and I it's still force of habit from my time working in the industry and looking at the ten-year rate, seeing it around for about 440, 445 basis points.

Like what's the fed's position or view of it right now?

MICHELLE BOWMAN: So, that yield curve is one of many things that we monitor and watch as we're monitoring economic activity in the United States, uh, for financial stability purposes and also to understand how the economy is, uh, is performing.

BYRON DONALDS: True, but do you -- do you think that, um, you know, there's work that can be done, whether it's here on Capitol Hill or even with the fed itself, to try to find ways to bring some of those rates down? Because obviously they go into -- they directly correlate to borrowing rates, whether it's home mortgages, auto loans, etc.

MICHELLE BOWMAN: I think there are many things that play into the yields that are paid on Treasury yields. I know that the Treasury Secretary has been very focused on this issue in particular. It goes beyond the Federal Reserve's remit to, uh, to affect the yields on Treasury bonds.

BYRON DONALDS: OK. Um, real quick. I know it's a priority, um, you know, as you guys continue to prioritize community banking issues and tailoring regulations, how would increasing the threshold for small bank holding companies free up capital -- capital for small business owners in the United States?

MICHELLE BOWMAN: Well, we're very focused among our interagency colleagues on making sure that the -- our requirements are appropriately tailored. This would include the small bank holding company statement. It could potentially free up a massive amounts of capital that could be reinvested in the communities that those banks serve.

BYRON DONALDS: Well, I'm glad you state that because there's been, obviously in this committee and quite frankly across America, there's always a lot of dialog of how small companies can have more access to capital. And my position has always been that the Dodd-Frank regulation, what it really did is it collapsed community banking in the United States, which is why small business owners -- I don't really care what your politics are, but small business owners across the country have been really struggling to find ways to get more capital flow into their business.

And I think it's important for the members of this committee in particular, but for everybody on Capitol Hill, to really understand that heavy handed financial regulation that is impacted, it has a major impact on community banks, directly diminishes the ability for a small business to be able to get that loan or get that working capital line of credit to expand their -- their enterprise.

So, I'm glad that the fed is taking that matter very seriously. Um, Comptroller Gould, the OCC has been very active in reviewing fintech and digital asset related charters, what principles guide your evaluation of these nontraditional applicants?

JONATHAN GOULD: Thank you for the question, sir. The principles that guide are the statutory criteria and are publicly disclosed and unchanged for years and years comptroller's licensing manual on charters. I would note that this, our licensing manual, including our procedures that do guide us, our publicly stated and have been unchanged for over five years.

Unfortunately, over the last few years under the Biden Administration, we just did not follow them. So, we are now following our own publicly stated procedures again and I think you see the results. There is a lot of interest in new bank formation in this country. It is something we should celebrate, not be afraid of. It is what drives economic growth in your community and your state and across this country.

And as Secretary Bessent has said, it's critical to our economic security to have this economic growth.

BYRON DONALDS: Well, to piggyback on that, obviously, there was a lot of, uh, I would say, issues in the Biden Administration at the OCC and a lot of, quite frankly, creating reputational risk for the OCC. Like, what actions have you guys taken to combat deep banking efforts and to remove that, uh, that reputational risk from supervisory programs?

JONATHAN GOULD: Thank you, sir. So, one thing we did together with the FDIC was literally excise the use of reputation risk in our supervisory process. We excised it from our regulations, we have also been working on implementing the President's EO on de-banking. We are into the, what I would call the transaction testing phase, where we are investigating the largest national banks and allegations of banking to confirm whether or not they actually happened, what might be a legal theory of liability to address them.

So, we are well advanced in that process and as I noted in my testimony, we will follow the facts where they lead us.

BYRON DONALDS: Well, I really appreciate that. And Mr. Hill, sorry I wasn't able to get to you. Nice podium, by the way. Um, but, you know, it is something that is critical. I think it's important for the American people to understand, you do not want agencies of our government picking and choosing who gets to operate in our financial economy.

It has major chilling effects on the future of our economy and we're the most stellar nation in the world, we need to remember the principles that got us there. Thank you guys for being here. I yield back.

MIKE HARIDOPOLOS: Gentleman yields back. The chair recognizes the Ranking Member of our Subcommittee on National Security, Ms. Beatty of Ohio, for five minutes. You're recognized.

JOYCE BEATTY: Thank you, Mr. Chairman, and Ranking Member and thank you to all of our witnesses today. Let me start with you, Vice Chair Bowman. There have been reports about reduction in supervisory staffing and resources, which I find deeply concerning. How much has the Federal Reserve reduced its banking examination staff over, let's say, the past several years?

And what was the reasoning for those cuts? Um, budgetary -- budgetary, supervisory strategies, etc.?

MICHELLE BOWMAN: Congressman, thank you for that question, and I appreciate the opportunity to clarify. We have not reduced our examination staff at all. They are all resident within our reserve bank structure across our 12 reserve banks. We have about 4,000 staff that work within the 12 reserve banks. Where we have focused our --

JOYCE BEATTY: Is that adequate? Do you think that's adequate?

MICHELLE BOWMAN: Oh, you know, I think as we're looking at the expectations that we have across the banking system going forward, it may be too few. I don't expect that it's too -- uh, I don't expect that it's too many, certainly. So, we'll have a better understanding of that as we're moving forward and reviewing our footprint within the reserve banks.

JOYCE BEATTY: Let me ask you that if we think it leans towards certainly it's not too many, how are fair lending examinations being impacted by that number or staffing cuts?

MICHELLE BOWMAN: We think at this point, because we have seen some consolidation and we have fewer banks that we oversee over time, that -- that -- I don't expect that we will reduce that number, certainly. We certainly will need to refocus some of the work that we do because of the complexity of some of the services that are being offered or will be offered in the future, including AI, cyber security, a number of different innovations that -- that likely will begin to be offered within the banking system because of the Congress passing the GENIUS Act and other -- and other actions.

So, I think more to come on that, but we're certainly looking at that very closely.

JOYCE BEATTY: OK, thank you. I'm going to move on. Mr. Hill, we'll go to you to make it worth you standing there. We want to make sure that we include you. But let me start. I want to talk about CRA, Community Reinvestment Act. As we're approaching 50 years from the inception of that, I am a big proponent in full disclosure, I've been around for a while.

Prior to being in Congress, working with financial institutions to -- to make sure that that is a standard. Because, as you know, it includes the community an evaluation, for lack of a better word, process, to make sure that financial institutions are making an investment. So, Chairman Hill, last July, the agencies released a proposal to repeal the Community Reinvestment Act rule that was finalized in 2023 to revert back to the 1995 regulations.

Despite major changes in banking, as we know over the last three decades that the 2023 rule addressed. Certainly, we know, um, Chairman Powell, then Chairman Powell, was very supportive, and he was an advocate of modernization or modernizing, uh, the rule. And so, I've had a lot of time of working with folks like you, your predecessors, and he on that.

Uh, so, does your agency -- also said that you decided against, uh, undergoing a regulatory process to change the CRA regulations further. Do you want to talk about that in any way? Mr. Hill?

TRAVIS HILL: Uh, thank you for the -- thank you for the question, congresswoman. So, um, so, as you know, the rule that was finalized in 2023 has never actually gone into effect. Um, it was ruled by, uh, by a federal court judge to have exceeded the statutory authorities. Um, the proposal that was issued last summer would codify rescinding that rule and reverting back to the -- to the 1995 rule, which has been in effect throughout this period.

Um, we have been evaluating a range of possible options for next steps, um, which includes both finalizing the proposal from last summer, but also considering other options for proactive reforms. Um, and that's something that we continue to consider and I think are likely to decide on a path in the near future.

JOYCE BEATTY: Does that mean that I could assume that you're not in favor of keeping the regulations the same? I mean, come on, it's 2026, that we're going to stay with 1995? That can be a yes or no because my time's going to run out.

TRAVIS HILL: I think we recognize that there are a lot of flaws in the 1995 rule. And so, um, uh, considering options for a new approach is -- are things we're considering.

JOYCE BEATTY: Thank you, and thank you, Mr. Chairman. I yield back.

MIKE HARIDOPOLOS: Gentlewoman yields. The chair recognizes the gentleman from North Carolina, Mr. Moore, for five minutes.

TIM MOORE: Thank you, Mr. Chairman. You know, in the last administration, prudential regulation drifted away from its core statutory mission of protecting safety and soundness toward subjective judgments and political priorities. That shift has caused unnecessary, or created rather, unnecessary uncertainty and imposed disproportionate burdens on the community and midsize institutions that drive credit formation.

We're now working to revive that principle of regulatory tailoring because requirements should match an institution's actual risk profile. Uh, Comptroller Gould, the OCC has proposed reducing exam frequency for smaller banks. The House has also passed a bill that I sponsored, the TRUST Act, which would raise the consolidated asset threshold for well-managed community banks that qualify for an 18-month exam cycle from -- from $3 billion to $6 billion.

Uh, how do you think that will improve the capacity without compromising safety and soundness?

JONATHAN GOULD: Uh, well, sir, first, thank you for your efforts on the legislative front. Um, obviously we can do what we can on the on the regulatory side to make some of these changes but you can make them permanent. So, thank you for -- for your willingness to push that. I think the reality is simply that as -- as we've seen, particularly post 2008, a lot of the burdens of the post 2008 crisis, regulatory and supervisory framework fell disproportionately on smaller banks, really imperiling their business models.

And so, anything we can do to kind of alleviate that, and I think anything you can do through statute would -- would be well taken by those -- by those banks. The reality is that, I mean, I think that we have been, at least at the OCC, we have not been allocating our examiners resources in all cases that is -- in a way that is proportionate to the risks presented by the actual banks, particularly smaller banks.

So, I think you're -- you know, you're -- again, I'm not familiar with all the details of your of your bill, sir. I'm happy to look at it and get back to you, but I think it sounds like what your bill would do would -- would help us kind of constrain that.

TIM MOORE: Great. You know, one size, all regulation has really distorted competition and discouraged institutions from growing past these arbitrary thresholds. Recognizing this need, the committee also passed the TIER Act to update the statutory tailoring thresholds and require federal banking agencies to periodically review and adjust the non-statutory thresholds as well.

Vice Chairman Bowman, you've emphasized the need to strengthen tailoring across Categories 2, 3 and 4. What specific changes is the fed considering to ensure mid-sized and regional banks are not subjected to capital and liquidity requirements that exceed their actual risk?

MICHELLE BOWMAN: Well, thank you very much for that question. And as we, uh, very thoughtfully considered those thresholds within the capital rules that we introduced back in March. Um, one, we're looking forward to comments to see if we've got the balance right on how we're applying the standardized approach to the non G-SIBs throughout the banking system, but we're also approaching the way that we're thinking about applying applications beyond capital, as we're looking at asset thresholds throughout the entirety of the banking system.

That would include the larger banks as well as the smallest banks.

TIM MOORE: Very good. You know, tailoring just isn't a bank issue. Chairman Hauptman, what steps is the NCUA taking to ensure regulatory tailoring for rapidly growing credit unions that may not resemble traditional models?

KYLE HAUPTMAN: Sorry. Just in the past year and a half, we've done a true top to bottom review of a lot of regulations, some of which were outdated, some of which were counter to each other or redundant. We know that even just complying with them doing the paperwork is an epic hassle, but we definitely want different kinds of credit unions.

As an insurer, you want a diversified portfolio. We want them to do different things. So, that's something that has been a struggle, but trying to have our examiners aware that doing new things in a different way is positive as an insurer. We don't want credit unions to look like each other.

TIM MOORE: Last November, committee Republicans sent a letter to the federal banking agencies to ask that you undertake rulemaking to index the regulatory thresholds for the application of enhanced prudential standards, which are based on four categories of institutions. The Senate Banking Committee sent a similar letter earlier this year.

Back in 2019, your agencies indicated that they planned to reevaluate these thresholds periodically through the notice and comment process, but that hasn't happened since they were originally sent seven years ago, which underscores the need to index these thresholds moving forward. Looking at how the scope of the new Basel III proposal is limited to Category 1 and 2 institutions, it's clear the agencies will continue to rely on the EPS [ph] categories and other prudential regulations, which further highlights the need for indexing.

So, Vice Chair Bowman, you've given many speeches and testified before this committee in support of adjusting these kinds of fixed thresholds and how, in the absence of indexing firms with stable growth and no change in risk profile, can cross asset thresholds and become subject to increasingly complex regulatory requirements and supervisory expectations.

I believe Chairman Hill actually asked you about this when you testified last October. So, can you give us an update on timing for when you and the other agencies will go through rulemaking to index the EPS thresholds?

MICHELLE BOWMAN: We're currently working on that. Hopefully in the near future.

TIM MOORE: Any idea of a timeline?

MICHELLE BOWMAN: I really don't want to commit to a timeline because I have a board that I have --

MIKE HARIDOPOLOS: The gentleman's time has expired.

TIM MOORE: Understood, thank you. And with that, I yield back, Mr. Chairman.

MIKE HARIDOPOLOS: Thank you. The chair recognizes the Ranking Member for our Task Force on Monetary Policy, Mr. Vargas of California, for five minutes. You're recognized, sir.

JUAN C. VARGAS: Thank you very much, Mr. Chairman, ranking member, and of course, the witnesses, thank you for being here. I think that earlier it was stated that Chairman Powell, during his testimony here, agreed that there was, quote, "Out of control spending. Chairman Powell never said that, never agreed to that. What Chairman Powell said that federal spending was, quote, "On an unsustainable fiscal path." The reason I say that, I think that even though Chairman Powell is a Republican, even though I don't agree with him on many things, he's a very honorable and very good person and I hope we don't put words in his mouth that he didn't say, and we don't create this aura about him that he isn't. I mean, he's a very honorable guy.

Again, I actually don't agree with him on many things, but he's a very honorable guy. And I guess that's one of the things that I found disturbing here today. Um, we hear from witnesses today here who are professionals, people who have been appointed and they use terms like unelected bureaucrats. The unelected bureaucrats do this, the unelected -- that's the jargon of politicians.

That's -- and, in fact, I asked AI about that and this is what AI said. The term unelected bureaucrats refers to career civil servants and government administrators who implement and manage public policy, but do not face voters at the ballot box. In modern political discourse, the phrase is frequently used as a pejorative shorthand to describe the perceived lack of democratic accountability and regulatory overreach.

Now, it's interesting because I've been an elected official for almost 30 years. I've faced the ballot box a lot, including yesterday, and of course, I did very well and I thanked the voters in my district, thank you very much. But let's have some respect for the professionals that do their jobs and let's not have politicians doing professionals jobs.

I mean, I think that's very, very problematic when you see ideologues placed in professional jobs. Now, for example, if I wanted to get an operation, I would want an unelected bureaucrat called a doctor to perform that, not an elected official like myself. And again, jargon matters here, language matters.

So, I hope we have a little more respect for people who are professionals. That being said, Vice Chair Bowman, I have great respect for you. Don't always agree with you either, but I do want to ask you about private credit. I'd ask this. Banks have significantly increased their involvement in the non-bank private lending area arena, which has led to some concern about spillover, contagion and risk posed by the strong interconnectedness within our economy.

An analysis of the fed staff published in May of last year they wrote, the lack of transparency and understanding of interconnectedness between private credit and the rest of the financial system makes it difficult to assess implications for systemic vulnerabilities. Now, could you comment on that? Because I do have some concern about that.

There's some gap in data. What have you been able to do or what are you looking at?

MICHELLE BOWMAN: So, this is an important issue that we've been looking very deeply into and trying to work with our regulated financial institutions to get a better sense of what the bank investment is into the private credit space. And since it's quite opaque, it's difficult to know. We have seen a rise in the investment from banks into the into NBFIs in particular, but it's been very difficult for us to have a clear understanding of where that, those, funds have been flowing.

Earlier this -- actually, last month, we introduced a data collection to assist our ability at the Federal Reserve through our supervisory work, to understand exactly where those investments are going outside of the banking system, into the NBFI space that will allow us to better understand and see more transparently how bank funding is being used within the non-bank space, particularly private credit.

JUAN C. VARGAS: Do we have concerns, though, of where it is today? I mean, is this going to pose a problem, because the numbers are big?

MICHELLE BOWMAN: Right. Well, I gave a speech about this at Stanford a few weeks ago, where it's a very small proportion of the lending categories within the banking system but it is something that we need to know more about because it's very opaque, which is exactly why we're asking for more information from our regulated institutions.

JUAN C. VARGAS: OK, thank you very much. And again, Mr. Chairman, I hope that, again, professionals use professional language instead of political language. Let the politicians be the politicians you guys be the professionals. Thank you very much. And with that, I yield back.

TIM MOORE: And the gentleman yields. The chair recognizes the Chair of the House Republican Conference, Ms. McClain of Michigan, for five minutes.

LISA MCCLAIN: Well, thank you, and thank you all for being here, appreciate your time. I want to talk a little bit about debanking, which is very concerning for me. For years and years, we heard horror stories about how regulators have pressured banks into cutting off businesses with industries that liberals don't like.

Let me give you a couple facts. First, it was Operation Checkpoint [ph], where Obama Administration tried to pressure banks into not doing business with firearm dealers. Then the Biden Administration launched Operation Checkpoint [ph] 2.0, where they pressured banks to pause services with cryptocurrency companies.

Even the First Lady and the president's own son, um, got denied a bank account; extremely concerning for me. So, what I'd like to understand is a little bit of history on how we got there. So, um, Secretary Bowman, or Ms. Bowman, can you explain how the guidelines encouraged banks to evaluate reputational risks?

How that gave way to this issue of debanking?

MICHELLE BOWMAN: Well, Congresswoman McClain, first of all, it's nice to see you again. We visited a few months ago about mortgages and we made some progress on.

LISA MCCLAIN: Yes, I appreciate it.

MICHELLE BOWMAN: But on this issue, during the first Operation Choke Point, I was actually a banker and was subject to scrutiny from the then FDIC, sorry, Chairman Hill, about the activities that we had and

it wasn't just limited to the activities that you mentioned. We were scrutinized based on check cashing services and standalone ATMs and other types of businesses that some of our customers were engaged in at the time.

It is an inappropriate use of supervision to eliminate certain customers from the banking system, and it's something that we feel very strongly about. Clearly, the president issued an executive order on this, and we are all working to ensure that that's no longer a part of our supervisory processes.

LISA MCCLAIN: And that leads me into my second question. So, thank you for that. So, I know this is a top priority of the president. What actual steps have been taken to put a stop to this?

MICHELLE BOWMAN: So, if you'd like me to continue --

LISA MCCLAIN: Please.

MICHELLE BOWMAN: We, just last week, I believe we finalized a regulatory -- regulation, interagency to remove reputational risk from the work that we do at the Federal Reserve. We -- or across the banking agencies. At the Federal Reserve we've also removed references to reputational risk from all of our guidance's and our supervisory materials to ensure that that's not used as a basis for supervisory activities or criticisms going forward.

LISA MCCLAIN: For discrimination?

MICHELLE BOWMAN: Absolutely.

LISA MCCLAIN: -- say that. What -- let's -- let's look internally now. What do we, as Congress, need to do to make sure that this discrimination doesn't continue to happen? You again.

MICHELLE BOWMAN: I could keep going on that. I think it's important to recognize that putting people in roles that are responsible for supervision of banks need to have some experience within the banking system, and either as a supervisor or as a banker, to ensure that we're not bringing ideology into the work that we do and that we're enforcing the law.

There are already laws on the books about anti-discrimination. Uh, these are not activities that we should have been engaging in from a supervisory perspective.

LISA MCCLAIN: So, I'm going to switch, thank you. I'm going to switch to Mr. Hauptman. Um, instead of -- one of the concerns that I have is instead of going through the formal rulemaking process, the Biden Administration directed the NCUA to implement regulatory regulation by enforcement, um, which is very concerning to me. Uh, what is the NCUA doing to put a stop or an end to this?

KYLE HAUPTMAN: Yeah, regulation by enforcement to me is unethical and nobody in this room would tolerate it in any other part of their life. Um, if you're familiar in a small town where they have a speed trap where you can tell the goal is to run up the tickets. Um --

LISA MCCLAIN: Usually around the end of the month.

KYLE HAUPTMAN: Yes, exactly. Um, none of us would tolerate it. Um, it was rampant across a lot of regulators. Even in my current job at NCUA, I asked the CFPB about something that was brought to my attention. And we'll enforce whatever the CFPB says and this is under Biden, and, um, he said, why don't you just send everybody that Wells Fargo settlement?

That's what we were asking about. He said, the Wells Fargo settlement with CFPB is that -- should we all follow what's in that now? And they're asking me, what did they do? We have employees that are judged on that, and I think it's unethical. And, again, we wouldn't tolerate it. We have a policy up on our website, uh, it is known regulation by enforcement is unethical at NCUA. It's unethical anywhere, but the main thing is that no enforcement ever sets policy.

LISA MCCLAIN: Amen, amen. And I know I'm out of time, so thank you. But one last thing I would like to say is ,I do think there needs to be consequences for people, for their actions, and that might get some people's attention. Thank you all for your time. Yield back.

TIM MOORE: Lady yields back. The chair recognizes the gentleman from Illinois, Mr. Casten, for five minutes.

SEAN CASTEN: Thank you. I just want to correct something that was just said, a bank that refuses to lend to somebody who's gone through serial bankruptcies and has been connected to, convicted of, financial fraud is not debanking, that's risk management. It's diligence. Um, I appreciate you praising the Trump family, but that's not why they were debanked, I think we all know that.

Mr. Gould, um, 2025, the OCC issued a proposal that defined unsafe or unsound practices to focus on issues that cause material harm to financial conditions of institutions. In May of this year, President Trump issued an executive order saying that undocumented immigrants pose a structural credit risk. Has the OCC conducted any research establishing that extending credit to immigrants poses a material risk to institutions or the broader financial system?

JONATHAN GOULD: Well, thank you very much for the -- for the question.

SEAN CASTEN: I'm just asking yes or no, because I got a bunch of stuff I want to get through.

JONATHAN GOULD: Well, congressman, I'm not going to give you a yes or no because --

SEAN CASTEN: So, you either have or haven't done the research?

JONATHAN GOULD: Congressman, you're conflating two things. You're talking about a proposed rule and then a directive from the president asking us to issue guidance. We issue guidance all the time on --

SEAN CASTEN: Look, I'm not -- you're don't -- you don't have to get angry at me, it's just a yes or no question.

JONATHAN GOULD: Congressman, as I said, I'm not --

SEAN CASTEN: Are you going to do that research in response to the executive order?

JONATHAN GOULD: Congressman, on a regular basis, we assess safety and soundness risks and we issue guidance --

SEAN CASTEN: Are you looking at the risks of debanking immigrants if there's a capital flight out of the banking system?

JONATHAN GOULD: We have concerns about any -- any amount of particularly levels of financial fraud in the banking system that we have seen and --

SEAN CASTEN: But that's not -- that's not the question. The immigrants -- immigrants commit crime at a much lower rate than the native born population. We're -- we're stipulating things because the president wants them to be true. You are responsible for the banking system, are you doing the research?

JONATHAN GOULD: Congressman, we are doing the research on a regular basis to --

SEAN CASTEN: Can you provide that research to us?

JONATHAN GOULD: -- safety and soundness risk to the system, including risks of financial fraud --

SEAN CASTEN: I would love to -- let me move along. I want to talk about the skinny master accounts that are -- and Ms. Bowman, I want to get to you about some of this question, but I want to stay with Mr. Gould for a moment, because historically the master accounts have required that we have a bank charter. Whether -- you know, the Tier 1, Tier 2, Tier 3. Um, a number of the people who have been preparing to apply for these master accounts have now been going through this OCC process for bank charters.

And I want to just clarify with you, Mr. Gould, because in your exchange with Mr. Meeks, um, you if I understood you right, you said that trust charter applicants don't necessarily need to demonstrate compliance with anti-money laundering rules. I think you said it's not as simple as a yes or no as you just did.

But the OCCs chartering guidance specifically says that trust applicants must outline an AML compliance program. So, do you want to correct what you said to Mr. Meeks, or are you suggesting that you can get an OCC charter without a --

JONATHAN GOULD: Congressman, if you'll give me a moment to -- to explain to you what's in our -- our controller's licensing manual, we have a two phase process to chartering a bank. Before a bank opens its doors for business it obviously has to have an operational BSA, AML compliance program. But in the first phase, that is the phase where we determine whether or not we're going to issue a preliminary conditional approval or not, and at which it has not actually opened for business and is not ready to open for business we -- a bank does not, by definition, that's one that's information need to have a BSA, AML compliance program.

So, we give them that second phase to develop the policies and procedures.

SEAN CASTEN: So, here's the issue, and I want to get to Ms. Bowman, the -- if a bank -- if you have to have a charter in order to get into a master account situation, the OCC charters, um -- they don't require compliance with the CRA, don't require your parent companies to be -- to be subject to the Bank Holding Company Act. There are lower protections that are in there.

And if you've got access to these master accounts, skinny or otherwise, you can move money through the system much more quickly. And the concern would be if you've got people who can move that money but don't otherwise have the kind of AML protections that we want to have in the system. So, are -- are we confident that this process, if it's -- if it's too difficult for Mr. Gould to give a yes or no, do they have the same equivalent AML that other chartered banks will have?

How are we protecting against making sure that people who get these skinny accounts can't use that as a way to bypass some of our AML protections?

MICHELLE BOWMAN: Well, that's a good question. I do want to recognize that one of my colleagues, Chris Waller, is responsible for payments on the Federal Reserve Board.

SEAN CASTEN: I understand.

MICHELLE BOWMAN: I do serve on the Committee for Payments as well. We did just issue a proposal, publish a proposal. It does require BSA, AML requirements as a part of that analysis. So, it is not entirely accurate to say that there's no requirement for BSA, AML procedures. There's also not necessarily a requirement for a charter, a chartered entity, to be able to qualify for a master account, especially for one of the limited purpose ones, as we called skinny master accounts.

SEAN CASTEN: OK, I'm out of time. May want to follow up with you, but --

MICHELLE BOWMAN: I'd be happy to follow up with you on that.

SEAN CASTEN: I yield back.

TIM MOORE: Gentleman yields back. The chair recognizes the gentleman from the great state of Iowa, Mr. Nunn, for five minutes.

ZACH NUNN: Well, thank you, Chairman Moore, I appreciate that, and thank you very much for this panel being here today. I want to highlight, you know, folks back in Iowa right now as a Midwestern gal yourself, they're Ms. Bowman, community banks, credit unions they provide loans that keep us all farming. Small businesses are growing and family budgets on track.

The work your panel specifically has done here, and refocusing supervision on real risk, tailoring regulations to size and complexity, and ending Operation Chokepoint 2.0 is exactly what our communities need, and I appreciate you guys all leading forward on this. I spent most of my career as an intelligence officer, so I'll be very direct, AML modernization is long overdue.

Every year, financial institutions file more than four million suspicious activity reports, or SARS, 20 million currency transaction reports, yet fewer than one percent of these SARS has led to an investigation, and only five percent of the CTRs every access by law enforcement. I think we all see the result of this, that is, millions of reports, billions of compliance costs, and very little actionable intelligence to be able to go after.

I would offer, we need to be shifting quantity for quality in this area. In April, a joint AML/CFT proposed rule would be a -- was a meaningful step forward but real reform requires enforcement that evolves alongside the rules. Comptroller Gould, Chairman Hill, Chairman Hauptman, can you provide a commitment for in -- basically helping us enforce this?

I think we are all on the same page here. I just want to verbally hear that we're all committed to making sure that that level of compliance goes forward. Chairman Gould?

JONATHAN GOULD: Yes, sir. Yes we're happy to work with main [ph] Treasury and --

TRAVIS HILL: Absolutely.

ZACH NUNN: Good. Um, look, I think, Chairman Gould, you highlighted here that this is a matter of national security as well as what we can do on economic security. The specific changes would allow a community institution to redirect compliance resources towards identifying genuine threats and bad actors. With that, I want to highlight something that my colleague across the aisle, Mr. Casten, raised a number of issues with you, Mr. Gould.

I want to give you first an opportunity to respond, I think you got cut off there, and then also talk about what we're trying to do on the enforcement side moving forward. Um, so, I turn it over to you for any response.

JONATHAN GOULD: I mean, thank you very much. I mean, obviously before a bank actually opens for business, it has to have an operational BSA, AML compliance program that meets our standards. However, we have a two-phase program to how we charter a bank, potentially. While a bank's information, it gets an early nod or not from us as to whether or not we think it has a reasonable chance of success.

After it gets that nod or declination, as the case may be, then it does the hard work of building the policies and procedures, hiring the people, raising the capital. This is just common sense. Um, and this is what we've always said we've done, we just haven't, in all cases in practice, historically, lived up to our own stated procedures and the statutory criteria.

Thank you.

ZACH NUNN: I think that's very well said. And coming from the state of Iowa where we have some of the highest number of lenders as a percentage of capital in the country, our guys understand and get this. I don't think that we need to confuse the issue, we need to be able to go after real AML modernization. Um, Vice Chairman Bowman, thank you, first of all for hosting us, meeting with us one on one on a lot of these issues.

Your board has done the revised, uh, work for Basel III proposal. The 2023 version would have squeezed credit to Iowa farmers, home buyers and small businesses. The 2026 proposal corrects that overreach, and a companion G-SIB surcharge adjustment delivers the kind of tailoring that your committee has long -- or this committee has long called for, and you have long called for.

Together, these proposals show what risk based economically grounded capital reform looks like. Could you walk us through how a revised standard approach better captures actual risk profile, particularly for agriculture and mortgage lending?

MICHELLE BOWMAN: This is one of the important areas that we identified in the original proposal from 2023, I can't remember when it was originally introduced. But we've learned a significant amount from the number of comments that were submitted from that proposal. One of them is this important issue with agriculture and commodities.

We look forward to receiving comments through the comment process. That process ends June 18, and hopefully we've gotten the balance right in this proposal, but we look forward to understanding if it needs improvement or if we've if we've aligned it correctly.

ZACH NUNN: Very good, thank you, chairman.

MICHELLE BOWMAN: Thanks.

ZACH NUNN: Mr. Chair, I'd just like to take a brief moment of personal privilege in my last 30 seconds here to say that, tragically, I'm going to be losing one of our top staffers. Ms. Caroline Sayers is headed off to work for Ms. McClain. She has been a leader here in the committee on leading more bills than anyone else, other than you, Mr. Chair.

And so, we're thrilled that Ms. Sayers is going to stay with us on financial services. But, Caroline, we wish you a lot of luck. Thank you for everything you've done for the folks of Iowa back home, and good luck in your next mission. Team, thank you for being here today, appreciate it.

FRENCH HILL: Gentleman yields back. Chair recognizes the gentlewoman from Michigan, Ms. Tlaib, for five minutes.

RASHIDA TLAIB: Thank you so much, chairman. Vice Chair Bowman, Bloomberg and Reuters had reported in April that you met with big bank CEOs, is that correct?

MICHELLE BOWMAN: I'm sorry, I didn't understand what you said.

RASHIDA TLAIB: Bloomberg and Reuters had reported in April that you met with big bank CEOs, like -- including JP Morgan, Chase and Goldman Sachs to direct their commenting strategy with Basel Bank?

MICHELLE BOWMAN: I frequently meet with CEOs of all sizes of banks.

RASHIDA TLAIB: But you met with institutions?

MICHELLE BOWMAN: Yes, I meet with a number of institutions.

RASHIDA TLAIB: OK, well this is important because I want people to know --

MICHELLE BOWMAN: I did not direct anyone about their comments for the rule

RASHIDA TLAIB: Yeah. OK, well --

MICHELLE BOWMAN: Their comment process is open until --

RASHIDA TLAIB: Reclaiming my time. One second, I'm trying to explain to the public that you meeting with them is actually -- could be unlawful. I would like to submit for the record --

MICHELLE BOWMAN: No, actually that's not accurate. HBO -- HBO versus FCC -- They're supervised institutions. We meet with them regularly.

RASHIDA TLAIB: -- court case for the record.

FRENCH HILL: Without objection.

MICHELLE BOWMAN: It's our responsibility to meet with --

RASHIDA TLAIB: Thank you. Bank capital is the cushion that -- I know, but let me finish. Let me explain myself, I said I think it could be unlawful. So, I'm just going to explain myself. OK, I know, but it's -- I mean, if you were a resident of mine and you know that you met with the big banks and right now it was reported that it was around commenting strategy regarding Basel Bank, you can say, no, that's -- that's fine.

Now, public commenting process is to promote transparency, to gather outside expertise and information. The purpose is not for regulators to increase their influence and manipulate the process. That's why HBO versus FCC is important here in the case law. In there, it says, quote, um, "1977 case, DC court ruled that once a proposed rule has been noticed, which it was, it was, Vice Chair Bowman, an agency official who is, may -- is or may reasonably be expected to be involved in the decision process, should refuse to discuss matters relating to rulemaking proceedings with any interested private party." So, that's what I put into the record.

I just want to notice that I believe there are some, you know, concerns in regards to that. And I'll have you comment in a minute. Bloomberg wrote, Bloomberg, again, wrote, quote, "Bankers walked away from the exchange in the view that they should limit their public comments to constructive feedback." That's what they came out of that meeting with you with.

Again, that was reported in April 23, 2006 [ph], and I would like to submit that for the record. The Bloomberg article.

FRENCH HILL: Without objection.

MICHELLE BOWMAN: We consider all comments --

RASHIDA TLAIB: Will you -- will you commit releasing your calendar and meeting logs to the public, Vice Chair Bowman?

MICHELLE BOWMAN: I'm sorry, could you repeat that?

RASHIDA TLAIB: Will you commit to releasing your calendar and meeting logs to the public?

MICHELLE BOWMAN: We're responsive to FOIA requests.

RASHIDA TLAIB: Oh, you want me to file FOIA? Would you like me to file FOIA?

MICHELLE BOWMAN: If you'd like access to material from the Federal Reserve, that's the -- the general process.

RASHIDA TLAIB: Yeah, so the meeting did happen, at least you acknowledge that.

MICHELLE BOWMAN: I'm not sure what meeting you're referring to. Like I said, I --

RASHIDA TLAIB: I am referring to the meeting --

MICHELLE BOWMAN: -- I meet with bank CEOs all the time.

RASHIDA TLAIB: I'm referring to the meeting in April. In April 2026, did you meet with JP Morgan Chase and Goldman Sachs, yes or no?

MICHELLE BOWMAN: Most likely, yes.

RASHIDA TLAIB: Yes, you did. You actually acknowledged earlier you did, I don't know if you realized that.

MICHELLE BOWMAN: Well, I meet with bank CEOs on a regular basis.

RASHIDA TLAIB: So, for the fed official to take -- I know, but I'm just trying to explain to the public and educate them that they're --

MICHELLE BOWMAN: These are not inappropriate meetings.

RASHIDA TLAIB: We have to follow the process.

MICHELLE BOWMAN: It's my responsibility as the oversight --

RASHIDA TLAIB: Vice Chair Bowman, I'm not the one who ran to Bloomberg and told him that somebody told them to have constructive feedback.

MICHELLE BOWMAN: I think if you've ever read a Bloomberg article, you'd know that they're not always accurate.

RASHIDA TLAIB: It doesn't matter.

MICHELLE BOWMAN: In fact, rarely accurate.

RASHIDA TLAIB: Look at the court record, follow the law.

MICHELLE BOWMAN: Particularly those reporters.

RASHIDA TLAIB: Turning -- Vice Chair Bowman, turning to related concerns, Section 171 of the Dodd-Frank Act, also known as Collins Amendment, smile all you want, people don't trust that kind of stuff -- created minimal capital requirements, y'all. One is large banks face stronger requirements than smaller banks. Two, capital requirements cannot be weaker than those in place at the time of Dodd-frank's enactment.

So, serious questions here. Vice Chair Bowman, or maybe Chair Hill, did your agency consider Collins Amendment? If so, why did you not disclose your legal analysis?

MICHELLE BOWMAN: We're confident that our proposals are in compliance with the Collins Amendment, which requires that large bank capital is higher than that for smaller banks.

RASHIDA TLAIB: OK, great. If that's true, then will you commit to publishing the Federal Reserve's Legal and quantitative analysis -- analysis of the Collins Amendment compliance before issuing the final rule?

MICHELLE BOWMAN: We're happy to be responsive to comments that are filed in the comment process for this rule.

RASHIDA TLAIB: Will you release the analysis that you're -- you just said you guys looked at it. Can you release the analysis and --

MICHELLE BOWMAN: We look forward to reviewing this. If there's a comment, we'd be happy to be responsive to that.

RASHIDA TLAIB: Oh, I'm asking you all, your agency, if you would disclose -- it's OK, I'll file a FOIA. Will you repropose the rule with the complete legal analysis so that the public can provide feedback on your reasoning?

FRENCH HILL: Gentleman's time has expired. Uh, I appreciate the gentlewoman from Massachusetts. The chair now recognizes the gentlewoman from Florida, Ms. Salazar. You're recognized for five minutes.

MARIA ELVIRA SALAZAR: Thank you, Mr. Chairman, and thanks to all of you for being here and giving us your time and your expertise. My name is Maria Salazar, I represent the city of Miami, a city that is full of banks and one of the most prosperous and prettiest cities in the country, but also with a very large immigration or immigrant population living in the city of Miami.

You know that on May 19, the White House issued an executive order that instructs Treasury and the banking regulators to try to identify those people who are undocumented in the country and who use our banking system by opening up, first of all, a company, then getting a tax ID number and then going to a banking institution and opening up a bank account.

Um, I do not always agree with the White House immigration policies established by this administration, sometimes I do, sometimes I don't, but I believe that in this case, this new directive could be, um -- could be damaging to the average American citizen and that's one of the questions that I want to pose to you.

Republicans, we stand for less regulation, less paperwork, less hurdle to do business. So, um, Mr. Gould, thank you for -- for being here and for answering our questions. In other words, do you believe, and tell me what's your personal opinion, that by having this directive coming from the White House, you may be then turning into a CBP agent, not only a banking regulator?

What's your opinion on that?

JONATHAN GOULD: Thank you for the -- thank you for the question.

MARIA ELVIRA SALAZAR: Sure.

JONATHAN GOULD: Um, and with -- with respect, I think your concerns are overblown. They're -- they're overblown? Overblown, yes, ma'am.

MARIA ELVIRA SALAZAR: OK, and tell me why.

JONATHAN GOULD: I'd be happy to tell you why. As a supervisor of the US banking system, I expect it not to be used to facilitate illegal activities, whether it be financial fraud or money laundering or anything of that nature. That is a long standing obligation that we impose on banks and I think it is an expectation that every American citizen has of its US banking system, that it not be used for these things.

As we've seen, fraud is so rampant in this country, particularly in certain states and local localities, the president actually had to convene a task force to address financial fraud.

MARIA ELVIRA SALAZAR: And I agree with you in that regard, that the banking institution cannot be used by others who are not American. But then reality could be -- theory may not be practice. How can you make sure that the average American will not be affected by now establishing another layer of regulation.

JONATHAN GOULD: Well, ma'am, a couple of things. Obviously, you know, we at the OCC are certainly sensitive to regulatory burden, um, in this area as we are in all other areas. The -- the OCC and Financial Crimes Enforcement Network and the federal banking agencies more generally expect banks to know their customers, that is an existing and long standing statutory and regulatory obligation.

Banks have flexibility in the documentation that they use to establish the identities of their customers. So, we look forward to working with banks of all sizes to make sure that they continue to have flexibility to know their customers for these purposes.

MARIA ELVIRA SALAZAR: But don't you think that that flexibility, that obviously the banking system -- the banking sector does not want any type of issues with the -- with the government? Let's put it -- I mean, you guys want to follow with banks want to follow what the -- what the new laws are. So, if I ask you how much money will this be costing you?

How many more individuals or regulators, you would have to be hiring or compliance agents, I should say, in order to satisfy the regulators desires. It means more money, it's more paperwork. That's -- that's the bottom line. Am I right or wrong?

JONATHAN GOULD: Well, again, I think it depends upon how banks are going to establish compliance with guidance that we have yet to even issue. So, I think it's probably appropriate to withhold judgment

until we've actually done the work working with Secretary Bessent and the other federal banking agencies to actually issue guidance pursuant -- pursuant to the EO.

MARIA ELVIRA SALAZAR: So, what you're telling me is that you're not concerned with this new directive coming from the White House, that this could create another burden? More paperwork, more money, more costs for the average banking credit union? That's -- that's what you're telling me? You're not concerned?

JONATHAN GOULD: I think it is a -- I think the president's EO is a common sense reaction to well understood and documented concerns that we are seeing in terms of a rise in financial fraud, money laundering, etc. And from my perspective, as a safety and soundness supervisor, I do want to make sure that the banks I supervise understand the nature of the financial risks --

MARIA ELVIRA SALAZAR: But we do -- we do too, but then what is the difference between now and my time is -- now and before. We were always in the business of making sure that El Chapo does not have access to our banking system. But what is the difference between now and before May 19? And with that, I close.

JONATHAN GOULD: Well -- Ma'am, I would I would just say that this EO focuses us on a well-known and understood issue and directs us to issue guidance directly addressing it. You know, we --

FRENCH HILL: The gentlewoman's time has expired.

MARIA ELVIRA SALAZAR: Thank you for your time.

FRENCH HILL: Chair recognizes the gentleman from South Texas, Mr. Gonzalez. You're recognized for five minutes.

VICENTE GONZALEZ: Thank you, Mr. Chairman. And I'd like to thank everyone for joining us this morning. I -- my -- my question is to Ms. Bowman. Ms. Bowman, the Merchant Banking Modernization Act reflects a bipartisan recognition that current merchant banking rules no longer align with today's economic realities. Under the existing framework, financial holding companies are generally required to divest merchant banking investments after ten years, even though many of these projects, particularly affordable housing and commercial revitalization and energy infrastructure, often require longer timelines to become financially viable.

Rising interest rates, inflation, labor shortages and supply chain disruptions have only extended development timelines further. This legislation received bipartisan support in the House Financial Services Committee because members on both sides of the aisle believed providing greater certainty and flexibility would help facilitate long term investments in projects critical to economic growth and community development.

Do you, ma'am, believe the Federal Reserve should consider providing more consistent flexibility around merchant banking holding periods, rather than relying on a case by case extension to better support these long term investments?

MICHELLE BOWMAN: Well, thank you for bringing up this important issue. I appreciate your concerns and would be happy to take a closer look at your bill and perhaps have a conversation with you about ways that we could consider addressing your concerns.

VICENTE GONZALEZ: Thank you, I would like to do that.

MICHELLE BOWMAN: Thank you.

VICENTE GONZALEZ: Um, Ms. -- the next question is for Mr. Hauptman. Mr. Hauptman, thank you for joining us. I want to take a moment to highlight the critical role critical unions play in South Texas, where they provide access to credit for veterans, small business owners and working families who might otherwise be left behind as a traditional banking system.

As someone who has proudly championed this work, I'm honored to lead HR 507, the Veterans Member Business Loan Act, HR 1791, the Increasing Credit Union Lending for Business Growth Act, and HR 7647, More Opportunities for Homeowners Homeownership Act alongside my friend, Congressman Brian Fitzpatrick. These bills are about empowering credit unions to responsibly support local economies while maintaining strong protections for their members.

My question would be, without asking you to weigh in on any specific legislation, do you believe carefully tailored lending flexibilities for groups like veteran, first time home buyers and small businesses can be implemented consistent with safety, soundness? And can responsible, well underwritten community lending strengthen both credit unions and local economies, the local economies they serve?

KYLE HAUPTMAN: As a general matter, yes. Yes, that is true, we want to be a country that has every niche covered. I was probably well into my 30s before I realized how unique this country was with having so many small depository institutions that serve various niches, including veterans, including immigrant groups, including various industries.

We don't want to be like Australia, which has four banks for the whole country, or Canada, which has six. We want to have all of these niches that are stable, and I think we're a better, more prosperous country because we do have banks that know soybeans and credit unions that know the Broadway industry in New York, for example.

So, we want to have every nook and cranny of this country covered with a financial institution that meets its needs.

VICENTE GONZALEZ: Thank you. I agree with that. Thank you and I yield back.

FRENCH HILL: Gentleman yields back. Chair recognizes the chairwoman who chairs our Capital Markets Subcommittee, Ms. Wagner. You're recognized for five minutes.

ANN WAGNER: I thank you, Mr. Chairman. US banks play an essential role in our capital markets, not just as lenders, but as securities underwriters, liquidity providers, and through other market making activities. These institutions keep capital flowing and help ensure that borrowing costs are stable for families and businesses across the country, including my home state of Missouri.

When the original 2023 Basel III Endgame proposal was released, many of us raised alarms that significant increases in capital requirements would have had drastic consequences for everyday Americans. Um, Vice Chair Bowman, I have a question for you in that regard but first, ma'am, um, I want to give you an opportunity to answer more fully a question that was posed by one of my Democrat colleagues regarding the process, um, of your meeting with stakeholders in our industry.

Ma'am, please.

MICHELLE BOWMAN: It's entirely appropriate for people from the prudential regulators to meet with stakeholders even when a proposal has been introduced or published for comment. There is a disclosure process that's required to say that there was essentially a high level view.

ANN WAGNER: A disclosure process is --

MICHELLE BOWMAN: It's, yeah, it's just a reporting, essentially. We say that there was a conversation and with which stakeholders. It's entirely appropriate for us to do that.

ANN WAGNER: I can't imagine anyone trying to impugn your integrity, ma'am. Uh --

MICHELLE BOWMAN: Thank you.

ANN WAGNER: We hold you in the highest regard. Uh, we also meet with such stakeholders and others in this, uh -- in this industry as we do our thoughtful deliberations. So, I wanted to give you an opportunity to respond to that.

MICHELLE BOWMAN: Thank you, I appreciate that.

ANN WAGNER: Now, moving back to, um, the new Basel III proposal. You've said the goal is to ensure that each requirement, quote, "Aligns with risk, achieves its intended purpose, and avoids creating unintended outcomes. How does this revised proposal strike the right balance of ensuring the resilience of the banking system, while also mitigating any negative impact on US capital markets?

MICHELLE BOWMAN: Well, as -- as you know, our proposal has been published. It was published in March, and our comment period ends in June on the 18th. We look forward to feedback on whether or not we've struck the right balance, especially with respect to capital markets. They're critically important to the US economy and its functioning, and we want to make sure that nothing we do is impairing their ability to serve their customers and the US economy.

ANN WAGNER: Great. Well, thank you very much. Um, one of the central arguments behind my bipartisan INVEST Act is that capital for early stage companies is too concentrated in a handful of coastal cities. Uh, this leaves entrepreneurs in places like Missouri's second Congressional district without access to the financing that they need to get off the ground and scale up. Bank lending to early stage companies, commonly referred to as venture lending, is an important piece of that puzzle.

For entrepreneurs in places like St. Louis, a venture loan from a local bank can be the difference between literally a company growing into a thriving business, um, or not getting started at all. Uh, Comptroller Gould, last December, your agency issued updated guidance on venture lending. This guidance states that the OCCs policy does not discourage banks from engaging in venture lending, but instead places responsibilities for those decisions with bank management rather than prescriptive agency standards.

Can you speak to what was wrong with the OCCs previous 2023 guidance on venture lending, and why this update was necessary?

JONATHAN GOULD: Yes, ma'am. So, our prior guidance treated too often venture -- so-called venture loans as non-pass at origination, which means that very few banks are going to make loans that are classified in that negative way at origination, which of course dried up the venture lending industry and the small businesses that depend upon them.

So, we rescinded that guidance and replaced it with what I would view as more common sense approach.

ANN WAGNER: I agree, much more common sense approach. I thank you for your answer. My time is expiring and I yield back to the chair.

FRENCH HILL: The gentlewoman yields back. The gentleman from New York, Mr. Torres, you're recognized for five minutes.

RITCHIE TORRES: Thank you, Mr. Chair. On March 9, 2023, Silicon Valley Bank saw $42 billion in withdrawals in a single day, one quarter of the bank's total deposits. In a world where deposits can flee a bank at the click of a button, the fed's slow moving discount window can no longer keep pace with a fast moving financial system.

A Federal Reserve without an effective discount window is a little like a hospital without an effective emergency room. Imagine calling 911 and no one responding, or imagine calling 911 and indefinitely being put on hold. That seems to be the experience of the fed's discount window. Chair -- Vice Chair Bowman, the Federal Reserve has 12 reserve banks, each operating its own discount window.

Do all 12 reserve banks have identical procedures?

MICHELLE BOWMAN: They do not.

RITCHIE TORRES: Do all 12 reserve banks maintain identical operating hours?

MICHELLE BOWMAN: I'm not aware specifically, but it's up to the reserve bank to post their operating hours.

RITCHIE TORRES: In the three years since the SVB collapse, has the Federal Reserve undertaken any effort to standardize discount window operations across the system?

MICHELLE BOWMAN: I'm not aware of efforts to standardize the approach, I am aware of efforts to try to modernize the infrastructure.

RITCHIE TORRES: Have those efforts succeeded?

MICHELLE BOWMAN: I think we should probably ask the banking system whether they've succeeded.

RITCHIE TORRES: My -- my frustration is the greatest problem is not that the fed is failing to modernize the discount window, the greatest problem, as far as I can tell, is that the fed is not even trying. If you -- do you have direct jurisdiction over it?

MICHELLE BOWMAN: I do not.

RITCHIE TORRES: OK. If you did, how long would it take you to fix it?

MICHELLE BOWMAN: Uh, I think we have had conversations internally about how long it might take us to resolve that, and we think it would be a period of months.

RITCHIE TORRES: And yet it's been three years since SVB?

MICHELLE BOWMAN: Correct.

RITCHIE TORRES: So, I think the American people have a right to be frustrated by the fed's failure to modernize and standardize the discount window. Like, in my view, in order for the fed to be a lender of last resort, not only on paper, but in practice, it must be capable of responding rapidly to emergencies and rapidly injecting emergency liquidity.

Is that a fair expectation?

MICHELLE BOWMAN: I agree.

RITCHIE TORRES: In April 2026, the Federal Reserve sent a letter to US banks inquiring about their financial exposure to the private credit market. Is the letter an admission that the Federal Reserve has insufficient visibility into the full extent of the banking systems exposure to private credit?

MICHELLE BOWMAN: Yes, as I was discussing with your colleague earlier, there are a number of opacities that exist between bank involvement and where it essentially eventually lands in the non-bank financial space. We have just launched a new data collection that will provide some more transparency and some specificity to where bank lending eventually ends up within the private credit space and within the non-bank space.

We hope that that will provide us with a much better view on -- on where the vulnerabilities might lie.

RITCHIE TORRES: And in your view, what is the nature of the challenge confronting private credit? Do you think of it as a problem with liquidity, or is there evidence of a deeper problem with credit quality? How do you think about the nature of the problem?

MICHELLE BOWMAN: Well, I think private credit is a very important service. I think unfortunately, since the financial crisis back in the 2008, 2009 period, some of the restrictions that were put in place on banking activity kept them from being able to directly fund activities that have now migrated outside of the regulated banking space and into a more opaque market of non-bank financial institutions.

So, what we're trying to do with some of the capital rules, especially with Basel III, was to bring some of that activity back into the banking system so that we have a much better view and an ability to supervise that activity. We did see from some of the bankruptcies and challenges last fall with several private credit funds that there was -- there were poor collateral management, there was some fraud that was occurring and then others, bankruptcies and a lack of clear disclosures, I think.

RITCHIE TORRES: And I probably should nuance, you know, if you have a private credit fund that has excessive exposure to software, right, the problem is not private credit. The problem is concentration in a single sector of the economy --

MICHELLE BOWMAN: It can be, yes.

RITCHIE TORRES: -- undergoing technological disruption and concentration is dangerous in both public and private markets. And so, how should we think about the problem? Is it about private versus public or is it about concentration versus diversification?

MICHELLE BOWMAN: I think generally it's about underwriting quality. And if you're looking at a particular industry that may be more vulnerable to shocks or erosion of its previous positioning, then you should take that into account as you're trying to understand how you should structure a loan.

RITCHIE TORRES: I see my -- my time is expired. So --

MICHELLE BOWMAN: Thank you.

FRENCH HILL: Gentleman from New York yields back. The chair recognizes last, but certainly not least, the distinguished Chair of our House Subcommittee on Financial Institutions, Mr. Barr of Kentucky. You're recognized for five minutes.

ANDY BARR: Thank you, Mr. Chairman, and thanks to our witnesses today for the good work that all of you all are doing. And, Vice Chair Bowman, let me start with you and I want to follow-up the line of

questioning from my colleague, the vice chair from Michigan, Mr. Huizenga, about the external review that you have commissioned.

And you commissioned that review of the supervisory and bank management failures that led to the 2023 collapse of Silicon Valley Bank and other institutions. You cited the inadequacy of the fed's previous internal review, led by your predecessor, Michael Barr, which was overly focused on non-core issues.

The question I have is, is the consultant that you hired, uh, to conduct that external independent review, are they receiving the cooperation that they are owed by the regulators at the fed?

MICHELLE BOWMAN: Uh, my understanding is that several people have refused to be interviewed.

ANDY BARR: That's very troubling to me. Uh, Congress wants answers. We need in a bipartisan way this committee deserves answers, objective answers, about what were the true supervisory and bank management failures that led to the collapse of the of those institutions and the subsequent run on deposits. So, just to confirm, you're telling me that regulators at the fed have not been sufficiently responsive to the consultant's requests?

MICHELLE BOWMAN: At this point, as far as I know, yes.

ANDY BARR: OK. Well, let it be known at the Federal Reserve that Congress expects compliance with all requests from this consultant. That is our intention, and we applaud you for commissioning an independent external review of the supervisory failures that led to the collapse of Silicon Valley Bank, especially at the San Francisco fed.

Um, let me -- let me move on to the importance of tailoring regulations. Chair -- Vice Chair Bowman, when you last testified before this committee, you emphasized that indexing thresholds is critical, especially for community banks. That concern is one of the reasons why I introduced the Community Bank Regulatory Tailoring Act earlier this year.

That bill updates outdated regulatory thresholds for community banks to reflect nominal GDP growth, preventing community banks and credit unions from facing higher regulatory burdens solely due to inflation and economic growth. Chairman Hill likewise recognized the importance of this issue by including this community financial institution indexing in the Main Street Capital Access Act. Question Vice Chair Bowman, do you agree that updating in statute these thresholds to reflect inflation and economic growth is necessary to ensure community banks and credit unions are regulated based on their actual risk profiles, while also allowing regulators to better target supervisory resources toward institutions and activities that pose the greatest risks to the financial system?

MICHELLE BOWMAN: I think it would be very helpful to have a statute that indicated that there should be an increase in the thresholds, as well as an ongoing indexing, yes.

ANDY BARR: And the committee on -- onto Basel III. The committee has welcomed the fed's efforts to incorporate bipartisan feedback and move toward a more balanced bank capital framework. I think, uh, your proposal deserves a lot of credit for inviting banks back into mortgage lending and servicing. Uh, we do have an affordability crisis in housing in this country, but as the chairman pointed out in his opening statement, it's not just about inadequate supply, that's a problem with affordability, but it's also about mortgage lending and deployment of capital.

Um, the proposal represents a significant improvement in this regard, ensuring that capital requirements are appropriately tailored to risk without unnecessarily restricting lending. Um, in your view, why is it important that capital requirements be carefully calibrated to risk? And what -- what effect can an overly

restricted capital standards have on the ability of Americans to access critical financing, especially in in the housing market?

MICHELLE BOWMAN: So, what we saw from the original Dodd-Frank regulations or the regulations that were written to support Dodd-Frank. One, it improved capital in the banking system exponentially, but it also pushed a lot of activity outside of the banking system that was traditional safe and sound banking activity. So, what we've done through our capital proposals is to try to bring that activity back inside the regulatory perimeter so that banks can engage in traditional banking activities in ways that are not --

ANDY BARR: Really -- really quickly to Comptroller Gould, the OCCs recent rulings on preemption are very important. You've said that preemption isn't a big bank versus small bank issue, that even community banks benefit because there's no longer limited by arbitrary geographies. Quickly, can you speak to how defending a uniform framework -- framework advances a competitive environment for banks?

JONATHAN GOULD: Yes, sir. It allows more banks to compete with one another by creating nationwide markets in which they can compete on even terms.

FRENCH HILL: Mr. Barr, your time has expired.

ANDY BARR: Thank you, Mr. Chairman.

FRENCH HILL: I want to thank our witnesses for their testimony today. We appreciate all of you being here and sharing your expertise with us, taking our questions. Without objection, all members will have five legislative days to submit additional written questions for the witnesses to the chair. Questions will be forwarded to the witnesses for their response and witnesses, we invite you to respond no later than July 9. This hearing is adjourned.

## Classification

**Language:** ENGLISH

**Subject:** BANKING & FINANCE (%); BANKING & FINANCE AGENCIES (%); BANKING INSTITUTIONS & SYSTEMS (%); REGULATORY COMPLIANCE (%); LEGISLATION (%); SAFETY (%); REAL ESTATE (%); FRIENDLY & PROVIDENT SOCIETIES (%); FINANCIAL TECHNOLOGY (%); CONSUMERS (%); BANKING & FINANCE REGULATORY COMPLIANCE (%); INNOVATION (%); FINANCIAL INCLUSION (%); BLOCKCHAIN (%); COMMUNITY BANKS (%); FINANCIAL RISK MANAGEMENT (%); SAVINGS INSTITUTIONS (%); CREDIT UNIONS (%); STABLECOINS (%); DIGITAL CURRENCY (%); TECHNOLOGY (%); DIGITAL CURRENCY (62%); TECHNOLOGY (62%); STABLECOINS (65%); SAFETY (89%); INNOVATION (78%); BANKING & FINANCE REGULATORY COMPLIANCE (78%); FINANCIAL RISK MANAGEMENT (72%); CREDIT UNIONS (71%); REGULATORY COMPLIANCE (89%); CONSUMERS (78%); LEGISLATION (89%); BLOCKCHAIN (73%); FINANCIAL TECHNOLOGY (78%)

**Industry:** REAL ESTATE (79%); DIGITAL CURRENCY (62%); COMMUNITY BANKS (72%); STABLECOINS (65%); BANKING & FINANCE REGULATORY COMPLIANCE (78%); FINANCIAL INCLUSION (78%); BANKING & FINANCE (93%); FINANCIAL RISK MANAGEMENT (72%); BANKING & FINANCE OVERVIEW (90%); BANKING INSTITUTIONS & SYSTEMS (89%); REAL ESTATE

OVERVIEW (79%); CREDIT UNIONS (71%); FRIENDLY & PROVIDENT SOCIETIES (78%); SAVINGS INSTITUTIONS (72%); BLOCKCHAIN (73%); FINANCIAL TECHNOLOGY (78%)

**Person:** DONALD TRUMP (55%); FRENCH HILL (91%)

**Geographic:** UNITED STATES (79%)

**Load-Date:** June 6, 2026

---

End of Document